**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**Case No.: _____**

PAUL HONIG, CARLA HONIG,
DAVID LIPPMAN, CAROLYN
LIPPMAN, and JOHN HERTVIK,
on behalf of themselves and a class of
all others similarly situated,

      Plaintiffs,

vs.

BARRY M. KORNFELD,
FERNE E. KORNFELD;
FIRST FINANCIAL TAX GROUP, INC.,
FEK ENTERPRISES, INC.,
and GBH CPAS, PC,

      Defendants,

_____/

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

      Plaintiffs, Paul Honig, Carla Honig, David Lippman, Carolyn Lippman, and John Hertvik, on their own behalf and on behalf of all others similarly situated (collectively, "Plaintiffs"), sue Defendants Barry M. Kornfeld, Ferne E. Kornfeld, First Financial Tax Group, Inc., FEK Enterprises, Inc., and GBH CPAS, PC based upon the Plaintiffs' personal knowledge and investigations conducted through counsel, including a review of filings and publications of the Securities Exchange Commission ("SEC"), certain transcripts of SEC testimony, media reports, social media, and other analysis and information.

## I.     SUMMARY OF THE ACTION AND CLAIMS

      1.     Plaintiffs bring this action on behalf of a class of all those who purchased investments from Woodbridge Group of Companies, LLC d/b/a Woodbridge Wealth

("Woodbridge") or their affiliated entities. Woodbridge was in fact operated as a Ponzi scheme by Woodbridge's owner and operator, Robert H. Shapiro ("Shapiro").

2.      Plaintiffs were marketed promissory notes, fund equity units and other offerings as low-risk, high-yield investments backed by high interest rate loans made to commercial borrowers.

3.      Investors were promised that they would be repaid from high interest rates that Shapiro's companies were earning on loans made to third-party borrowers. However, nearly all the purported third-party borrowers were actually companies affiliated with Shapiro, which had no revenue, no bank accounts, and never paid any interest under the loans. Because Shapiro was not receiving any actual interest payments from purported borrowers, Shapiro used new investor funds to pay the interest and dividends owed to earlier investors, *i.e.*, the hallmark of a Ponzi scheme.

4.      Defendants each participated in this Ponzi scheme, which raised more than $1.22 billion from over 8,400 unsuspecting investors nationwide, many of whom reside in Florida and in the Southern District of Florida.

5.      Shapiro, through Woodbridge, employed a network of hundreds of in-house and external sales agents who received substantial commissions in exchange for selling the Woodbridge securities to the public.

6.      As of September 30, 2017, Woodbridge raised at least $114 million from approximately 700 investors residing in this District, and Woodbridge paid over $12 million in commissions to over 20 salespersons located in the Southern District of Florida.

7.      The Defendants in this action include members of Woodbridge's sales force and Woodbridge's auditor. Shapiro and the Woodbridge insiders knowingly engineered and executed the fraudulent promissory note scheme, but they did not act alone.

2

8.     Defendants Barry M. Kornfeld, Ferne Kornfeld, First Financial Tax Group, Inc. and FEK Enterprises sold the Woodbridge investments to the public, and they knew or should have known that their representations and sales pitches to the Plaintiffs and other similarly situated investors that Woodbridge's promissory notes, fund equity units and other offerings were "low-risk, high-yield investments backed by high interest rate loans made to commercial borrowers" were false, inaccurate and misleading.

9.     Defendant GBH CPAS, PC served as Woodbridge's financial auditor and ignored the glaring financial red flags reflecting that the Woodbridge enterprise was a fraud.

10.    By December 2017, the fraudulent scheme collapsed, leaving investors with substantial losses, estimated to be at least $961 million in principal.

11.    There is a related action pending in the United States District Court for the Southern District of Florida styled *SEC v. Robert H. Shapiro, Woodbridge Group of Companies, LLC, et al.*, No. 17-24624 (S.D. Fla.) (the "SEC Action").  In its December 20, 2017 Complaint, the SEC alleges that the defendants in the SEC Action have committed numerous violations of the federal securities laws.  The SEC seeks to permanently enjoin the SEC Action defendants from further securities law violations and the appointment of a receiver with respect to Woodbridge and other Shapiro-related entities.  Upon information and belief, the SEC does not seek restitution for the investors who have lost, or who face a substantial risk of losing, their investments.

## II.    THE PARTIES

### A.    Plaintiffs

12.    Plaintiff Paul Honig ("Mr. Honig") is a citizen and resident of Palm Beach County, Florida.  Mr. Honig invested in excess of $1,000,000 in Woodbridge promissory notes and fund equity units.

13.     Plaintiff Carla Honig ("Mrs. Honig") is a citizen and resident of Palm Beach County, Florida.  Mrs. Honig invested in excess of $1,000,000 in Woodbridge promissory notes and fund equity units.

14.     Plaintiff David Lippman ("Mr. Lippman") is a citizen and resident of Palm Beach County, Florida.  Mr. Lippman invested in excess of $100,000 in Woodbridge promissory notes.

15.     Plaintiff Carolyn Lippman ("Mrs. Lippman") is a citizen and resident of Palm Beach County, Florida.  Mrs. Lippman invested in excess of $100,000 in Woodbridge promissory notes.

16.     Plaintiff John Hertvik ("Mr. Hertvik") is a citizen and resident of Palm Beach County, Florida.  Mr. Hertvik invested in excess of $100,000 in Woodbridge promissory notes and fund equity units.

**B.     Defendants**

17.     Defendant Barry M. Kornfeld is a citizen and resident of Broward County, Florida. He holds himself out to be the Founder and principal of First Financial Tax Group, and he conducts his investment advisory business principally in Boca Raton, Florida.

18.     Defendant Ferne E. Kornfeld is married to Defendant Barry Kornfeld, and she is a citizen and resident of Broward County, Florida.  She holds herself out to be the President of First Financial Tax Group and she is the President of FEK Enterprises, Inc., and she conducts her investment advisory business principally in Boca Raton, Florida.

19.     Defendant First Financial Tax Group Inc. ("First Financial") is a Florida corporation with its principal place of business in Boca Raton, Florida.  First Financial is controlled by Barry Kornfeld and Ferne Kornfeld.

20.     Defendant FEK Enterprises Inc. ("FEK Enterprises") is a Florida corporation with its principal place of business in Boca Raton, Florida, and it is the parent company of First

Financial.  FEK Enterprises is controlled by Barry Kornfeld and Ferne Kornfeld.

21.     Defendant GBH CPAS, PC ("GBH CPAS") is a Texas professional corporation with its principal place of business in Houston, Texas.

### C.     Relevant Non-Parties

22.     Robert H. Shapiro ("Shapiro") is a Florida registered voter, and his voter information provides a Palm Beach County address.  Until December 2017, Shapiro served as CEO of Woodbridge Group of Companies, LLC d/b/a Woodbridge Wealth ("Woodbridge") and trustee of the RS Trust.  Woodbridge has served as the main operating company for Shapiro's business with approximately 140 employees in offices in six states, including in Boca Raton, Florida.  Woodbridge formerly operated as Woodbridge Structured Funding LLC and was headquartered in Boca Raton, Florida.

23.     Dayne Roseman ("Roseman") is a resident of California, and was at all relevant times the Managing Director of Woodbridge, and he was involved in and supervised the sales program of Woodbridge securities, including sales to investors in the Southern District of Florida.

24.     Nina Pedersen ("Pedersen") is a citizen and resident of Volusia County, Florida, and was at all relevant times the Comptroller of Woodbridge.

25.     RS Protection Trust ("RS Trust") is an irrevocable domestic asset protection trust settled under Nevada law under the control of Shapiro for the benefit of himself and his family. RS Trust is an umbrella asset trust holding all of Shapiro's business entities and personal assets, including, but not limited to Woodbridge.  RS Trust, as the beneficial owner of all Shapiro's business entities, maintained operational control of each of the investment offerings to Plaintiffs through its ownership of Woodbridge

26.     WMF Management, LLC ("WMF Management") is a California LLC controlled by Shapiro. WMF is a holding company for many of the companies comprising the Woodbridge

Group Enterprise, all of which Shapiro controlled and operated, and which include Woodbridge Group of Companies, LLC, Woodbridge Mortgage Investment Fund 1, LLC, Woodbridge Mortgage Investment Fund 2, LLC, Woodbridge Mortgage Investment Fund 3, LLC, Woodbridge Mortgage Investment Fund 3A, LLC, Woodbridge Mortgage Investment Fund 4, LLC, Woodbridge Commercial Bridge Loan Fund 1, LLC, and Woodbridge Commercial Bridge Loan Fund 2, LLC (all of the foregoing referred to collectively as the "Woodbridge Investment Companies").

27.     Woodbridge Structured Funding, LLC ("WSF") is a Delaware LLC formed on July 20, 2009 and controlled by Shapiro.  From 2012 through approximately 2015, WSF served as the operating company of Shapiro's business entities, including but not limited to, the securities offerings at issue, and maintained Shapiro's businesses' primary bank account.

## III.     JURISDICTION AND VENUE

28.     This court has original jurisdiction over the subject matter of this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d).  Plaintiffs are residents of Florida and throughout the United States, and Defendants reside in Florida and Texas.  The amount in controversy exceeds $5 million and there are over 100 members of the putative class.

29.     This Court has personal jurisdiction over Defendants Barry Kornfeld, Ferne Kornfeld, First Financial, and FEK Enterprises because they are residents of Florida.  The Court also has personal jurisdiction over each Defendant under Florida's long-arm statute because they have all conducted continuous and systematic business in the State of Florida and are therefore subject to general jurisdiction. Alternatively, Defendants are subject to specific jurisdiction in Florida because they all participated in and committed tortious acts directed toward Florida as alleged herein.

30.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the Defendants can be found or transact business in this District.  Venue is also proper because Plaintiffs reside in this District and/or the acts and transactions alleged herein occurred in substantial part in this judicial district.   A substantial amount of investor funds were raised from Florida residents.

31.     All conditions precedent to the filing of this action have occurred or have been waived.

## IV.   FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### A.      The Woodbridge Scheme

32.      Woodbridge raised more than $1.22 billion from over 8,400 investors nationwide. At least 2,600 of these investors used their individual retirement account funds to invest nearly $400 million.

33.     Beginning in July 2012 through at least December 4, 2017, Shapiro orchestrated a Ponzi scheme using Woodbridge entities. Woodbridge was the principal operating company of Shapiro's businesses and employed approximately 140 people in offices in six states.  Shapiro was the sole owner, and maintained exclusive operational control over Woodbridge and each of its entities.

34.     Woodbridge sold investors two primary types of investments.  The first was a twelve-to-eighteen month term promissory note marketed as paying a 5%-8% annual return on a monthly basis known as First Position Commercial Mortgages ("FPCM").  The second was seven different private placement fund offerings with five-year terms ("Fund Offerings"), marketed as paying a 6%-10% annual return on a monthly basis and, at the end of five years, a 2% accrued dividend and share of the profits.

35.     Neither of these two types of investments were ever registered with the SEC or another government agency.

36.     The purported revenue source enabling Woodbridge to pay returns to investors was the interest a Woodbridge affiliate would be receiving on loans to third-party owners of commercial real estate. Woodbridge represented to investors that its affiliate would pool money from many investors and lend it to a third-party borrower for a short term, and for only about two-thirds of the value of the real estate securing the transaction, thereby ensuring that the "properties that secure the mortgages are worth considerably more than the loans themselves at closing."

37.     Woodbridge told investors that these third-party borrowers were paying the company 11- 15% annual interest for "hard money," short-term financing. As an additional source of revenue, Woodbridge told investors that it would purchase properties to develop and sell for a profit.

38.     In reality, Woodbridge's business model was a sham – the vast majority of the purported third-party borrowers were hundreds of Shapiro-owned and controlled LLCs, which had no source of income, no bank accounts, and never made any loan payments to Woodbridge, all facts Woodbridge and Shapiro concealed from investors. Rather, Shapiro and Woodbridge continued the ruse for the past several years by supporting their business operations nearly entirely by raising and using new investor funds, in classic Ponzi scheme fashion.

**B.     Woodbridge's Sales Force and False Marketing**

39.     Because of the third-party borrowers' lack of revenue and lack of ability to make interest payments, Woodbridge and Shapiro required the continuous infusion of new funds from investors to keep the scheme afloat.

40.     Thus, the Woodbridge scheme depended on a sales team of approximately 30 in-house employees who operated within Woodbridge's offices. Woodbridge also relied on a network of several hundred external sales agents to solicit investments from the public.

41.     External sales agents solicited the general public through television, radio, and newspaper advertising, cold calling, social media, websites, seminars, and in-person presentations.

42.     Virtually none of these sales agents were registered with any regulatory agency, which was not disclosed to investors.

43.     Woodbridge paid its external sales agents a 9% wholesale rate, and the sales agents in turn offered the FPCMs to their investor clients at 5% to 8% annual interest, and the external sales agent received the difference.  Woodbridge paid its sales agents more than $64.5 million in commissions.

44.     To generate the large volume of investor funds needed to sustain the scheme, Woodbridge aggressively promoted the FPCM notes by offering incentives, such as cash bonuses to brokers who recommended these investments to their clients. Woodbridge also established a program called "Pass It On," through which brokers were encouraged to inform their colleagues about the FPCM notes.  Under that program, a referring broker would earn 25 basis points on each FPCM sale closed by a broker whom he or she referred.

45.     Woodbridge provided the sales agents with information and sales materials which were in turn provided to investors.  All of the material information in the promotional materials was false.

46.     Woodbridge and its sales force told investors that the third-party borrowers were paying it 11-15% in annual interest for "hard money" loans. The borrowers, Woodbridge told

investors, were bona fide commercial property owners who could not obtain traditional loans and were willing to pay higher interest rates for short-term financing.

47. Woodbridge's marketing materials contained the following graphic regarding the FPCMs:



**Now is the time to forego old-fashioned wealth-building solutions.** Woodbridge Wealth wants to help you diversify your portfolio by participating in the real estate revolution. What does that look like?

First lien as security

**❶ Private Lender** You lend money to Woodbridge for 1 year, and receive 5% monthly interest payments.

**❷ Woodbridge Wealth** Woodbridge funds the real estate property loan, and receives payments from the owner.

**❸ Real Estate Property** The property owner makes payments to Woodbridge and you receive the first lien position as a security.

Let us help you protect your retirement funds from market volatility. We succeed when you succeed. It's that simple.

48. In reality, the claimed interest payments from the purported third-party "property owner" (Circle 3) to Woodbridge (Circle 2) did not exist. Payments from the investors in the FPCMs and in the Funds Investments derived almost exclusively from funds Woodbridge received from other investors.

49. Woodbridge and its sales force lied to investors when claiming that Woodbridge "receives the mortgage payments directly from the borrower, and Woodbridge in turn delivers the

loan payments to you." Woodbridge's promotional FAQ document falsely claimed that "[y]our loan is secured by a hard asset collateral—the property itself."

50.     Woodbridge falsely represented that after one year, the borrower would be obligated to repay Woodbridge the principal amount of the loan and that upon default Woodbridge could foreclose on the property to recover the full amount owed.

51.     Woodbridge told FPCM investors that their returns would be derived from those interest payments, falsely promising the investors a pro rata first-position "lien" interest in the underlying properties: "If you have a first position, that means you have priority over any other liens or claims on a property if the property owner defaults." In the offering memoranda for the Fund Offerings, Woodbridge represented to investors that their funds would be used for real estate acquisitions and investments, including in Woodbridge's own FPCMs. But in fact, Woodbridge directly applied the funds to pay other investors' returns.

52.     Woodbridge's marketing materials state that it "receives the mortgage payments directly from the borrower, and Woodbridge in turn delivers the loan payments to you under your first position documents." That statement was false. Contrary to Woodbridge's representations, the great majority of the purported third-party borrowers were hundreds of Shapiro owned and controlled LLCs with no bank account or source of income, and which never made any loan payments to Woodbridge. Shapiro and his sales team concealed these facts from investors.

53.     Woodbridge raised at least $1.22 billion from FPCM and Fund Offering investors but issued only approximately $675 million in "loans" for real estate purportedly securing the investments. Instead of generating the promised 11-15% interest, the loans generated only $13.7 million from third-party borrowers — far less than required to operate Woodbridge's business and pay investor returns.

### C.       The Woodbridge Insiders.

54.      Shapiro orchestrated and operated the fraud through Woodbridge and its various affiliated entities.

55.      Roseman was Woodbridge's Managing Director and Head of Sales, and he reported directly to Shapiro.  Roseman directed internal and external sales agents to continue to raise funds from investors knowing that Woodbridge had no inventory of available real property and lacked revenue from development activity necessary to make interest payments to investors.

56.      Roseman was responsible for ensuring that the sales force followed the Woodbridge "script," knowing that representations relating to the Woodbridge investments were false or misleading.  Shapiro directed Roseman to, and Roseman did in fact, withhold material information from investors.

57.      Shapiro employed the RS Trust to conceal his fraudulent scheme and hide the fact that most of the third-party borrowers and owners of the underlying property were Shapiro and his family.  Shapiro owns the real estate properties ultimately through RS Trust, whose trustee is Shapiro. None of the publicly available documentation indicated that RS Trust was the ultimate owner of the underlying properties that had been purchased with FPCM and Fund investors' funds. Investors were not told that the vast majority of loans were made to entities that had no revenue and that Shapiro controlled through RS Trust.

58.      Woodbridge used an internal bookkeeping system managed by Nina Pedersen, its Comptroller, who is not a CPA and who completed only one year's worth of college accounting classes.  Pedersen operated from a satellite office in Daytona Beach, Florida, where she supervised other Woodbridge employees and maintained the company's financial records with daily instructions from Shapiro.

59.      Upon information and belief, Pedersen provided Shapiro daily notifications of the

company's income and expenses and provided him a monthly report showing the company's revenue and interest payments to investors.

60.     Upon information and belief, at Shapiro's direction, Pedersen "wrote off" amounts that were owed by the Woodbridge Investment Companies to Woodbridge or to its predecessor, WSF.   She concealed transactions which transferred funds from Woodbridge Investment Companies accounts to Woodbridge's main operating account, leaving the Investment Companies with multimillion dollar deficits.   In this manner, millions of dollars in investor deposits were misappropriated and improperly commingled to keep the scheme afloat.

61.     Upon information and belief, Pedersen interacted on a daily basis with Shapiro. She consulted with Shapiro about what to tell Woodbridge's outside auditors.   In doing so, she helped Shapiro and Woodbridge's attempts to mislead auditors about Woodbridge's financial condition and use of investor money.

62.     Upon information and belief, at Shapiro's direction, Pedersen mischaracterized transactions from the Woodbridge operating account, which were often used to pay for mortgages on the property secretly purchased through the Trust or to pay commissions to Woodbridge's external sales force.

### D.     Defendants' Participation in the Woodbridge Scheme

63.     Shapiro defrauded Woodbridge investors, but he did not act alone, and the scheme could not have been possible without the participation of others.

#### (i)     *External Sales Force Defendants Barry and Ferne Kornfeld, First Financial and FEK Enterprises, Inc*

64.     Barry Kornfeld and Ferne Kornfeld are husband and wife, are business partners, and were among the external sales people employed to perpetrate the Woodbridge scheme.

65.     Both of the Kornfelds represent themselves to be the principals of "First Financial Tax Group," headquartered in Boca Raton, Florida, with clients in Florida and throughout the United States.

66.     Barry Kornfeld holds himself out to be a financial advisor with an "unsurpassed level of expertise" and promises "trusting relationships with his clients" and "the best possible results."[1]   Barry Kornfeld claims a specialized focus on providing retirees and senior citizens with guaranteed income financial products to "ensure lives of prosperity and security in retirement" based on his purported understanding of "the complex psychology of aging and retirement planning."[2]

67.     Barry Kornfeld actively promoted the Woodbridge FPCM investments.  According to his blog, "A short term fixed-rate vehicle that Barry M. Kornfeld offers is first position commercial mortgages, which pay out 6% or higher, on an annual basis, with interest paid monthly."[3]   Barry Kornfeld promotes himself as having "specialized knowledge of Co-Lending Opportunities. . . which are also known as first position commercial mortgage notes (FPCMs)." He promotes the FPCMs as safe and secure with a fixed high return.[4]

68.     Barry Kornfeld has a checkered past, and he failed to disclose to any of his actual or potential clients – including the Plaintiffs – that he has been barred from the securities industry and from associating with any broker dealer or investment advisor as a result of regulatory actions taken by the SEC and the Financial Industry Regulatory Authority ("FINRA").  In fact, the SEC previously charged Barry Kornfeld with securities fraud for representing to retiree clients that

---

[1] *See* https://www.linkedin.com/in/barrykornfeld (last visited 12/26/17).

[2] *Id.*

[3] *See* https://barykornfeld.wordpress.com (last visited 12/26/17).

[4] *See id.*

collateralized mortgage obligations ("CMOS") were safe and secure investments.

69.     Ferne Kornfield is a former registered securities broker who promotes herself as an experienced investment advisor specializing in providing investment advice and "guaranteed" returns to retirees as the President of First Financial Tax Group.  According to Ferne Kornfeld:[5]

> If you are looking for guaranteed income in retirement and estate planning solutions that work no matter which way the markets go, then we're a firm you'll want to talk to.  I am a warm and caring financial professional specializing in holistic retirement planning for pre and post retirees.  We integrate all aspects of life . . . guaranteed income, taxes, growth, inflation, estate planning, into a comprehensive & fluid plan to achieve a stress-free retirement.  I have over 20 years' experience helping conservative investors seeking preservatrion of capital, guaranteed income and secure family planning strategies regardless of the ups & downs of the market or economic conditions.  We are passionate about what we do & the people we help, and we are on a mission to make our clients' retirement everything they want it to be!

70.     Barry Kornfeld and Ferne Kornfeld hold Ferne Kornfeld out to be an "instructor" of Baby Boomer Retirement Planning courses and Social Security Income Optimization Courses (the "Courses").  The Kornfelds used the Courses as a tool for targeting potential clients and soliciting attendees to invest in Woodbridge investments, pitching them as safe and secure.

71.     Plaintiffs Paul and Carla Honig (among many others) were specifically targeted, solicited and induced to invest in Woodbridge investments by the Kornfelds after attending the Ferne Kornfeld Course.

72.     The Kornfeld Defendants recommended and sold Woodbridge investments to Plaintiffs.  Upon information and belief, the Kornfeld Defendants sold Woodbridge investments to hundreds of additional investors in Florida and throughout the United States.

---

[5] *See* https://www.linkedin.com/in/ferne-kornfeld-13048159/ (last visited on 12/27/17).

73.     Shapiro and Roseman characterized the Kornfelds as among the top producers of Woodbridge investor funds.  According to Barry Kornfeld's sworn testimony to the SEC, the Kornfelds have at least 300 clients who invested over $50 million in Woodbridge investments.

74.     As such, the Kornfelds provided a constant and significant source of investor funds necessary to prop up and keep the Ponzi scheme afloat.  This in turn allowed Shapiro and Woodbridge to continue to defraud investors throughout the country, including those who did not purchase securities directly from the Kornfelds.

### (ii)    *GBH CPAS*

75.     Defendant GBH CPAS is an accounting firm specializing in providing audit services for public companies and closely-held private companies.  GBH CPAS performed audit and accounting services for Woodbridge and its affiliated Woodbridge entities during the time Woodbridge was operating as a Ponzi scheme.

76.     In order to perform its auditing functions, GBH CPAS, including through its Senior Audit Manager Cory Ellspermann, communicated directly and regularly with Shapiro and Pedersen in her Florida office for information about the Woodbridge entities' business activities and financial books, records, and bank accounts.  For example, in a series of 2015 emails, Mr. Ellspermann requested information related to the financial and banking records for Woodbridge mortgage investments funds, the Woodbridge Investment Companies, and Woodbridge Structured Funding, and he received responses from Pedersen.

77.     As Woodbridge's external auditor, GBH CPAS played a crucial role in validating Woodbridge's financial information and had a duty to ensure that the financial information did not contain misstatements and were free from fraud.  In fulfilling this duty, GBH CPAS was required to obtain a thorough understanding of Woodbridge's operations, internal controls, and business

model.   GBH CPAS was required to ensure that evidence of Woodbridge's financial condition was obtained from reliable sources.

78.     GBH CPAS failed to fulfill these duties and thereby assisted Shapiro and Woodbridge in perpetrating the Ponzi scheme and defrauding investors.

79.     GBH CPAS accepted questionable financial information from Pedersen, who was an unreliable source of information given her patent lack of accounting experience or expertise.

80.     GBH CPAS failed to address or simply ignored numerous glaring financial red flags at Woodbridge:

a.      That the Woodbridge enterprise did not generate sufficient profits to pay promised returns to investors.

b.      That the Woodbridge business activities were not consistent with Woodbridge's stated business model.

c.      That the Woodbridge entities' accounting records did not reflect the correct amount of income and assets that is consistent with the cash flow activity reflected in Woodbridge entities' bank records.

d.      That the Woodbridge entities made improper payments of at least $21.2 million to or for the benefit of Shapiro, his relatives or related entities.

e.      That the Woodbridge operating entities' intercompany QuickBooks accounts did not reconcile with the Woodbridge fund entities' intercompany accounts.

f.      That the Woodbridge fund entities' QuickBooks reflect mortgages receivable and some owned real estate assets.  The manner in which the Woodbridge fund entities recorded these assets primarily comprised of journal entries as a "due to" in an intercompany

account. There was no transfer of cash from the Woodbridge fund entities in such transactions, effectively creating assets with only book entries and not represented by a cash transaction.

        g.     That a significant amount of the interest income revenue recorded in the Woodbridge fund entities' QuickBooks was not cash collected from third parties but instead was recorded as an intercompany receivable transaction with the Woodbridge operating entities. Although an intercompany receivable transaction was recorded in the Woodbridge fund entities' QuickBooks, in many instances, no corresponding cash receipt was identified in the Woodbridge operating entities' bank account nor was a corresponding journal entry reflecting the intercompany transaction recorded in the Woodbridge fund entities' QuickBooks.

        h.     That the Woodbridge fund entities recorded assets duplicative of the Woodbridge operating entities.

81.     Moreover, the Woodbridge fund entities' books and records did not include the customary accounting and banking transactional flow that one would expect to see in the bank accounts and Woodbridge fund entities' QuickBooks.  This includes transaction flows relating to the receipt and use of investor funds.  As a result, the Woodbridge entities' accounting records do not reflect the correct amount in income and assets that is consistent with the cash flow activity reflected in the Woodbridge Entities' bank records, resulting in an artificial representation of the income generated and assets available to pay Woodbridge investors.

82.     Had GBH CPAs undertaken the proper analysis and testing of the Woodbridge enterprise, the Woodbridge Investment Companies, and all their financials, it would have determined that the Woodbridge claimed business model could not have functioned as a legitimate or profitable enterprise.  Instead, GBH CPAS failed to audit the Woodbridge enterprise according

to auditing standards, which permitted Woodbridge to misstate its financial condition and perpetuate its fraudulent scheme.

       **D.**    **Misrepresentations Regarding Woodbridge Regulatory Proceedings**

83.    Five states, Texas, Massachusetts, Arizona, Pennsylvania, and Michigan, have issued cease and desist orders against one or more of the Woodbridge entities based on their unregistered sale of securities. Woodbridge nonetheless continued to sell their investment products.

84.    Woodbridge and Shapiro engaged in deceptive conduct with respect to the many other pending state regulatory actions against Woodbridge for its sale of unregistered securities. Shapiro instructed Roseman to affirmatively withhold this information from investors.

85.    Woodbridge's sales agents falsely mischaracterized the dispositions of these regulatory actions to external sales agents claiming that the company was exonerated of any wrongdoing or fraudulent activity" when no such determination was actually made.  Upon information and believe, Barry Kornfeld and Ferne Kornfeld made similar misrepresentations existing and prospective clients, which the Kornfelds knew or should have known were false.

86.    In an apparent attempt to deflect publicity and attention of the regulators and the public, Woodbridge had begun transitioning investors into a new product called a Co-Lending Opportunity ("CLO"). The CLO mirrors the FPCM in every material respect save one - the CLO's term is for 9 months. In email communications, Shapiro and Roseman contended that this small change ensured that the CLO was not a security and that Woodbridge could circumvent the states' regulatory agencies.

87.    Barry Kornfeld has promoted the Woodbridge CLOs to Plaintiffs and other similarly situated individuals as a suitable investment for retirees.  According to an internet post by Barry Kornfeld, "among Barry Kornfeld's firm's specialized offerings are Co-Lending

Opportunities (CLOs), also known as secured bridge loans, which are ideal for retirees and others seeking safer alternatives. They come with set nine-month terms and generate 6% annual interest, paid monthly."[6]

88.    On December 1, 2017, still owing more than $961 million in principal to investors, Woodbridge and Shapiro missed their first interest payments to investors. On December 4, 2017, Shapiro caused most of his companies to declare Chapter 11 bankruptcy (none of which are named Defendants here).

89.    There are no material differences between the actions committed by the Defendants against the Plaintiffs and committed against the other Class members.

## CLASS ACTION ALLEGATIONS

90.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23.  The definition of the Plaintiff class and subclasses are as follows:

   a.    All persons who invested in the Woodbridge FPCMs and Funds, excluding Defendants, their affiliates, subsidiaries, agents, officers, directors and/or employees.

   b.    All persons who invested in Woodbridge FPCMs and Funds who reside in the State of Florida, excluding Defendants, their affiliates, subsidiaries, agents, officers, directors and/or employees.

   c.    All persons who invested in Woodbridge FPCMs and Funds based on the solicitation or participation of the Kornfeld Defendants, excluding Defendants, their affiliates, subsidiaries, agents, officers, directors and/or employees.

---

[6] *See* https://medium.com/@BarryKornfeld/co-lending-opportunities-a-safer-alternative-with-fixed-6-returns-d67dc99f8fb8 (last visited 12/27/17).

91.     Plaintiffs reserve the right to modify or amend the proposed class definitions prior to the time the Court determines whether a class certification is proper.

92.     Defendants subjected the Plaintiffs and the respective Class members to the same unfair, unlawful, and deceptive practices and harmed them in the same matter.

93.     The Class meets the requirements for class certification under Rule 23(a) of the Federal Rules of Civil Procedure.

      a.     <u>Numerosity</u>.  The members of the Class are so numerous that joinder of all members is impracticable.  Defendants' conduct as alleged in this Complaint harmed hundreds of investors in Florida and thousands nationwide.  Individual Class members are ascertainable as they may be identified from records maintained by Defendants, and the precise number of the Class can be determined through discovery; however, the number of Class members are clearly more than can be consolidated in one complaint such that it would be impractical for each Class member to bring suit individually. The members of the Class may be notified of the pendency of this action by mail or otherwise using a form of notice similar to that customarily used in class actions.

      b.     <u>Commonality</u>.  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

        i. whether the Defendants Barry Kornfeld, Ferne Kornfeld, First Financial and FEK Enterprises breached their duty of care or breached their fiduciary duties to the Plaintiffs in soliciting and selling Plaintiffs Woodbridge investments;

        ii. whether the Defendants Barry Kornfeld, Ferne Kornfeld, First Financial and FEK Enterprises made negligent misrepresentations in connection with soliciting and selling Plaintiffs Woodbridge investments;

          iii. whether the Defendants Barry Kornfeld, Ferne Kornfeld, First Financial and FEK Enterprises aided and abetted the Shapiro's breach of fiduciary duties to Woodbridge investors, including Plaintiffs;

          iv. whether and to what extent Plaintiffs were damaged by the wrongful conduct of Barry Kornfeld, Ferne Kornfeld, First Financial and FEK Enterprises;

          v. whether Defendant GBH CPAS was negligent and failed to exercise due professional care in its audits of the Woodbridge enterprise;

          vi. whether and to what extent Plaintiffs were damaged by the negligence of GBH CPAS;

          vii. whether the FPCM and Fund Offerings were securities as defined by state or federal law that had to be registered under the applicable federal or state securities laws and regulations;

          viii. whether the Kornfeld Defendants were engaged in the sale of unregistered securities to Plaintiffs or otherwise participated in the sale of unregistered securities under Chapter 517, Florida Statues;

          ix. whether Plaintiffs are entitled to rescission and/or damages, and in what amounts, under Chapter 517, Florida Statues.

      c.      **Typicality.**  Plaintiffs' claims are typical of the claims of members of the Class as all members of the Class were similarly affected by the Defendants' wrongful conduct in violation of law as alleged herein.  The named Plaintiffs are members of the Class and the losses to the named Plaintiffs are based on the same legal theories.

      d.      **Adequacy**.  Plaintiffs will fairly and adequately represent and protect the interest of the members of the Class, and they are committed to vigorously prosecuting these

claims.  Plaintiffs have retained competent and experienced counsel in litigation of this nature. There is no hostility between Plaintiffs and unnamed Class members.  Plaintiffs do not anticipate any difficulty in the management of this litigation as a class action.

94.     This class action also meets the requirements of Federal Rule of Civil Procedure 23(b)(3).  The common issues outlined herein predominate over any individual issues in the case. A class action is superior to an individual action and to all other available methods of the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

95.     The class members did not discover, and could not with the exercise of reasonable diligence have discovered, the true nature of their losses until the SEC filed its Complaint in the SEC Action on December 20, 2017. The wrongful acts by Defendants were inherently undiscoverable, and Plaintiffs were not aware of facts that would have put them on inquiry notice with respect to Defendants' role in the Woodbridge scheme until now.

**COUNT I**
**Negligence**
**(against Barry Kornfeld, Ferne Kornfeld, First Financial and FEK Enterprises)**

96.     Plaintiffs re-allege Paragraphs 1 through 95, and incorporate the same as if fully set forth herein.

97.     Barry Kornfeld, Ferne Kornfeld, First Financial and FEK Enterprises owed Plaintiffs a duty of due care as investment advisors.  This duty included the obligation to perform reasonable due diligence on Plaintiffs' behalf prior to selling Plaintiffs the Woodbridge FPCMs and Fund Offerings.

98.     Barry Kornfeld, Ferne Kornfeld, First Financial and FEK Enterprises breached their duty of care and were negligent in selling the Woodbridge FPCMs and Fund Offerings. Defendants knew or should have known that Woodbridge investments were fraudulent. Defendants failed to perform any due diligence of Woodbridge, the FPCMs, or the Fund Offerings.

Defendants also ignored numerous red flags concerning the Woodbridge FPCMs and Fund Offerings, including, among other things, that:

a.     The FPCMs and Fund Offerings were unregistered securities, but Defendants did not make (and were not required by Woodbridge to make) any effort to determine whether an investor was accredited or sophisticated;

b.     The Fund Offerings claimed that Woodbridge was paying commissions to "licensed broker/dealers," but Defendant Barry Kornfeld was not registered with any regulatory agency yet received commissions from Woodbridge;

c.     The sales packets supplied by Woodbridge to Defendants for distribution to investors listed examples of real property being used for the FPCMs and Fund Offerings, but those properties were not owned by actual third-party borrowers;

d.     Woodbridge threatened to terminate external sales agents like Defendants who would not permit Woodbridge to contact investors directly about rolling over short-term FPCMs into longer term Fund Offerings;

e.     Despite Woodbridge's purported multi-million dollar nationwide real estate investment and development operations, all Woodbridge checks to investors and sales agents were hand-signed by Shapiro.

99.     Barry Kornfeld, Ferne Kornfeld, First Financial and FEK Enterprises' breach of their duty of care directly and proximately caused the Plaintiffs to sustain significant damages.

**COUNT II**
**Negligent Misrepresentation**
**(against Barry Kornfeld, Ferne Kornfeld, First Financial and FEK Enterprises)**

100.     Plaintiffs re-allege Paragraphs 1 through 95, and incorporate the same as if fully set forth herein.

101.     Barry Kornfeld, Ferne Kornfeld, First Financial and FEK Enterprises made

24

misrepresentations of material facts to Plaintiffs concerning the FPCMs and Fund Offerings, including that:

       a.     The FPCMs used bona fide third-party borrowers who were in need of hard-money loans from Woodbridge, when in fact almost all the borrowers were companies owned and controlled by Shapiro with no source of income and who never made any loan payments;

       b.     The FPCM investors would be paid using the interest from Woodbridge's loans to third-party borrowers, when in fact existing investors were paid almost exclusively from the funds of new investors;

       c.     The Fund Offerings would be funded in part by properties that Woodbridge would purchase to develop and sell for a profit, when in fact little or no development ever occurred, with many properties sitting undeveloped as vacant lots.

102.    Barry Kornfeld, Ferne Kornfeld, First Financial and FEK Enterprises knew or should have known that their misrepresentations were false.

103.    Barry Kornfeld, Ferne Kornfeld, First Financial and FEK Enterprises intended to induce investors to purchase FPCMs and Fund Offerings by the misrepresentations. Defendants had a direct pecuniary interest in making their misrepresentations, because they received commissions from Woodbridge for each new investor they lured into the Ponzi scheme.

104.    Plaintiffs justifiably relied on the misrepresentations of Barry Kornfeld, Ferne Kornfeld, First Financial and FEK Enterprises, and suffered significant damages as a result.

**COUNT III**
**<u>Breach of Fiduciary Duty</u>**
**(against Barry Kornfeld, Ferne Kornfeld, First Financial and FEK Enterprises)**

105.    Plaintiffs re-allege Paragraphs 1 through 95, and incorporate the same as if fully set forth herein.

106.    Barry Kornfeld, Ferne Kornfeld, First Financial and FEK Enterprises held themselves out as experienced investment advisors.  Defendants purported to advise and instruct Plaintiffs on the suitability of the Woodbridge FPCMs and Fund Offerings for their investment needs. Plaintiffs reposed their trust and confidence in Defendants, which Defendants accepted.  As such, Defendants owed the Plaintiffs a fiduciary duty to act fairly and honestly, in good faith, and to make full and fair disclosure of material facts.

107.    Barry Kornfeld, Ferne Kornfeld, First Financial and FEK Enterprises abused and violated their fiduciary duties to Plaintiffs by failing to do sufficient due diligence on the Woodbridge FPCMs and Fund Offerings (if they ever did any at all) prior to selling the FPCMs and Fund Offerings to Plaintiffs.

108.    Barry Kornfeld, Ferne Kornfeld, First Financial and FEK Enterprises abused and violated their fiduciary duties to Plaintiffs by failing to disclose that Defendant Barry Kornfeld was not registered with the SEC or any other regulatory agency, and that he had been barred by the SEC from associating with any broker, dealer, or investment adviser.

109.    Defendants' breaches of fiduciary duty directly and proximately caused the Plaintiffs to sustain significant damages.

**COUNT IV**
**Aiding and Abetting Breach of Fiduciary Duty**
**(against Barry Kornfeld, Ferne Kornfeld, First Financial and FEK Enterprises)**

110.    Plaintiffs re-allege Paragraphs 1 through 95, and incorporate the same as if fully set forth herein.

111.    At all relevant times, Shapiro was the CEO of Woodbridge and the trustee of the RS Protection Trust.

112.    At all relevant times, Shapiro maintained complete or substantially complete control over the Woodbridge group of companies and each of the Woodbridge investment funds.

113.    By reason of his controlling positions, actions, and direct and indirect representations to Plaintiffs and class members, Shapiro owed them fiduciary duties of loyalty, care, and to deal honestly and in good faith.

114.    By selling Plaintiffs and class members promissory notes and fund offerings pursuant to false offering materials, and by misappropriating, commingling, and otherwise misusing investor funds, Shapiro breached fiduciary duties he owed to Plaintiffs and class members.

115.    Defendants Barry Kornfeld, Ferne Kornfeld, First Financial and FEK Enterprises substantially assisted in Shapiro's breaches of fiduciary duty with knowledge, general awareness, or recklessness by inducing investors to purchase FPCMs and Fund Offerings.

116.    Defendants' wrongful conduct proximately caused the Plaintiffs to sustain significant damages.

**COUNT V**
**<u>Negligence</u>**
**(against GBH CPAS)**

117.    Plaintiffs re-allege Paragraphs 1 through 95, and incorporate the same as if fully set forth herein.

118.    GBH CPAS, as Woodbridge's auditors, had a special relationship with Plaintiffs and owed them a duty of care.

119.    GBH CPAS knew that its audits would be relied upon, directly or indirectly, by Plaintiffs in deciding to make or retain investments in Woodbridge.  Among other things, GBH CPAS knew Woodbridge would use the audits to represent to third parties, including investors like Plaintiffs, that Woodbridge had obtained "clean" audited financial statements.

120.     GBH CPAS breached its duty of care to Plaintiffs and was negligent in auditing Woodbridge. GBH CPAS failed to properly audit Woodbridge in accordance with Generally Accepted Auditing Standard (GAAS) and other applicable standards. GBH CPAS failed to perform sufficient due diligence of Woodbridge, the FPCMs, or the Fund Offerings. GBH CPAS also ignored numerous red flags concerning Woodbridge, the FPCMs, or the Fund Offerings, including that:

a.     The Woodbridge Investment Companies' revenue consisted mostly of intercompany receivable transactions, but this was not reflected by corresponding cash receipts in the Woodbridge operating accounts or journal entries in the Woodbridge Investment Companies' financial statements;

b.     The Woodbridge Investment Companies recorded assets that were duplicative of the Woodbridge operating accounts' assets;

c.     The account transactions in the Woodbridge Investment Companies' accounts were highly unusual, and in most cases consisted of investor funds being received, and then immediately transferred to the Woodbridge operating accounts;

d.     There was minimal cash actually received from borrowers for mortgage interest payments, which was the purported source of the Woodbridge FPCM payments and the supposed basis for the entire Woodbridge business model;

e.     There was extensive commingling of funds between the Woodbridge entities, which totaled approximately $1.66 billion.

121.     Plaintiffs foreseeably and reasonably relied, directly or indirectly, on GBH CPAS to exercise such care as ordinarily exercised by outside auditors generally in conducting audits of Woodbridge.

28

122.   GBH CPAS's breach of its duty of care directly and proximately caused the Plaintiffs to sustain significant damages.

**COUNT VI**
**Sale of Unregistered Securities**
**(against Barry Kornfeld, Ferne Kornfeld, First Financial and FEK Enterprises)**

123.   Plaintiff re-alleges the allegations set forth in Paragraph 1 through 95, as if fully set forth herein.

124.   This is a claim against the Barry Kornfeld, Ferne Kornfeld, First Financial and FEK Enterprises for violations of Chapter 517 of the Florida Securities and Investor Protection Act arising from the sale of unregistered securities in the state of Florida.  The offers of FPCMs and Fund investments to residents of Florida violated section 517.211, Florida Statutes, which provides a private right of action for violations of section 517.07, Florida Statutes.

125.   Section 517.07 provides that "[i]t is unlawful and a violation of this chapter for any person to sell or offer to sell a security within this state" unless the security or transaction is "exempt" under Chapter 517, or unless the security is "registered pursuant to this chapter."

126.   The FPCMs and Fund investments are securities as defined in section 517.021(21), Florida Statutes.

127.   Despite attempts to evade compliance with registration requirements by claiming a Regulation D exemption, the nation-wide offering of FPCMs and Fund investments to purportedly "accredited" U.S. investors was in fact an unregistered public offering made in violation of state and federal securities laws.  It was an integrated offering under the securities laws, and, on information and belief, involved each of the following factors that made it a public offering and not a private offering exempt from registration:

a.   The integrated offering involved general solicitation. This general solicitation by Woodbridge affiliates, agents and brokers, included general public advertisements,

publicly distributed magazine articles, television and other communications and media published in print throughout the country, including in Florida, and distributed broadly for general distribution in the United States, including in Florida.

      b.     The integrated offering involved general solicitation through television advertisement, internet advertisement, seminars and meetings conducted in the United States (including Florida).  The integrated offering was conducted through the use of sales seminars, "road shows," and meetings directed at potential offerees and purchasers.

      c.     The integrated offering involved offers to tens of thousands of offerees and purchases by thousands of offerees involving sums of money, in approximately $1 billion, far in excess of that disclosed to the SEC Form D filing with the SEC. The integrated offering involved offers to, and purchases by, at least thousands of investors in the United States (including Florida residents) or those otherwise subject to Florida law.

      d.     The aggregate size of the sales of FPCMs and Fund investments during this period was in excess of $1 billion. The number of investors purchasing the FPCMs and Fund investments in the United States under the Reg. D filing was far in excess of 1,000.

      e.     The offering was made to investors with whom Defendants had no pre-existing relationship, through brokers or affiliates of Woodbridge who were paid substantial and excessive undisclosed commissions in connection with the Notes.

      f.     The offering was made to persons who did not qualify as "accredited United States investors"; and far more than 35 persons who did not qualify as "accredited United States investors" purchased the Notes.

    128.    The FPCMs and Fund investments and transactions are not exempt from registration under the Act, nor were the Notes properly registered as required.

129.    Section 517.211 renders jointly and severally liable each person making the sale "and every director, officer, partner or agent of or for the seller if the director, officer, partner or agent has personally participated or aided in making the sale."

130.    The Defendants acted as an agent for the sellers of FPCMs and Fund investments and their affiliated entities, and the Kornfeld Defendants personally participated in and/or aided in the sale of FPCMs and Fund investments with knowledge that the offer was not exempt from Florida and federal registration requirements.

131.    Pursuant to section 517.211, Florida Statutes, Plaintiff and members of the class are entitled to rescission and actual damages together with interest thereon.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all similarly situated individuals, demands judgment against Defendants as follows:

(1)    a determination that this action be certified as a class action and that Plaintiffs be designated as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel be designated as class counsel;

(2)    awarding Plaintiffs and the Class compensatory damages in an amount to be determined at trial, including interest;

(3)    awarding Plaintiffs and the Class the reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees;

(4)    awarding such other relief that is just, proper, and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff and the Class request a jury trial for any and all claims for which a jury trial is permitted by law.

Dated:  January 6, 2018.

By: */s/ Jonathan B. Butler*
Matthew N. Thibout (FBN 514918)
MThibaut@ciklinlubitz.com
Jonathan B. Butler (FBN 056197)
JButler@ciklinlubitz.com
Jason S. Haselkorn (FBN 052140)
JHaselkorn@ciklinlubitz.com
**CIKLIN LUBITZ & O'CONNELL**
515 North Flagler Drive, 20th Floor
West Palm Beach, FL 33401
T: (561) 832-5900
F: (561) 833-4209
*Co-Counsel for Plaintiffs*

-and-

Joseph G. Galardi (FBN 180572)
galardi@beasleylaw.net
James W. Beasley, Jr. (FBN 145750)
beasley@beasleylaw.net
Andrew S. Kwan (FBN 76539)
kwan@beasleylaw.net
**BEASLEY KRAMER & GALARDI, P.A.**
505 South Flagler Drive, Suite 1500
West Palm Beach, Florida 33401
T: (561) 835-0900
F: (561) 833-4209
*Co-Counsel for Plaintiffs*