# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No.: 9:18-cv-80019-DMM

PAUL HONIG, CARLA HONIG,
DAVID LIPPMAN, CAROLYN
LIPPMAN, JOHN HERTVIK,
GERALD ROY, and HERMANT
NANAVATY on behalf of themselves
and a class of all others similarly situated,

      Plaintiffs,

vs.

BARRY M. KORNFELD,
FERNE E. KORNFELD,
FIRST FINANCIAL TAX GROUP, INC.,
FEK ENTERPRISES, INC., LYNETTE M.
ROBBINS, THEODORE LEUTZ,
KNOWLES SYSTEMS, INC., ALBERT D.
KLAGER, MICHELE KLAGER,
ATLANTIC INSURANCE AND
FINANCIAL SERVICES, INC., ANDREW
G. COSTA, DAVID ANTHONY CUSANO,
JAMES H. GILCHRIST, SR., FLORIDA
TAX ADVISORY SERVICES, INC.,
GORDON C. HANNAH, RETIREMENT
PLANNING SOLUTIONS, LLC,
DOUGLAS R. ANDREW, PARAMOUNT
FINANCIAL SERVICES, INC., ROBERT S.
DAVIS, JR., TONY MACKENZIE, PAULA
BURKE, OLD SECURITY FINANCIAL
GROUP CORP., JAMES D. HELGESON,
KOVAK SECURITIES, INC., JERRY
DAVIS RAINES, HD VEST INVESTMENT
SERVICES, INC., BENJAMIN A.
HEIDARI, WILLIAM BLAIR &
COMPANY, RICHARD D. FRITZ,
PRUDENTIAL ANNUITIES
DISTRIBUTORS, INC., ALAN NEW,
LIGHTHOUSE FINANCIAL ADVISORS,
INC., LUKE DANIEL VAN HOUTEN,
PUTNAM RETAIL MANAGEMENT
LIMITED PARTNERSHIP, INC., DAVID

OUELETTE, SHIELD FINANCIAL
GROUP, INC., PANTHREX ASSET
MANANGEMENT, LLC, HENRY
WIENIEWITZ, WIENIEWITZ WEALTH
MANAGEMENT, LLC, and GBH CPAS,
PC,

       Defendants,

_____/

## FIRST AMENDED CLASS ACTION COMPLAINT
## AND DEMAND FOR JURY TRIAL

Plaintiffs, Paul Honig, Carla Honig, David Lippman, Carolyn Lippman, John Hertvik,

Gerald Roy and Hermant Nanavaty on their own behalf and on behalf of all others similarly

situated (collectively, "Plaintiffs"), sue Defendants Barry M. Kornfeld, Ferne E. Kornfeld, First

Financial Tax Group, Inc., FEK Enterprises, Inc., Lynette M. Robbins, Theodore F. Leutz,

Knowles Systems, Inc., Albert D. Klager, Michelle Klager, Atlantic Insurance and Financial

Services, Inc., Andrew G. Costa, David Anthony Cusano, James H. Gilchrist, Sr., Florida Tax

Advisory Services, Inc., Gordon C. Hannah, Retirement Planning Solutions, LLC, Douglas R.

Andrew, Paramount Financial Services, Inc., Robert S. Davis, Jr., Tony MacKenzie, Paula Burke,

Old Security Financial Group Corp., James D. Helgeson, Kovak Securities, Inc., Jerry Davis

Raines, HD Vest Investment Services, Inc., Benjamin A. Heidari, William Blair & Company,

Richard D. Fritz, Prudential Annuities Distributors, Inc., Alan New, Lighthouse Financial

Advisors, Inc., Luke Daniel Van Houten, Putnam Retail Management Limited Partnership, David

Ouelette, Shield Financial Group, Inc., PanthRex Asset Management, LLC, Henry "Trae"

Wieniewitz, Wieniewitz Wealth Management, LLC, and GBH CPAS, PC,  (individually and

collectively, "Defendants") based upon the Plaintiffs' personal knowledge and investigations

conducted through counsel, including a review of filings and publications of the Securities

Exchange Commission ("SEC"), certain transcripts of SEC testimony, media reports, social media, and other analysis and information.

## I.    SUMMARY OF THE ACTION AND CLAIMS

1.    Plaintiffs bring this action on behalf of a class of all those who purchased investments from Woodbridge Group of Companies, LLC d/b/a Woodbridge Wealth ("Woodbridge") or their affiliated entities.  Woodbridge was in fact operated as a Ponzi scheme by Woodbridge's owner and operator, Robert H. Shapiro ("Shapiro").

2.    Plaintiffs were marketed and sold promissory notes, fund equity units and other offerings as low-risk, high-yield investments backed by high interest rate loans made to commercial borrowers.

3.    Plaintiffs and other Woodbridge investors were promised that they would be repaid from high interest rates that Shapiro's companies were earning on loans made to third-party borrowers.  However, nearly all the purported third-party commercial borrowers were actually companies affiliated with Shapiro, which had no revenue, no bank accounts, and never paid any interest under the loans.  Because Shapiro was not receiving any actual interest payments from purported borrowers, Shapiro used new investor funds to pay the interest and dividends owed to earlier investors, *i.e.*, the hallmark of a Ponzi scheme.

4.    As of September 30, 2017, Woodbridge raised at least $114 million from approximately 700 investors residing in this District, and Woodbridge paid over $12 million in commissions to over 20 salespersons located in the Southern District of Florida.

5.    Shapiro and the Woodbridge insiders knowingly engineered and executed the fraudulent promissory note scheme, but they did not act alone.  Rather, Shapiro, through Woodbridge, employed a network of hundreds of in-house and external sales agents who received

3

substantial commissions in exchange for selling the Woodbridge securities to the public.

6.      The external sales agent Defendants sold the Woodbridge investments to the public, and they knew or should have known that their uniform representations and scripted sales pitches to the Plaintiffs and other similarly situated investors that Woodbridge's promissory notes, fund equity units and other offerings were "low-risk, high-yield investments backed by high interest rate loans made to commercial borrowers" were false, inaccurate and misleading.

7.      Defendant GBH PAS, PC served as Woodbridge's financial auditor and ignored the glaring financial red flags reflecting that the Woodbridge enterprise was a fraud.

8.      Each of the named Defendants agreed to join and participate in a civil conspiracy relating to the Woodbridge investments, and each Defendant committed overt acts in furtherance of the conspiracy that substantially aided and successfully "propped up" Woodbridge's fraudulent scheme.  Indeed, but for the concerted participation and overt acts of each of the Defendants in furtherance of the conspiracy, the Woodbridge scheme would have either failed or unraveled at a much earlier point in time.

9.      With the assistant of the Defendants, Woodbridge raised more than $1.22 billion from over 8,400 unsuspecting investors nationwide, many of whom reside in Florida and in the Southern District of Florida.  By December 2017, however, the scheme collapsed, leaving investors with substantial losses estimated to be at least $961 million in principal alone.

10.      The Plaintiffs and putative class member investors have been gravely injured as a consequence of the Defendants' conduct.  This conduct includes the civil conspiracy of the sales agent Defendants, and each of the named co-conspirator Defendants is liable for the damages resulting from any and all other co-conspirator's actions.

11.     There is a related action pending in the United States District Court for the Southern District of Florida styled *SEC v. Robert H. Shapiro, Woodbridge Group of Companies, LLC, et al.*, No. 17-24624 (S.D. Fla.) (the "SEC Action").  In its December 20, 2017 Complaint, the SEC alleges that the defendants in the SEC Action committed numerous violations of the federal securities laws.  The SEC's Complaint seeks to permanently enjoin the SEC Action defendants from further securities law violations and the appointment of a receiver with respect to Woodbridge and other Shapiro-related entities.  Upon information and belief, the SEC does not seek restitution for the investors who have lost, or who face a substantial risk of losing, their investments.

## II.     THE PARTIES

### A.     Plaintiffs

12.     Plaintiff Paul Honig ("Mr. Honig") is a resident of Palm Beach County, Florida. Mr. Honig invested in excess of $1,000,000 in Woodbridge promissory notes and fund equity units.

13.     Plaintiff Carla Honig ("Mrs. Honig") is a resident of Palm Beach County, Florida. Mrs. Honig invested in excess of $1,000,000 in Woodbridge promissory notes and fund equity units.

14.     Plaintiff David Lippman ("Mr. Lippman") is a resident of Palm Beach County, Florida.  Mr. Lippman invested in excess of $100,000 in Woodbridge promissory notes.

15.     Plaintiff Carolyn Lippman ("Mrs. Lippman") is a resident of Palm Beach County, Florida.  Mrs. Lippman invested in excess of $100,000 in Woodbridge promissory notes.

16.     Plaintiff John Hertvik ("Mr. Hertvik") is a resident of Palm Beach County, Florida. Mr. Hertvik invested in excess of $100,000 in Woodbridge promissory notes and fund equity units.

17.     Plaintiff Gerald Roy ("Mr. Roy") is a resident of Indian River County, Florida.  Mr. Roy invested approximately $450,000 in Woodbridge promissory notes and fund equity units.

18.     Plaintiff Hermant Nanavaty ("Mr. Nanavaty") is a resident of Chicago, Illinois.  Mr. Nanavaty invested in excess of $100,000 in Woodbridge promissory notes.

**B.      The Defendants**

**(i)     *The Sales Agent Defendants***

19.     Defendant Barry M. Kornfeld ("Barry Kornfeld") is resident of Broward County, Florida.  He holds himself out to be the Founder and principal of First Financial Tax Group, and conduct his investment advisory business principally in Boca Raton, Florida.

20.     Defendant Ferne E. Kornfeld ("Ferne Kornfeld") is married to Defendant Barry Kornfeld, and she is a resident of Broward County, Florida.  She holds herself out to be the President of First Financial Tax Group and she is the President of FEK Enterprises, Inc.  Fern Kornfeld conducts her investment advisory business principally in Boca Raton, Florida.

21.     Defendant First Financial Tax Group Inc. ("First Financial") is a Florida corporation with its principal place of business in Boca Raton, Florida.  First Financial is controlled by Barry Kornfeld and Ferne Kornfeld.  At all material times, Barry and Ferne Kornfeld were employed by or affiliated with First Financial and acting within the course and scope of their actual or apparent agency with First Financial.

22.     Defendant FEK Enterprises Inc. ("FEK Enterprises") is a Florida corporation with its principal place of business in Boca Raton, Florida, and it is the parent company of First Financial.  FEK Enterprises is controlled by Barry Kornfeld and Ferne Kornfeld.  At all material times, Barry and Ferne Kornfeld were employed by or affiliated with FEK Enterprises and acting within the course and scope of their actual or apparent agency with FEK Enterprises.

23.     Defendant Lynette M. Robbins ("Robbins") is a resident of Sumter County, Florida.

She holds herself out as an officer and/or director of Knowles Systems, Inc.

24.    Defendant Theodore F. Leutz ("Leutz") is married to Defendant Lynette M. Robbins, and he is a resident of Sumter County, Florida.  He holds herself out as an officer and/or director of Knowles Systems, Inc.

25.    Defendant Knowles Systems, Inc. ("Knowles Systems") is a Delaware corporation authorized to conduct business in Florida, and with its principal place of business in the Villages, Florida.  Knowles Systems is controlled by Defendants Robbins and Leutz.  At all material times, Robbins and Leutz were employed by or affiliated with Knowles Systems and acting within the course and scope of their actual or apparent agency with Knowles Systems.

26.    Defendant Albert D. Klager ("Al Klager") is a resident of Indian River County, Florida.  He holds himself out as an officer and/or director of Atlantic Insurance and Financial Services, Inc.

27.    Defendant Michele Klager ("Michelle Klager") is married to Defendant Al Klager, and a resident of Indian River County, Florida.  She holds herself out as an officer and/or director of Atlantic Insurance and Financial Services, Inc.

28.    Defendant Atlantic Insurance and Financial Services, Inc. ("Atlantic") is a Florida corporation with its principal place of business in Vero Beach, Florida.  Atlantic is controlled by Defendants Al and Michele Klager.  At all material times, Al Klager and Michelle Klager were employed by or affiliated with Atlantic and acting within the course and scope of their actual or apparent agency with Atlantic.

29.    Defendant Andrew G. Costa ("Costa") is a resident of Palm Beach County, Florida.

30.    Defendant David Anthony Cusano ("Cusano") is a resident of Sarasota, Florida.

31.    Defendant James H. Gilchrist, Sr. ("Gilchrist") is resident of Ft. Pierce, Florida.

32.     Defendant Florida Tax Advisory Services, Inc. ("Florida Tax") is a Florida corporation with its principal place of business in Stuart, Florida.  Florida Tax is controlled by Defendant Gilchrist.  At all material times, Gilchrist was employed by or affiliated with Florida Tax and acting within the course and scope of his actual or apparent agency with Gilchrist.

33.     Defendant Gordon C. Hannah ("Hannah") is resident of Stuart, Florida.

34.     Defendant Retirement Planning Solutions, LLC ("Retirement Solutions") is a Florida limited liability corporation with its principal place of business in Stuart, Florida. Retirement Solutions is controlled by Defendant Gordon C. Hannah.  At all material times, Hannah was employed by or affiliated with Retirement Solutions and acting within the course and scope of their actual or apparent agency with Retirement Solutions.

35.     Defendant Douglas R. Andrew ("Andrew") is a resident of Salt Lake City, Utah. He holds himself out to be the Founder and principal of Paramount Financial Services, Inc.

36.     Defendant Paramount Financial Services, Inc. ("Paramount") is a Utah corporation with its principal place of business in Salt Lake City, Utah.  Paramount is controlled by Defendant Andrew, and Paramount and Andrew conduct business as Live Abundant and Live Abundant Financial.  At all material times, Andrew was employed by or affiliated with Paramount and acting within the course and scope of his actual or apparent agency with Paramount.

37.     Defendant Robert S. Davis, Jr. ("Davis") is a resident of Houston, Texas.  Davis holds himself as founder and officer of Old Security Financial Group Corp.

38.     Defendant Tony MacKenzie ("MacKenzie") is resident of Houston, Texas. MacKenzie holds himself as founder and officer of Old Security Financial Group Corp.

39.     Defendant Paula Burke ("Burke") is a resident of Houston, Texas.

40.     Defendant Old Security Financial Group Corp. ("Old Security") is a Texas for profit corporation with its principal place of business in Spring, Texas.  At all material times, Davis, MacKenzie and Burke were employed by or affiliated with Old Security and acting within the course and scope of their actual or apparent agency with Old Security.

41.     Defendant James D. Helgeson ("Helgeson") is a resident of Billings, Montana.

42.     Defendant Kovak Securities, Inc. ("Kovac Securities") is a registered broker-dealer and member firm of the Financial Industry Regulatory Authority ("FINRA"), and which regularly conducts substantial business within the State of Florida.  At all material times, Helgeson was employed by or affiliated with Kovac Securities as a registered representative of the firm, and was acting within the course and scope of his actual or apparent agency with Kovac Securities.

43.     Defendant Jerry Davis Raines ("Raines") is a citizen and resident of Kilgore, Texas.

44.     Defendant HD Vest Investment Services, Inc. ("HD Vest") is a registered broker-dealer and member firm of the Financial Industry Regulatory Authority ("FINRA"), and which regularly conducts substantial business within the State of Florida.  At all material times, Raines was employed by or affiliated with HD Vest as a registered representative of the firm, and was acting within the course and scope of his actual or apparent agency with HD Vest.

45.     Defendant Benjamin A. Heidari ("Heidari") is a citizen and resident of Chicago, Illinois.

46.     Defendant William Blair & Company ("William Blair") is a registered broker-dealer and member firm of the Financial Industry Regulatory Authority ("FINRA"), and which regularly conducts substantial business within the State of Florida.  At all material times, Heidari was employed by or affiliated with William Blair as a registered representative of the firm, and was acting within the course and scope of his actual or apparent agency with William Blair.

47.     Defendant Richard D. Fritz ("Fritz") is a citizen and resident of Galena, Ohio.

48.     Defendant Prudential Annuities Distributors, Inc. ("Prudential Annuities") is a registered broker-dealer and member firm of the Financial Industry Regulatory Authority ("FINRA"), and which regularly conducts substantial business within the State of Florida.  At all material times, Fritz was employed by or affiliated with Prudential Annuities as a registered representative of the firm, and was acting within the course and scope of his actual or apparent agency with Prudential Annuities.

49.     Defendant Alan New ("New") is a resident of Maryland.

50.     Defendant Lighthouse Financial Advisors, Inc., d/b/a Lighthouse Wealth Management ("Lighthouse") is a Maryland corporation with its principal place of business in New Market, Maryland, and a Registered Investment Advisor with the Securities & Exchange Commission.  At all material times, New was employed by or affiliated with Lighthouse as an investment advisor of the firm, and was acting within the course and scope of his actual or apparent agency with Lighthouse.

51.     Defendant Luke Daniel Van Houten ("Van Houten") is a resident of Andover, Massachusetts.

52.     Defendant Putnam Retail Management Limited Partnership ("Putnam Retail") is a registered broker-dealer and member firm of the Financial Industry Regulatory Authority ("FINRA"), with its principal place of business in Boston, Massachusetts.  At all material times, Van Houten was employed by or affiliated with Putnam Retail as a registered representative of the firm, and was acting within the course and scope of his actual or apparent agency with Putnam Retail.

53.     Defendant David Ouelette ("Ouelette") is a resident of San Antonio, Texas. Defendant Ouelette holds himself out as a founder and officer of Defendant Shield Financial Group, Inc.

54.     Defendant Shield Financial Group, Inc. ("Shield Financial") is a Texas corporation with its principal place of business in San Antonio, Texas.  At all material times, Ouelette was employed by or affiliated with Ouelette and acting within the course and scope of his actual or apparent agency with Ouelette.

55.     Defendant PanthRex Asset Management, LLC ("PanthRex") is a Texas limited liability corporation with its principal place of business in Coppell, Texas, and a Registered Investment Advisor with the Securities & Exchange Commission.  At all material times, Ouelette was employed by or affiliated with PanthRex as an investment advisor of the firm, and was acting within the course and scope of his actual or apparent agency with PanthRex.

56.     Defendant Henry "Trae" Wieniewitz ("Wieniewitz") is a resident of Knoxville, Tennessee.

57.     Defendant Wieniewitz Wealth Management, LLC ("Wieniewitz Wealth") is a Tennessee limited liability corporation with its principal place of business in Knoxville, Tennessee, and a Registered Investment Advisor with the Securities & Exchange Commission.  At all material times, Wieniewitz was employed by or affiliated with Wieniewitz Wealth as an investment advisor of the firm, and was acting within the course and scope of his actual or apparent agency with Wieniewitz Wealth.

58.     The Defendants identified in Paragraph 18 through Paragraph 56 herein are collectively referenced herein as the "Sales Agent Defendants."

    **(ii)**    *The Auditor Defendant*

59.    Defendant GBH CPAS, PC ("GBH" or the "Auditor Defendant") is a Texas professional corporation with its principal place of business in Houston, Texas.

    **C.**    **Relevant Non-Party Woodbridge Insiders**

60.    Robert H. Shapiro ("Shapiro") is a Florida registered voter, and his voter information provides a Palm Beach County address. Until December 2017, Shapiro served as CEO of Woodbridge Group of Companies, LLC d/b/a Woodbridge Wealth ("Woodbridge") and trustee of the RS Trust. Woodbridge has served as the main operating company for Shapiro's business with approximately 140 employees in offices in six states, including in Boca Raton, Florida. Woodbridge formerly operated as Woodbridge Structured Funding LLC and was headquartered in Boca Raton, Florida.

61.    Dayne Roseman ("Roseman") is a resident of California, and was at all relevant times the Managing Director of Woodbridge. Roseman was charged by Woodbridge and Shapiro with the responsibility for supervising the sales agents and sales program of Woodbridge securities, including sales to investors in the Southern District of Florida.

62.    Nina Pedersen ("Pedersen") is a resident of Volusia County, Florida, and was at all relevant times the Comptroller of Woodbridge.

63.    RS Protection Trust ("RS Trust") is an irrevocable domestic asset protection trust settled under Nevada law under the control of Shapiro for the benefit of himself and his family. RS Trust is an umbrella asset trust holding all of Shapiro's business entities and personal assets, including, but not limited to Woodbridge. RS Trust, as the beneficial owner of all Shapiro's business entities, maintained operational control of each of the investment offerings to Plaintiffs through its ownership of Woodbridge

64.     WMF Management, LLC ("WMF Management") is a California LLC controlled by Shapiro. WMF is a holding company for many of the companies comprising the Woodbridge Group Enterprise, all of which Shapiro controlled and operated, and which include Woodbridge Group of Companies, LLC, Woodbridge Mortgage Investment Fund 1, .LLC, Woodbridge Mortgage Investment Fund 2, LLC, Woodbridge Mortgage Investment Fund 3, LLC, Woodbridge Mortgage Investment Fund 3A, LLC, Woodbridge Mortgage Investment Fund 4, LLC, Woodbridge Commercial Bridge Loan Fund 1, LLC, and Woodbridge Commercial Bridge Loan Fund 2, LLC (all of the foregoing referred to collectively as the "Woodbridge Investment Companies").

65.     Woodbridge Structured Funding, LLC ("WSF") is a Delaware LLC formed on July 20, 2009 and controlled by Shapiro.  From 2012 through approximately 2015, WSF served as the operating company of Shapiro's business entities, including but not limited to, the securities offerings at issue, and maintained Shapiro's businesses' primary bank account.

### III.     JURISDICTION AND VENUE

66.     This court has original jurisdiction over the subject matter of this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d).  Plaintiffs are residents of Florida and throughout the United States, and Defendants reside in Florida and other states throughout the United States. The amount in controversy exceeds $5 million and there are over 100 members of the putative class.

67.     This Court has personal jurisdiction over Defendants Barry Kornfeld, Ferne Kornfeld, First Financial, FEK Enterprises, Robbins, Leutz, Knowles Systems, Al Klager, Michelle Klager, Atlantic, Hannah, Retirement Planning, Costa, Cusano and Gilchrist because they are residents of the State of Florida and/or conduct regular and substantial business in the State.  The Court has personal jurisdiction over each non-resident Defendant under Florida's long-

arm statute because they have all conducted continuous and systematic business in the State of Florida by and through their co-conspirator Co-Defendants, and are therefore subject to the Court's general jurisdiction.

68.     In addition, the Court has specific long-arm jurisdiction over each of the non-resident Defendants under Florida's long-arm statute because they all participated in and committed tortious acts directed toward Florida.  As described in detail herein, all of the non-resident Sales Agent Defendants, by and through the tortious acts and omissions of their Florida resident co-conspirator Co-Defendants, have engaged in intentional, tortious conduct within the State of Florida, targeting the State of Florida and its citizens, and causing damages to the Plaintiffs within the State of Florida, for the Defendants' own personal enrichment and benefit.  Accordingly, personal jurisdiction over each of the Sales Agent Defendants is constitutionally and statutorily proper under Fla. Stat. §48.193(1)(a).

69.     As further described herein, Defendant GBH caused injury and damages to the Plaintiffs within the State of Florida arising out of GBH's acts and omissions committed outside the State, and at the time of such injury and damages Defendant GBH was engaged in services activities on behalf of Woodbridge and Shapiro for products, materials and things used within the State of Florida in the ordinary course of commerce, trade, or use.  Accordingly, personal jurisdiction over each of Defendant GBH is constitutionally and statutorily proper under Fla. Stat. §48.193(1)(a).

70.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the Defendants can be found or transact business in this District.  Venue is also proper because Plaintiffs reside in this District and/or the acts and transactions alleged herein occurred in

substantial part in this judicial district.   Indeed, a substantial amount of Woodbridge investor funds were raised from Florida residents.

71.     All conditions precedent to the filing of this action have occurred or have been waived.

## IV.    FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### A.    The Woodbridge Scheme

72.     Woodbridge raised more than $1.22 billion from over 8,400 investors nationwide. At least 2,600 of these investors used their individual retirement account funds to invest nearly $400 million.

73.     Beginning in July 2012 through at least December 4, 2017, Shapiro orchestrated a Ponzi scheme using Woodbridge entities. Woodbridge was the principal operating company of Shapiro's businesses and employed approximately 140 people in offices in six states.  Shapiro was the sole owner, and maintained exclusive operational control over Woodbridge and each of its entities.

74.     Woodbridge sold investors two primary types of investments.  The first was a twelve-to-eighteen-month term promissory note marketed as paying a 5%-8% annual return on a monthly basis known as First Position Commercial Mortgages ("FPCM").  The second was seven different private placement fund offerings with five-year terms ("Fund Offerings"), marketed as paying a 6%-10% annual return on a monthly basis and, at the end of five years, a 2% accrued dividend and share of the profits.

75.     Neither of these two types of investments (collectively, "the Woodbridge investments") were ever registered with the SEC or another government agency.

76.     The purported revenue source enabling Woodbridge to pay returns to investors was the interest a Woodbridge affiliate would be receiving on loans to third-party owners of

commercial real estate. Woodbridge represented to investors that its affiliate would pool money from many investors and lend it to a third-party borrower for a short term, and for only about two-thirds of the value of the real estate securing the transaction, thereby ensuring that the "properties that secure the mortgages are worth considerably more than the loans themselves at closing."

77.    Woodbridge told investors that these third-party borrowers were paying the company 11- 15% annual interest for "hard money," short-term financing.  As an additional source of revenue, Woodbridge told investors that it would purchase properties to develop and sell for a profit.

78.    In reality, Woodbridge's business model was a sham – the vast majority of the purported third-party borrowers were hundreds of Shapiro-owned and controlled LLCs, which had no source of income, no bank accounts, and never made any loan payments to Woodbridge, all facts Woodbridge and Shapiro concealed from investors. Rather, Shapiro and Woodbridge continued the ruse for the past several years by supporting their business operations nearly entirely by raising and using new investor funds, in classic Ponzi scheme fashion.

**B.    The Woodbridge Civil Conspiracy**

79.    Because of the third-party borrowers' lack of revenue and lack of ability to make interest payments, Woodbridge and Shapiro required the continuous infusion of new funds from investors to keep the scheme afloat.

80.    Thus, the Woodbridge scheme depended on a sales team of approximately 30 in-house employees who operated within Woodbridge's offices and a network of several hundred external sales agents to solicit investments from the public.

81.    External sales agents solicited the general public through television, radio, and newspaper advertising, cold calling, social media, websites, seminars, and in-person presentations.

82.     Many of the sales agents were not licensed or registered with any regulatory agency, which was not disclosed to investors.

83.     Woodbridge paid its external sales agents a 9% wholesale rate, and the sales agents in turn offered the FPCMs to their investor clients at 5% to 8% annual interest, and the external sales agent received the difference.  Woodbridge paid its sales agents more than $64.5 million in commissions.

84.     To generate the large volume of investor funds needed to sustain the scheme, Woodbridge aggressively promoted the FPCM notes by offering incentives, such as cash bonuses to brokers who recommended these investments to their clients. Woodbridge also established a program called "Pass It On," through which brokers were encouraged to inform their colleagues about the FPCM notes.  Under that program, a referring broker would earn 25 basis points on each FPCM sale closed by a broker whom he or she referred.

85.     Woodbridge provided the sales agents with uniform, scripted information and sales materials which were in turn provided to investors (the "Woodbridge sales script").  All of the material information in the promotional materials was false.

86.     Woodbridge and its sales force told investors that the third-party borrowers were paying it 11-15% in annual interest for "hard money" loans. The borrowers, Woodbridge told investors, were bona fide commercial property owners who could not obtain traditional loans and were willing to pay higher interest rates for short-term financing.

87.     Woodbridge's marketing materials contained the following graphic regarding the FPCMs:

**Now is the time to forego old-fashioned wealth-building solutions.** Woodbridge Wealth wants to help you diversify your portfolio by participating in the real estate revolution. What does that look like?



Let us help you protect your retirement funds from market volatility. We succeed when you succeed. It's that simple.

88.    In reality, the claimed interest payments from the purported third-party "property owner" (Circle 3) to Woodbridge (Circle 2) did not exist.  Payments from the investors in the FPCMs and in the Fund Investments were instead derived almost exclusively from funds Woodbridge received from other investors.

89.    Woodbridge and its sales force lied to investors when claiming that Woodbridge "receives the mortgage payments directly from the borrower, and Woodbridge in turn delivers the loan payments to you."  Woodbridge's promotional FAQ document falsely claimed that "[y]our loan is secured by a hard asset collateral—the property itself."

90.    Woodbridge falsely represented that after one year, the borrower would be obligated to repay Woodbridge the principal amount of the loan and that upon default Woodbridge could foreclose on the property to recover the full amount owed.

91.    Woodbridge told FPCM investors that their returns would be derived from those interest payments, falsely promising the investors a pro rata first-position "lien" interest in the underlying properties: "If you have a first position, that means you have priority over any other liens or claims on a property if the property owner defaults." In the offering memoranda for the Fund Offerings, Woodbridge represented to investors that their funds would be used for real estate acquisitions and investments, including in Woodbridge's own FPCMs. But in fact, Woodbridge directly applied the funds to pay other investors' returns.

92.    Woodbridge's marketing materials state that it "receives the mortgage payments directly from the borrower, and Woodbridge in turn delivers the loan payments to you under your first position documents." That statement was false. Contrary to Woodbridge's representations, the great majority of the purported third-party borrowers were hundreds of Shapiro owned and controlled LLCs with no bank account or source of income, and which never made any loan payments to Woodbridge. Shapiro and his sales team concealed these facts from investors.

93.    Woodbridge raised at least $1.22 billion from FPCM and Fund Offering investors but issued only approximately $675 million in "loans" for real estate purportedly securing the investments. Instead of generating the promised 11-15% interest, the loans generated only $13.7 million from third-party borrowers — far less than required to operate Woodbridge's business and pay investor returns.

### C.    The Role of the Woodbridge Insiders

94.    Shapiro orchestrated and operated the fraud through Woodbridge and its various affiliated entities.

95.    Roseman was Woodbridge's Managing Director and Head of Sales, and he reported directly to Shapiro. Roseman directed internal and external sales agents to continue to raise funds

from investors knowing that Woodbridge had no inventory of available real property and lacked revenue from development activity necessary to make interest payments to investors.

96.     Roseman was responsible for ensuring that the sales force followed the Woodbridge "script," knowing that representations relating to the Woodbridge investments were false or misleading.  Shapiro directed Roseman to, and Roseman did in fact, withhold material information from investors.

97.     Shapiro employed the RS Trust to conceal his fraudulent scheme and hide the fact that most of the third-party borrowers and owners of the underlying property were Shapiro and his family.  Shapiro owns the real estate properties ultimately through RS Trust, whose trustee is Shapiro. None of the publicly available documentation indicated that RS Trust was the ultimate owner of the underlying properties that had been purchased with FPCM and Fund investors' funds. Investors were not told that the vast majority of loans were made to entities that had no revenue and that Shapiro controlled through RS Trust.

98.     Woodbridge used an internal bookkeeping system managed by Nina Pedersen, its Comptroller, who is not a CPA and who completed only one year's worth of college accounting classes.  Pedersen operated from a satellite office in Daytona Beach, Florida, where she supervised other Woodbridge employees and maintained the company's financial records with daily instructions from Shapiro.

99.     Upon information and belief, Pedersen provided Shapiro daily notifications of the company's income and expenses and provided him a monthly report showing the company's revenue and interest payments to investors.

100.     Upon information and belief, at Shapiro's direction, Pedersen "wrote off" amounts that were owed by the Woodbridge Investment Companies to Woodbridge or to its predecessor,

WSF.    She concealed transactions which transferred funds from Woodbridge Investment Companies accounts to Woodbridge's main operating account, leaving the Investment Companies with multimillion dollar deficits.    In this manner, millions of dollars in investor deposits were misappropriated and improperly commingled to keep the scheme afloat.

101.    Upon information and belief, Pedersen interacted on a daily basis with Shapiro. She consulted with Shapiro about what to tell Woodbridge's outside auditors.    In doing so, she helped Shapiro and Woodbridge's attempts to mislead auditors about Woodbridge's financial condition and use of investor money.

102.    Upon information and belief, at Shapiro's direction, Pedersen mischaracterized transactions from the Woodbridge operating account, which were often used to pay for mortgages on the property secretly purchased through the Trust or to pay commissions to Woodbridge's external sales force.

### D.    Defendants' Participation in the Woodbridge Scheme and Conspiracy

103.    Shapiro defrauded Woodbridge investors, but he did not act alone, and the scheme could not have been possible without the participation of others.

#### (i)    *The Kornfeld Sales Agent Defendants*

104.    Barry Kornfeld and Ferne Kornfeld are husband and wife, are business partners, and were among the external sales people employed to perpetrate the Woodbridge scheme.

105.    Both of the Kornfelds represent themselves to be the principals of Defendant First Financial Tax Group, headquartered in Boca Raton, Florida, with clients in Florida and throughout the United States.    FEK Enterprises it is the parent company of First Financial.    Defendants Barry Kornfeld, Ferne Kornfeld, First Financial and FEK Enterprises are collectively referred to herein as the "Kornfeld Sales Agent Defendants".

106.    Barry Kornfeld holds himself out to be a financial advisor with an "unsurpassed level of expertise" and promises "trusting relationships with his clients" and "the best possible results."[1]  Barry Kornfeld claims a specialized focus on providing retirees and senior citizens with guaranteed income financial products to "ensure lives of prosperity and security in retirement" based on his purported understanding of "the complex psychology of aging and retirement planning."[2]

107.    Barry Kornfeld actively promoted the Woodbridge FPCM investments.  According to his blog, "A short term fixed-rate vehicle that Barry M. Kornfeld offers is first position commercial mortgages, which pay out 6% or higher, on an annual basis, with interest paid monthly."[3]  Barry Kornfeld promotes himself as having "specialized knowledge of Co-Lending Opportunities. . . which are also known as first position commercial mortgage notes (FPCMs)." He promotes the FPCMs as safe and secure with a fixed high return.[4]

108.    Barry Kornfeld has a checkered past, and he failed to disclose to any of his actual or potential clients – including the Plaintiffs – that he has been barred from the securities industry and from associating with any broker dealer or investment advisor as a result of regulatory actions taken by the SEC and the Financial Industry Regulatory Authority ("FINRA").  In fact, the SEC previously charged Barry Kornfeld with securities fraud for representing to retiree clients that collateralized mortgage obligations ("CMOS") were safe and secure investments.

---

[1] See https://www.linkedin.com/in/barrykornfeld (last visited 12/26/17).

[2] Id.

[3] See https://barykornfeld.wordpress.com (last visited 12/26/17).

[4] See id.

109.    Ferne Kornfield is a former registered securities broker who promotes herself as an experienced investment advisor specializing in providing investment advice and "guaranteed" returns to retirees as the President of First Financial Tax Group.  According to Ferne Kornfield:[5]

> If you are looking for guaranteed income in retirement and estate planning solutions that work no matter which way the markets go, then we're a firm you'll want to talk to.  I am a warm and caring financial professional specializing in holistic retirement planning for pre and post retirees.  We integrate all aspects of life . . . guaranteed income, taxes, growth, inflation, estate planning, into a comprehensive & flulid plan to achieve a stress-free retirement.  I have over 20 years' experience helping conservative investors seeking preservatrion of capital, guaranteed income and secure family planning strategies regardless of the ups & downs of the market or economic conditions.  We are passionate about what we do & the people we help, and we are on a mission to make our clients' retirement everything they want it to be!

110.    Barry Kornfield and Ferne Kornfeld hold Ferne Kornfeld out to be an "instructor" of Baby Boomer Retirement Planning courses and Social Security Income Optimization Courses (the "Courses").  The Kornfelds used the Courses as a tool for targeting potential clients and soliciting attendees to invest in Woodbridge investments, pitching them as safe and secure.

111.    Plaintiffs Paul and Carla Honig (among many others) were specifically targeted, solicited and induced to invest in Woodbridge investments by the Kornfelds after attending the Ferne Kornfeld Course.

112.    Barry and Ferne Kornfeld utilized the false and misleading Woodbridge sales script to recommend and sell Woodbridge investments to Plaintiffs Paul and Carla Honig, David and Carolyn Lippman, and John Hertvik.  Upon information and belief, the Kornfeld Defendants sold Woodbridge investments to hundreds of additional investors in Florida and throughout the United States.

---

[5] *See* https://www.linkedin.com/in/ferne-kornfeld-13048159/ (last visited on 12/27/17).

113.    Shapiro and Roseman characterized the Kornfelds as among the top producers of Woodbridge investor funds.  According to Barry Kornfeld's sworn testimony to the SEC, the Kornfelds have at least 300 clients who invested over $50 million in Woodbridge investments.

114.    As such, the Kornfelds provided a constant and significant source of investor funds necessary to prop up and keep the Ponzi scheme afloat.  This in turn allowed Shapiro and Woodbridge to continue to defraud investors throughout the country, including those who did not purchase securities directly from the Kornfelds.

**(ii)    *The Klager Sales Agent Defendants***

115.    Defendants Albert D. Klager and Michelle Klager are a married couple.  At all material times, Albert and Michelle Klager were affiliated with and conducted their investment advisory business through, Defendant Atlantic Insurance and Financial Services, Inc.  Defendants Al Klager, Michelle Klager and Atlantic are collectively referred to herein as the "Klager Sales Agent Defendants".

116.    Al Klager and Michelle Klager utilized the false and misleading Woodbridge sales script to recommend and sell Woodbridge investments to Plaintiff Gerald Roy.  Upon information and belief, the Klagers sold Woodbridge investments to hundreds of additional investors in Florida and throughout the United States.

117.    On information and believe, Al and Michelle Klager raised approximately $20 million in principal through the sale of Woodbridge investments and were paid in excess of $1.2 million in commissions by Woodbridge.  As such, Al and Michelle Klager's actions in providing a constant and significant source of investor funds were critical to the success of the Woodbridge scheme and conspiracy as it allowed Shapiro and Woodbridge to continue to defraud investors throughout the country.

(iii)     *The Knowles Systems Sales Agent Defendants*

118.     Defendants Lynette M. Robbins and Theodore F. Leutz are a married couple.  At all material times, Robbins and Leutz were affiliated with and conducted their investment advisory business through, Defendant Knowles Systems.  Defendants Robbins, Leutz and Knowles Systems are collectively referred to herein as the "Knowles System Sales Agent Defendants".

119.     The Knowles System Sales Agent Defendants utilized the false and misleading Woodbridge sales script to recommend and sell Woodbridge investments to Plaintiff Hermant Nanavaty.  Upon information and belief, the Knowles System Sales Agent Defendants utilized the false and misleading Woodbridge sales script to recommend and sell Woodbridge investments to hundreds of investors in Florida, Chicago and throughout the United States.

120.     On information and believe, Robbins and Leutz raised approximately $100 million in principal through the sale of Woodbridge investments and were paid in excess of $8 million in commissions by Woodbridge.  As such, Robbins and Leutz were the top producers of Woodbridge investor funds, and their actions in providing a constant and significant source of investor funds were critical to the success of the Woodbridge scheme and conspiracy as it allowed Shapiro and Woodbridge to continue to defraud investors throughout the country.

(iv)     *The Non-Resident Sales Agent Defendants*

121.     Defendants Costa, Cusano, Gilchrist, Hannah. Retirement Solutions, Andrew, Paramount, Davis, MacKenzie, Burke, Old Security, Helgeson, Kovak Securities, Raines, HD Vest, Heidari, William Blair, Fritz, Prudential Annuities, New, Lighthouse, Van Houten, Putnam Retail, Ouelette, Shield Financial, PanthRex, Wieniewitz, Wieniewitz Wealth, and Harris (collectively, "the Non-Resident Sales Agent Defendants") similarly utilized the false and misleading Woodbridge sales script to recommend and sell Woodbridge investments to thousands

of additional investors in Florida and throughout the United States. These Defendants' actions provided Woodbridge with a constant and significant source of investor funds necessary to keep the Ponzi scheme afloat and thus were critical to the success of the Woodbridge scheme and civil conspiracy.

     (v)    ***The Auditor Defendant***

122.    Defendant GBH CPAS is an accounting firm specializing in providing audit services for public companies and closely-held private companies. GBH CPAS performed audit and accounting services for Woodbridge and its affiliated Woodbridge entities during the time Woodbridge was operating as a Ponzi scheme.

123.    In order to perform its auditing functions, GBH CPAS, including through its Senior Audit Manager Cory Ellspermann, communicated directly and regularly with Shapiro and Pedersen in her Florida office for information about the Woodbridge entities' business activities and financial books, records, and bank accounts. For example, in a series of 2015 emails, Mr. Ellspermann requested information related to the financial and banking records for Woodbridge mortgage investments funds, the Woodbridge Investment Companies, and Woodbridge Structured Funding, and he received responses from Pedersen.

124.    As Woodbridge's external auditor, GBH CPAS played a crucial role in validating Woodbridge's financial information and had a duty to ensure that the financial information did not contain misstatements and were free from fraud. In fulfilling this duty, GBH CPAS was required to obtain a thorough understanding of Woodbridge's operations, internal controls, and business model. GBH CPAS was required to ensure that evidence of Woodbridge's financial condition was obtained from reliable sources.

125.    GBH CPAS failed to fulfill these duties and thereby assisted Shapiro and Woodbridge in perpetrating the Ponzi scheme and defrauding investors.

126.    GBH CPAS accepted questionable financial information from Pedersen, who was an unreliable source of information given her patent lack of accounting experience or expertise.

127.    GBH CPAS failed to address or simply ignored numerous glaring financial red flags at Woodbridge:

      a.    That the Woodbridge enterprise did not generate sufficient profits to pay promised returns to investors.

      b.    That the Woodbridge business activities were not consistent with Woodbridge's stated business model.

      c.    That the Woodbridge entities' accounting records did not reflect the correct amount of income and assets that is consistent with the cash flow activity reflected in Woodbridge entities' bank records.

      d.    That the Woodbridge entities made improper payments of at least $21.2 million to or for the benefit of Shapiro, his relatives or related entities.

      e.    That the Woodbridge operating entities' intercompany QuickBooks accounts did not reconcile with the Woodbridge fund entities' intercompany accounts.

      f.    That the Woodbridge fund entities' QuickBooks reflect mortgages receivable and some owned real estate assets.  The manner in which the Woodbridge fund entities recorded these assets primarily comprised of journal entries as a "due to" in an intercompany account. There was no transfer of cash from the Woodbridge fund entities in such transactions, effectively creating assets with only book entries and not represented by a cash transaction.

g.    That a significant amount of the interest income revenue recorded in the Woodbridge fund entities' QuickBooks was not cash collected from third parties but instead was recorded as an intercompany receivable transaction with the Woodbridge operating entities. Although an intercompany receivable transaction was recorded in the Woodbridge fund entities' QuickBooks, in many instances, no corresponding cash receipt was identified in the Woodbridge operating entities' bank account nor was a corresponding journal entry reflecting the intercompany transaction recorded in the Woodbridge fund entities' QuickBooks.

h.    That the Woodbridge fund entities recorded assets duplicative of the Woodbridge operating entities.

128.   Moreover, the Woodbridge fund entities' books and records did not include the customary accounting and banking transactional flow that one would expect to see in the bank accounts and Woodbridge fund entities' QuickBooks.  This includes transaction flows relating to the receipt and use of investor funds.  As a result, the Woodbridge entities' accounting records do not reflect the correct amount in income and assets that is consistent with the cash flow activity reflected in the Woodbridge Entities' bank records, resulting in an artificial representation of the income generated and assets available to pay Woodbridge investors.

129.   Had GBH CPAs undertaken the proper analysis and testing of the Woodbridge enterprise, the Woodbridge Investment Companies, and all their financials, it would have determined that the Woodbridge claimed business model could not have functioned as a legitimate or profitable enterprise.  Instead, GBH CPAS failed to audit the Woodbridge enterprise according to auditing standards, which permitted Woodbridge to misstate its financial condition and perpetuate its fraudulent scheme.

E.     **The Co-Conspirators' Misrepresentations Regarding Woodbridge Regulatory Proceedings**

130.     Five states, Texas, Massachusetts, Arizona, Pennsylvania, and Michigan, have issued cease and desist orders against one or more of the Woodbridge entities based on their unregistered sale of securities. Woodbridge nonetheless continued to sell their investment products.

131.     Woodbridge and Shapiro engaged in deceptive conduct with respect to the many other pending state regulatory actions against Woodbridge for its sale of unregistered securities. Shapiro instructed Roseman to affirmatively withhold this information from investors.

132.     Woodbridge's sales agents falsely mischaracterized the dispositions of these regulatory actions to external sales agents claiming that the company was exonerated of any wrongdoing or fraudulent activity" when no such determination was actually made.   Upon information and believe, Barry Kornfeld and Ferne Kornfeld made similar misrepresentations existing and prospective clients, which the Kornfelds knew or should have known were false.

133.     In an apparent attempt to deflect publicity and attention of the regulators and the public, Woodbridge had begun transitioning investors into a new product called a Co-Lending Opportunity ("CLO").  The CLO mirrors the FPCM in every material respect save one - the CLO's term is for 9 months.  In email communications, Shapiro and Roseman contended that this small change ensured that the CLO was not a security and that Woodbridge could circumvent the states' regulatory agencies.  In furtherance of the scheme and civil conspiracy, the Sales Agent Defendants made numerous misrepresentations in connection with the sale of the CLOs.

134.     By way of example, Defendant Barry Kornfeld promoted the Woodbridge CLOs to Plaintiffs and other similarly situated individuals as a suitable investment for retirees.  According to an internet post by Barry Kornfeld, "among Barry Kornfeld's firm's specialized offerings are

Co-Lending Opportunities (CLOs), also known as secured bridge loans, which are ideal for retirees and others seeking safer alternatives. They come with set nine-month terms and generate 6% annual interest, paid monthly."[6]

135. All of the Sales Agent Defendants made similar misrepresentations and omissions to the putative class regarding the regulatory proceedings involving Woodbridge.

136. On December 1, 2017, still owing more than $961 million in principal to investors, Woodbridge and Shapiro missed their first interest payments to investors. On December 4, 2017, Shapiro caused most of his companies to declare Chapter 11 bankruptcy (none of which are named Defendants here).

137. There are no material differences between the actions committed by the Defendants against the Plaintiffs and committed against the other Class members.

## V.   CLASS ACTION ALLEGATIONS

138. Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23. The definition of the Plaintiff class and subclasses are as follows:

    a.   All persons who invested in the Woodbridge FPCMs and Funds, excluding Defendants, their affiliates, subsidiaries, agents, officers, directors and/or employees.

    b.   All persons who invested in Woodbridge FPCMs and Funds who reside in the State of Florida, excluding Defendants, their affiliates, subsidiaries, agents, officers, directors and/or employees.

    c.   All persons who invested in Woodbridge FPCMs and Funds based on the

---

[6] *See* https://medium.com/@BarryKornfeld/co-lending-opportunities-a-safer-alternative-with-fixed-6-returns-d67dc99f8fb8 (last visited 12/27/17).

solicitation or participation of the Sales Agent Defendants, excluding the Sales

Agent Defendants, their affiliates, subsidiaries, agents, officers, directors and/or

employees.

139.    Plaintiffs reserve the right to modify or amend the proposed class definitions prior

to the time the Court determines whether a class certification is proper.

140.    Defendants subjected the Plaintiffs and the respective Class members to the same

unfair, unlawful, and deceptive practices and harmed them in the same matter.

141.    The Class meets the requirements for class certification under Rule 23(a) of the

Federal Rules of Civil Procedure.

      a.    **Numerosity**.  The members of the Class are so numerous that joinder of all

members is impracticable.  Defendants' conduct as alleged in this Complaint harmed hundreds of

investors in Florida and thousands nationwide.  Individual Class members are ascertainable as they

may be identified from records maintained by Defendants, and the precise number of the Class can

be determined through discovery; however, the number of Class members are clearly more than

can be consolidated in one complaint such that it would be impractical for each Class member to

bring suit individually. The members of the Class may be notified of the pendency of this action

by mail or otherwise using a form of notice similar to that customarily used in class actions.

      b.    **Commonality**.  Common questions of law and fact exist as to all members

of the Class and predominate over any questions affecting solely individual members of the Class.

Among the questions of law and fact common to the Class are:

            i. whether the Sales Agent Defendants breached their duty of care or breached

their fiduciary duties to the Plaintiffs in soliciting and selling Plaintiffs Woodbridge investments;

ii. whether the Sales Agent Defendants made negligent misrepresentations in connection with soliciting and selling Plaintiffs Woodbridge investments;

iii. whether the Sales Agent Defendants aided and abetted the Shapiro's breach of fiduciary duties to Woodbridge investors, including Plaintiffs;

iv. whether and to what extent Plaintiffs were damaged by the wrongful conduct of Defendants;

v. whether Defendant GBH CPAS was negligent and failed to exercise due professional care in its audits of the Woodbridge enterprise;

vi. whether and to what extent Plaintiffs were damaged by the negligence of GBH CPAS;

vii. whether the Woodbridge investments were securities as defined by state or federal law that had to be registered under the applicable federal or state securities laws and regulations;

viii. whether the Defendants were engaged in the sale of unregistered securities to Plaintiffs or otherwise participated in the sale of unregistered securities under Chapter 517, Florida Statues and other applicable State Blue Sky Laws;

ix. whether Plaintiffs are entitled to rescission and/or damages, and in what amounts, under Chapter 517, Florida Statues and other applicable State Blue Sky Laws;

x. whether the Sales Agent Defendants joined and participated in a civil conspiracy to commit unlawful acts or to use unlawful means;

xi. whether the Sales Agent Defendants engaged in one or more overt acts in furtherance of a civil conspiracy; and

xii. whether and to what extent Plaintiffs were damaged by the Sales Agent Defendants' civil conspiracy.

      c.    **Typicality.**  Plaintiffs' claims are typical of the claims of members of the Class as all members of the Class were similarly affected by the Defendants' wrongful conduct in violation of law as alleged herein.  The named Plaintiffs are members of the Class and the losses to the named Plaintiffs are based on the same legal theories.

      d.    **Adequacy**.  Plaintiffs will fairly and adequately represent and protect the interest of the members of the Class, and they are committed to vigorously prosecuting these claims.  Plaintiffs have retained competent and experienced counsel in litigation of this nature. There is no hostility between Plaintiffs and unnamed Class members.  Plaintiffs do not anticipate any difficulty in the management of this litigation as a class action.

    142.    This class action also meets the requirements of Federal Rule of Civil Procedure 23(b)(3).  The common issues outlined herein predominate over any individual issues in the case. A class action is superior to an individual action and to all other available methods of the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

    143.    The class members did not discover, and could not with the exercise of reasonable diligence have discovered, the true nature of their losses until the SEC filed its Complaint in the SEC Action on December 20, 2017.  The wrongful acts by Defendants were inherently undiscoverable, and Plaintiffs were not aware of facts that would have put them on inquiry notice with respect to Defendants' role in the Woodbridge scheme until now.

**COUNT I**
**<u>Negligence</u>**
**(Plaintiffs Honig, Lippman and Hertvik against the Kornfeld Sales Agent Defendants)**

144.    Plaintiffs re-allege Paragraphs 1 through 143, and incorporate the same as if fully set forth herein.

145.    The Kornfeld Sales Agent Defendants owed Plaintiffs Paul and Carla Honig, David and Carolyn Lippman and John Hertvik a duty of due care as investment advisors.  This duty included the obligation to perform reasonable due diligence on these Plaintiffs' behalf prior to selling them Woodbridge FPCMs and Fund Offerings.

146.    The Kornfeld Sales Agent Defendants breached their duty of care and were negligent in selling the Woodbridge FPCMs, Fund Offerings and other Woodbridge investments. The Kornfeld Sales Agent Defendants knew or should have known that Woodbridge investments were fraudulent.  The Kornfeld Sales Agent Defendants failed to perform any due diligence of Woodbridge, the FPCMs, or the Fund Offerings.  The Kornfeld Sales Agent Defendants also ignored numerous red flags concerning the Woodbridge FPCMs and Fund Offerings, including, among other things, that:

a.      The FPCMs and Fund Offerings were unregistered securities, but the Kornfeld Sales Agent Defendants did not make (and were not required by Woodbridge to make) any effort to determine whether an investor was accredited or sophisticated;

b.      The Fund Offerings claimed that Woodbridge was paying commissions to "licensed broker/dealers," but the Kornfeld Sales Agent Defendants were not registered with any regulatory agency yet received commissions from Woodbridge;

c.      The sales packets supplied by Woodbridge to the Kornfeld Sales Agent Defendants for distribution to investors listed examples of real property being used for the FPCMs and Fund Offerings, but those properties were not owned by actual third-party borrowers;

34

d.     Woodbridge threatened to terminate external sales agents like the Kornfeld Sales Agent Defendants who would not permit Woodbridge to contact investors directly about rolling over short-term FPCMs into longer term Fund Offerings;

e.     Despite Woodbridge's purported multi-million dollar nationwide real estate investment and development operations, all Woodbridge checks to investors and sales agents were hand-signed by Shapiro.

147.   The Kornfeld Sales Agent Defendants breach of their duty of care directly and proximately caused Plaintiffs Paul and Carla Honig, David and Carolyn Lippman and John Hertvik to sustain significant damages.

**COUNT II**
**<u>Negligence</u>**
**(Plaintiff Roy against the Klager Sales Agent Defendants)**

148.   Plaintiffs re-allege Paragraphs 1 through 143, and incorporate the same as if fully set forth herein.

149.   The Klager Sales Agent Defendants owed Plaintiff Gerald Roy a duty of due care as investment advisors.  This duty included the obligation to perform reasonable due diligence on Roy's behalf prior to selling him Woodbridge FPCMs and Fund Offerings.

150.   The Klager Sales Agent Defendants breached their duty of care and were negligent in selling the Woodbridge FPCMs, Fund Offerings and other Woodbridge investments.  The Klager Sales Agent Defendants knew or should have known that Woodbridge investments were fraudulent.  The Klager Sales Agent Defendants failed to perform any due diligence of Woodbridge, the FPCMs, or the Fund Offerings.  The Klager Sales Agent Defendants also ignored numerous red flags concerning the Woodbridge FPCMs and Fund Offerings, including, among other things, that:

a.      The FPCMs and Fund Offerings were unregistered securities, but the Klager Sales Agent Defendants did not make (and were not required by Woodbridge to make) any effort to determine whether an investor was accredited or sophisticated;

b.      The Fund Offerings claimed that Woodbridge was paying commissions to "licensed broker/dealers," but the Klager Sales Agent Defendants were not registered with any regulatory agency yet received commissions from Woodbridge;

c.      The sales packets supplied by Woodbridge to the Klager Sales Agent Defendants for distribution to investors listed examples of real property being used for the FPCMs and Fund Offerings, but those properties were not owned by actual third-party borrowers;

d.      Woodbridge threatened to terminate external sales agents like the Klager Sales Agent Defendants who would not permit Woodbridge to contact investors directly about rolling over short-term FPCMs into longer term Fund Offerings;

e.      Despite Woodbridge's purported multi-million dollar nationwide real estate investment and development operations, all Woodbridge checks to investors and sales agents were hand-signed by Shapiro.

151.   The Klager Sales Agent Defendants breach of their duty of care directly and proximately caused Plaintiff Gerald Roy to sustain significant damages.

## COUNT III
### Negligence
**(Plaintiff Nanavaty against the Knowles System Agent Defendants)**

152.   Plaintiffs re-allege Paragraphs 1 through 143, and incorporate the same as if fully set forth herein.

153.   The Knowles System Sales Agent Defendants owed Plaintiff Hermant Nanavaty a duty of due care as investment advisors.  This duty included the obligation to perform reasonable due diligence on Nanavaty's behalf prior to selling him Woodbridge FPCMs and Fund Offerings.

36

154. The Knowles System Sales Agent Defendants breached their duty of care and were negligent in selling the Woodbridge FPCMs, Fund Offerings and other Woodbridge investments. The Knowles System Sales Agent Defendants knew or should have known that Woodbridge investments were fraudulent. The Knowles System Sales Agent Defendants failed to perform any due diligence of Woodbridge, the FPCMs, or the Fund Offerings. The Knowles System Sales Agent Defendants also ignored numerous red flags concerning the Woodbridge FPCMs and Fund Offerings, including, among other things, that:

a. The FPCMs and Fund Offerings were unregistered securities, but the Knowles System Sales Agent Defendants did not make (and were not required by Woodbridge to make) any effort to determine whether an investor was accredited or sophisticated;

b. The Fund Offerings claimed that Woodbridge was paying commissions to "licensed broker/dealers," but the Knowles System Sales Agent Defendants were not registered with any regulatory agency yet received commissions from Woodbridge;

c. The sales packets supplied by Woodbridge to the Knowles System Sales Agent Defendants for distribution to investors listed examples of real property being used for the FPCMs and Fund Offerings, but those properties were not owned by actual third-party borrowers;

d. Woodbridge threatened to terminate external sales agents like the Knowles System Sales Agent Defendants who would not permit Woodbridge to contact investors directly about rolling over short-term FPCMs into longer term Fund Offerings;

e. Despite Woodbridge's purported multi-million dollar nationwide real estate investment and development operations, all Woodbridge checks to investors and sales agents were hand-signed by Shapiro.

155.     The Knowles System Sales Agent Defendants breach of their duty of care directly and proximately caused Plaintiff Hermant Nanavaty to sustain significant damages.

**COUNT IV**
**Negligent Misrepresentation**
**(Plaintiffs Honig, Lippman and Hertvik against the Kornfeld Sales Agent Defendants)**

156.     Plaintiffs re-allege Paragraphs 1 through 143, and incorporate the same as if fully set forth herein.

157.     The Kornfeld Sales Agent Defendants made misrepresentations of material facts to Plaintiffs Paul and Carla Honig, David and Carolyn Lippman and John Hertvik concerning the FPCMs and Fund Offerings, including that:

      a.     The FPCMs used bona fide third-party borrowers who were in need of hard-money loans from Woodbridge, when in fact almost all the borrowers were companies owned and controlled by Shapiro with no source of income and who never made any loan payments;

      b.     The FPCM investors would be paid using the interest from Woodbridge's loans to third-party borrowers, when in fact existing investors were paid almost exclusively from the funds of new investors;

      c.     The Fund Offerings would be funded in part by properties that Woodbridge would purchase to develop and sell for a profit, when in fact little or no development ever occurred, with many properties sitting undeveloped as vacant lots.

158.     The Kornfeld Sales Agent Defendants knew or should have known that their misrepresentations were false.

159.     The Kornfeld Sales Agent Defendants intended to induce investors to purchase FPCMs and Fund Offerings by the misrepresentations.  The Kornfeld Sales Agent Defendants had a direct pecuniary interest in making their misrepresentations, because they received commissions from Woodbridge for each new investor they lured into the Ponzi scheme.

160.    Plaintiffs Paul and Carla Honig, David and Carolyn Lippman and John Hertvik justifiably relied on the misrepresentations of the Kornfeld Sales Agent Defendants, and suffered significant damages as a result.

**COUNT V**
**<u>Negligent Misrepresentation</u>**
**(Plaintiff Roy against the Klager Sales Agent Defendants)**

161.    Plaintiffs re-allege Paragraphs 1 through 143, and incorporate the same as if fully set forth herein.

162.    The Klager Sales Agent Defendants made misrepresentations of material facts to Plaintiff Gerald Roy concerning the FPCMs and Fund Offerings, including that:

      a.    The FPCMs used bona fide third-party borrowers who were in need of hard-money loans from Woodbridge, when in fact almost all the borrowers were companies owned and controlled by Shapiro with no source of income and who never made any loan payments;

      b.    The FPCM investors would be paid using the interest from Woodbridge's loans to third-party borrowers, when in fact existing investors were paid almost exclusively from the funds of new investors;

      c.    The Fund Offerings would be funded in part by properties that Woodbridge would purchase to develop and sell for a profit, when in fact little or no development ever occurred, with many properties sitting undeveloped as vacant lots.

163.    The Klager Sales Agent Defendants knew or should have known that their misrepresentations were false.

164.    The Klager Sales Agent Defendants intended to induce investors to purchase FPCMs and Fund Offerings by the misrepresentations.  The Klager Sales Agent Defendants had a direct pecuniary interest in making their misrepresentations, because they received commissions from Woodbridge for each new investor they lured into the Ponzi scheme.

165.     Plaintiff Gerald Roy justifiably relied on the misrepresentations of the Klager Sales Agent Defendants, and suffered significant damages as a result.

**COUNT VI**
**Negligent Misrepresentation**
**(Plaintiff Nanavaty against the Knowles System Sales Agent Defendants)**

166.     Plaintiffs re-allege Paragraphs 1 through 143, and incorporate the same as if fully set forth herein.

167.     The Knowles System Sales Agent Defendants made misrepresentations of material facts to Plaintiff Hermant Nanavaty concerning the FPCMs and Fund Offerings, including that:

a.       The FPCMs used bona fide third-party borrowers who were in need of hard-money loans from Woodbridge, when in fact almost all the borrowers were companies owned and controlled by Shapiro with no source of income and who never made any loan payments;

b.       The FPCM investors would be paid using the interest from Woodbridge's loans to third-party borrowers, when in fact existing investors were paid almost exclusively from the funds of new investors;

c.       The Fund Offerings would be funded in part by properties that Woodbridge would purchase to develop and sell for a profit, when in fact little or no development ever occurred, with many properties sitting undeveloped as vacant lots.

168.     The Knowles System Sales Agent Defendants knew or should have known that their misrepresentations were false.

169.     The Knowles System Sales Agent Defendants intended to induce investors to purchase FPCMs and Fund Offerings by the misrepresentations.  The Knowles System Sales Agent Defendants had a direct pecuniary interest in making their misrepresentations, because they received commissions from Woodbridge for each new investor they lured into the Ponzi scheme.

170.    Plaintiff Hermant Nanavaty justifiably relied on the misrepresentations of the Knowles System Sales Agent Defendants, and suffered significant damages as a result.

**COUNT VII**
**Breach of Fiduciary Duty**
**(Plaintiffs Honig, Lippman and Hertvik against the Kornfeld Sales Agent Defendants)**

171.    Plaintiffs re-allege Paragraphs 1 through 143, and incorporate the same as if fully set forth herein.

172.    The Kornfeld Sales Agent Defendants held themselves out as experienced investment advisors.   The Kornfeld Sales Agent Defendants purported to advise and instruct Plaintiffs Paul and Carla Honig, David and Carolyn Lippman and John Hertvik on the suitability of the Woodbridge FPCMs and Fund Offerings for their investment needs.   These Plaintiffs reposed their trust and confidence in the Kornfeld Sales Agent Defendants, which they accepted. As such, the Kornfeld Sales Agent Defendants owed Plaintiffs Paul and Carla Honig, David and Carolyn Lippman and John Hertvik a fiduciary duty to act fairly and honestly, in good faith, and to make full and fair disclosure of material facts.

173.    The Kornfeld Sales Agent Defendants abused and violated their fiduciary duties to Plaintiffs Paul and Carla Honig, David and Carolyn Lippman and John Hertvik by failing to do sufficient due diligence on the Woodbridge FPCMs and Fund Offerings (if they ever did any at all) prior to selling the FPCMs and Fund Offerings to these Plaintiffs.

174.    The Kornfeld Sales Agent Defendants abused and violated their fiduciary duties to Plaintiffs Paul and Carla Honig, David and Carolyn Lippman and John Hertvik by failing to disclose that the Kornfeld Sales Agent Defendants were not registered with the SEC or any other regulatory agency, and that Barry Kornfeld had been barred by the SEC from associating with any broker, dealer, or investment adviser.

175.    The Kornfeld Sales Agent Defendants' breaches of fiduciary duty directly and proximately caused the Plaintiffs Paul and Carla Honig, David and Carolyn Lippman and John Hertvik to sustain significant damages.

**COUNT VIII**
**<u>Breach of Fiduciary Duty</u>**
**(Plaintiff Roy against the Klager Sales Agent Defendants)**

176.    Plaintiffs re-allege Paragraphs 1 through 143, and incorporate the same as if fully set forth herein.

177.    The Klager Sales Agent Defendants held themselves out as experienced investment advisors.  The Klager Sales Agent Defendants purported to advise and instruct Plaintiff Gerald Roy on the suitability of the Woodbridge FPCMs and Fund Offerings for their investment needs. Plaintiff Roy reposed his trust and confidence in the Klager Sales Agent Defendants, which they accepted.  As such, the Klager Sales Agent Defendants owed Plaintiff Roy a fiduciary duty to act fairly and honestly, in good faith, and to make full and fair disclosure of material facts.

178.    The Klager Sales Agent Defendants abused and violated their fiduciary duties to Plaintiff Roy by failing to do sufficient due diligence on the Woodbridge FPCMs and Fund Offerings (if they ever did any at all) prior to selling the FPCMs and Fund Offerings to Roy.

179.    The Klager Sales Agent Defendants abused and violated their fiduciary duties to Plaintiff Roy by failing to disclose that the Klager Sales Agent Defendants were not registered with the SEC or any other regulatory agency.

180.    The Klager Sales Agent Defendants' breaches of fiduciary duty directly and proximately caused the Plaintiff Roy to sustain significant damages.

## COUNT IX
### Breach of Fiduciary Duty
**(Plaintiff Nanavaty against the Knowles System Sales Agent Defendants)**

181.    Plaintiffs re-allege Paragraphs 1 through 143, and incorporate the same as if fully set forth herein.

182.    The Knowles System Sales Agent Defendants held themselves out as experienced investment advisors.  The Knowles System Sales Agent Defendants purported to advise and instruct Plaintiff Hermant Nanavaty on the suitability of the Woodbridge FPCMs and Fund Offerings for their investment needs.  Plaintiff Nanavaty reposed his trust and confidence in the Knowles System Sales Agent Defendants, which they accepted.  As such, the Knowles System Sales Agent Defendants owed Plaintiff Nanavaty a fiduciary duty to act fairly and honestly, in good faith, and to make full and fair disclosure of material facts.

183.    The Knowles System Sales Agent Defendants abused and violated their fiduciary duties to Plaintiff Nanavaty by failing to do sufficient due diligence on the Woodbridge FPCMs and Fund Offerings (if they ever did any at all) prior to selling the FPCMs and Fund Offerings to Nanavaty.

184.    The Knowles System Sales Agent Defendants abused and violated their fiduciary duties to Plaintiff Nanavaty by failing to disclose that the Knowles System Sales Agent Defendants were not registered with the SEC or any other regulatory agency.

185.    The Knowles System Sales Agent Defendants' breaches of fiduciary duty directly and proximately caused the Plaintiff Nanavaty to sustain significant damages.

## COUNT X
### Aiding and Abetting Breach of Fiduciary Duty
**(All Plaintiffs against all Sales Agent Defendants)**

186.    Plaintiffs re-allege Paragraphs 1 through 143, and incorporate the same as if fully set forth herein.

187.    At all relevant times, Shapiro was the CEO of Woodbridge and the trustee of the RS Protection Trust.

188.    At all relevant times, Shapiro maintained complete or substantially complete control over the Woodbridge group of companies and each of the Woodbridge investment funds.

189.    By reason of his controlling positions, actions, and direct and indirect representations to Plaintiffs and class members, Shapiro owed them fiduciary duties of loyalty, care, and to deal honestly and in good faith.

190.    By selling Plaintiffs and class members promissory notes and fund offerings pursuant to false offering materials, and by misappropriating, commingling, and otherwise misusing investor funds, Shapiro breached fiduciary duties he owed to Plaintiffs and class members.

191.    The Sales Agent Defendants substantially assisted in Shapiro's breaches of fiduciary duty with knowledge, general awareness, or recklessness by inducing investors to purchase FPCMs and Fund Offerings.

192.    The Sales Agent Defendants' wrongful conduct proximately caused the Plaintiffs to sustain significant damages.

193.    Additionally, Defendants First Financial, FEK Enterprises, Knowles Systems, Atlantic, Retirement Solutions, Paramount, Old Security, Kovak Securities, HD Vest, William Blair, Prudential Annuities, Putnam Retail, Shield Financial, PanthRex, and Wieniewitz Wealth are vicariously liable for the actions and inactions of their respective affiliated Sales Agent Defendants, each of whom were acting within the course and scope of their actual or apparent agency.

## COUNT XI

### Sale of Unregistered Securities in Violation of Chapter 517, Florida Statutes
### (Plaintiffs Honig, Lippman and Hertvik against the Kornfeld Sales Agent Defendants)

194.    Plaintiff re-alleges the allegations set forth in Paragraph 1 through 143, as if fully set forth herein.

195.    This is a claim by Plaintiffs Paul and Carla Honig, David and Carolyn Lippman and John Hertvik against the Kornfeld Sales Agent Defendants for violations of Chapter 517 of the Florida Act arising from the sale of unregistered securities in the state of Florida.

196.    The Kornfeld Sales Agent Defendants' offers of FPCMs and Fund investments to residents of Florida violated section 517.211, Florida Statutes, which provides a private right of action for violations of section 517.07, Florida Statutes.

197.    Section 517.07 provides that "[i]t is unlawful and a violation of this chapter for any person to sell or offer to sell a security within this state" unless the security or transaction is "exempt" under Chapter 517, or unless the security is "registered pursuant to this chapter."

198.    The FPCMs and Fund investments are securities as defined in section 517.021(21), Florida Statutes.

199.    Despite attempts to evade compliance with registration requirements by claiming a Regulation D exemption, the nation-wide offering of FPCMs and Fund investments to purportedly "accredited" U.S. investors was in fact an unregistered public offering made in violation of state and federal securities laws.   It was an integrated offering under the securities laws, and, on information and belief, involved each of the following factors that made it a public offering and not a private offering exempt from registration:

a.    The integrated offering involved general solicitation. This general solicitation by Woodbridge affiliates, agents and brokers, included general public advertisements,

publicly distributed magazine articles, television and other communications and media published in print throughout the country, including in Florida, and distributed broadly for general distribution in the United States, including in Florida.

        b.      The integrated offering involved general solicitation through television advertisement, internet advertisement, seminars and meetings conducted in the United States (including Florida). The integrated offering was conducted through the use of sales seminars, "road shows," and meetings directed at potential offerees and purchasers.

        c.      The integrated offering involved offers to tens of thousands of offerees and purchases by thousands of offerees involving sums of money, in approximately $1 billion, far in excess of that disclosed to the SEC Form D filing with the SEC. The integrated offering involved offers to, and purchases by, at least thousands of investors in the United States (including Florida residents) or those otherwise subject to Florida law.

        d.      The aggregate size of the sales of FPCMs and Fund investments during this period was in excess of $1 billion. The number of investors purchasing the FPCMs and Fund investments in the United States under the Reg. D filing was far in excess of 1,000.

        e.      The offering was made to investors with whom Defendants had no pre-existing relationship, through brokers or affiliates of Woodbridge who were paid substantial and excessive undisclosed commissions in connection with the Notes.

        f.      The offering was made to persons who did not qualify as "accredited United States investors"; and far more than 35 persons who did not qualify as "accredited United States investors" purchased the Notes.

    200.    The FPCMs and Fund investments and transactions are not exempt from registration under the Act, nor were the Notes properly registered as required.

201.    Section 517.211 renders jointly and severally liable each person making the sale "and every director, officer, partner or agent of or for the seller if the director, officer, partner or agent has personally participated or aided in making the sale."

202.    The Kornfeld Defendants acted as an agent for the sellers of FPCMs and Fund investments and their affiliated entities, and the Kornfeld Defendants personally participated in and/or aided in the sale of FPCMs and Fund investments with knowledge that the offer was not exempt from Florida and federal registration requirements.

203.    Pursuant to section 517.211, Florida Statutes, Plaintiffs Paul and Carla Honig, David and Carolyn Lippman and John Hertvik and members of the class are entitled to rescission and actual damages together with interest thereon.

### COUNT XII
### Sale of Unregistered Securities in Violation of Chapter 517, Florida Statutes
### (Plaintiff Roy against the Klager Sales Agent Defendants)

204.    Plaintiff re-alleges the allegations set forth in Paragraph 1 through 143, as if fully set forth herein.

205.    This is a claim by Plaintiff Gerald Roy against the Klager Sales Agent Defendants for violations of Chapter 517 of the Florida Act arising from the sale of unregistered securities in the state of Florida.

206.    The Klager Sales Agent Defendants' offers of FPCMs and Fund investments to residents of Florida violated section 517.211, Florida Statutes, which provides a private right of action for violations of section 517.07, Florida Statutes.

207.    Section 517.07 provides that "[i]t is unlawful and a violation of this chapter for any person to sell or offer to sell a security within this state" unless the security or transaction is "exempt" under Chapter 517, or unless the security is "registered pursuant to this chapter."

208.     The FPCMs and Fund investments are securities as defined in section 517.021(21), Florida Statutes.

209.     Despite attempts to evade compliance with registration requirements by claiming a Regulation D exemption, the nation-wide offering of FPCMs and Fund investments to purportedly "accredited" U.S. investors was in fact an unregistered public offering made in violation of state and federal securities laws.  It was an integrated offering under the securities laws, and, on information and belief, involved each of the following factors that made it a public offering and not a private offering exempt from registration:

a.     The integrated offering involved general solicitation. This general solicitation by Woodbridge affiliates, agents and brokers, included general public advertisements, publicly distributed magazine articles, television and other communications and media published in print throughout the country, including in Florida, and distributed broadly for general distribution in the United States, including in Florida.

b.     The integrated offering involved general solicitation through television advertisement, internet advertisement, seminars and meetings conducted in the United States (including Florida).  The integrated offering was conducted through the use of sales seminars, "road shows," and meetings directed at potential offerees and purchasers.

c.     The integrated offering involved offers to tens of thousands of offerees and purchases by thousands of offerees involving sums of money, in approximately $1 billion, far in excess of that disclosed to the SEC Form D filing with the SEC. The integrated offering involved offers to, and purchases by, at least thousands of investors in the United States (including Florida residents) or those otherwise subject to Florida law.

      d.     The aggregate size of the sales of FPCMs and Fund investments during this period was in excess of $1 billion. The number of investors purchasing the FPCMs and Fund investments in the United States under the Reg. D filing was far in excess of 1,000.

      e.     The offering was made to investors with whom Defendants had no pre-existing relationship, through brokers or affiliates of Woodbridge who were paid substantial and excessive undisclosed commissions in connection with the Notes.

      f.     The offering was made to persons who did not qualify as "accredited United States investors"; and far more than 35 persons who did not qualify as "accredited United States investors" purchased the Notes.

210.    The FPCMs and Fund investments and transactions are not exempt from registration under the Act, nor were the Notes properly registered as required.

211.    Section 517.211 renders jointly and severally liable each person making the sale "and every director, officer, partner or agent of or for the seller if the director, officer, partner or agent has personally participated or aided in making the sale."

212.    The Klager Defendants acted as an agent for the sellers of FPCMs and Fund investments and their affiliated entities, and the Klager Defendants personally participated in and/or aided in the sale of FPCMs and Fund investments with knowledge that the offer was not exempt from Florida and federal registration requirements.

213.    Pursuant to section 517.211, Florida Statutes, Plaintiff Gerald Roy and members of the class are entitled to rescission and actual damages together with interest thereon.

## COUNT XIII
### Civil Conspiracy
### (All Plaintiffs against all Sales Agent Defendants)

214. Plaintiff re-alleges the allegations set forth in Paragraph 1 through 143, as if fully set forth herein.

215. Beginning in or about 2012, Woodbridge, Shapiro and the other Woodbridge insiders embarked on a scheme and civil conspiracy relating to the sale of Woodbridge Investments, as more fully described in detail herein in ¶¶ 69-99 of this First Amended Complaint.

216. Shapiro and the other Woodbridge insiders knew the continuous infusion of new funds from investors was critical to keeping the fraudulent scheme afloat. Shapiro and the other Woodbridge insiders also knew that the scheme's success depended upon engaging an external auditor who would assist Shapiro and Woodbridge in perpetrating the Ponzi scheme and defrauding investors, or at the very least turn a blind eye towards the scheme.

217. Shapiro, Roseman and the other Woodbridge insiders thus launched a conspiracy to recruit and compensate a network of several hundred external sales agents to solicit the purchase and sale of Woodbridge Investments from the investing public, including the Plaintiffs.

218. The common purpose and design of the conspiracy was to generate substantial wealth and profits through the sale of Woodbridge Investments by engaging in uniform, widespread misrepresentations, omissions, and breaches of fiduciary duty, to the grave injury of the often elderly and unsophisticated investors.

219. The Sales Agent Defendants each reached and entered into an express or tacit agreement with at least one or more of the other co-conspirators, including specifically but not limited to Shapiro and Roseman, to pursue the following course of concerted, unlawful conduct in exchange for substantial compensation:

a.      Negligence in the solicitation, recommendation and sale of Woodbridge Investments;

b.      Negligent misrepresentations relating to the Woodbridge Investments;

c.      Breach of fiduciary duties and aiding and abetting breach of fiduciary duties in connection with the solicitation, recommendation and sale of Woodbridge investments; and

d.      Sale of unregistered securities to the Plaintiffs and putative class members in violation of applicable state Blue Sky Laws.

220.    The Sales Agent Defendants each committed an overt act in furtherance of the conspiracy by selling one or more Woodbridge Investments through the use of uniform and standardized misrepresentations, omissions, and false marketing and advertising materials, *i.e.,* the Woodbridge "sales script."

221.    The Sales Agent Defendants knew, or should have known, that the solicitation, recommendation and sale of Woodbridge investments to the Plaintiffs and other class members was improper and unlawful, but they agreed to join in and participate in the Woodbridge civil conspiracy in exchange for the substantial commissions that Woodbridge paid them for each sale of a Woodbridge investment.  The Sales Agent Defendants collectively received millions of dollars in sales-based commissions to motivate and incentivize them to commit these overt acts in further of the Woodbridge civil conspiracy.

222.    The Sales Agent Defendants knew, or should have known of each other's existence, role and participation in the conspiracy and their sale of Woodbridge Investments to Plaintiffs and the putative class members through improper and unlawful means.  Woodbridge jointly communicated with its Sales Agent Defendants on a regular basis; invited the Sales Agent Defendants to its visit its headquarters and view its operations; and hosted lavish parties

51

and events designed to pitch the Woodbridge investments and motivate and incentivize the Sales Agent Defendants' ongoing participation in the conspiracy.

223.    Each of the Sales Agent Defendants agreed to join and participate in a civil conspiracy relating to the Woodbridge investments, and each Sales Agent Defendants committed overt acts in furtherance of the conspiracy that substantially aided and successfully "propped up" Woodbridge's fraudulent scheme.  Indeed, but for the concerted participation and overt acts of each of the Sales Agent Defendants in furtherance of the conspiracy, the Woodbridge scheme would have either failed or unraveled at a much earlier point in time.

224.    By way of example, on May 4, 2016, Shapiro sent an email to Roseman complaining about his sales force's lack of effort and production, to which Roseman relied that "my team is not lazy" and that "our 3 main brokers Knowles [*i.e.*, Defendants Robbins, Leutz and Knowles Systems], live abundant [*i.e.*, Defendants Andrew and Paramount] and kornfeld [*i.e.*, Defendants Barry and Ferne Kornfeld] are all slow at the moment and it is effecting our numbers . . . ." In short, the individual actions of each of the Defendants were essential to the overall success of the conspiracy.

225.    The tortious conduct and overt acts committed by the Sales Agent Defendants in furtherance of the goals of the Woodbridge civil conspiracy have caused Plaintiffs and putative class members substantial damages estimated to be at least $961 million in principal as a result of the loss of their investment and retirement funds.

226.    Each co-conspirator Sales Agent Defendants is jointly and severally liable for the damages caused by the conduct of the other members of the conspiracy occurring at any time prior to and after its joinder of the conspiracy, and continuing until the time that such co-conspirator unequivocally withdraws from the conspiracy.

227.    The tortious and wrongful conduct committed by each of the individual co-conspirator Sales Agent Defendants named in this action has caused Plaintiffs to become embroiled in litigation with the other co-conspirators, requiring Plaintiffs to incur actual attorneys' fees and expenses in protecting its interests against the other co-conspirators. Pursuant to the third-party litigation exception to the American Rule of attorneys' fees, Plaintiffs are entitled to recover from each co-conspirator Sales Agent Defendants the actual attorneys' fees and costs incurred in protecting Plaintiffs' interests against the other co-conspirators, as additional compensatory damages.

**Count XIV**
**<u>Vicarious Liability</u>**
**(All Plaintiffs against Corporate Defendants)**

228.    Plaintiff re-alleges the allegations set forth in Paragraph 1 through 143, as if fully set forth herein.

229.    Defendants Barry and Ferne Kornfeld were employed by, an officer of, or affiliated with Defendants First Financial and FEK Enterprises and acting within the course and scope of their actual or apparent agency with First Financial and FEK Enterprises at all times material to this action.

230.    Defendants Robbins and Leutz were employed by, an officer of, or affiliated with Defendant Knowles Systems and acting within the course and scope of their actual or apparent agency with Knowles Systems at all times material to this action.

231.    Defendants Al and Michelle Klager were employed by, an officer of, or affiliated with Defendant Atlantic and acting within the course and scope of their actual or apparent agency with Atlantic at all times material to this action.

232.    Defendant Gilchrist was employed by, an officer of, or affiliated with Defendant Florida Tax and acting within the course and scope of his actual or apparent agency with Florida Tax at all times material to this action.

233.    Defendant Hannah was employed by, an officer of, or affiliated with Defendant Retirement Planning and acting within the course and scope of his actual or apparent agency with Retirement Planning at all times material to this action.

234.    Defendant Andrew was employed by, an officer of, or affiliated with Defendant Paramount and acting within the course and scope of his actual or apparent agency with Paramount at all times material to this action.

235.    Defendants David, MacKenzie and Burke were employed by, officers of, or affiliated with Defendant Old Security and acting within the course and scope of their actual or apparent agency with Old Security at all times material to this action.

236.    Defendant Helgeson was employed by or affiliated with Defendant Kovac Securities as a registered representative of the firm and acting within the course and scope of his actual or apparent agency with Kovac Securities at all times material to this action.

237.    Defendant Raines was employed by or affiliated with Defendant HD Vest as a registered representative of the firm and acting within the course and scope of his actual or apparent agency with HD Vest at all times material to this action.

238.    Defendant Heidari was employed by or affiliated with Defendant William Blair as a registered representative of the firm and acting within the course and scope of his actual or apparent agency with William Blair at all times material to this action.

239.    Defendant Fritz was employed by or affiliated with Defendant Prudential Annuities as a registered representative of the firm and acting within the course and scope of his actual or apparent agency with Prudential Annuities at all times material to this action.

240.    Defendant New was employed by or affiliated with Defendant Lighthouse as an investment advisor of the firm and acting within the course and scope of his actual or apparent agency with Lighthouse at all times material to this action.

241.    Defendant Van Houten was employed by or affiliated with Defendant Putnam Retail as a registered representative of the firm and acting within the course and scope of his actual or apparent agency with Putnam Retail at all times material to this action.

242.    Defendant Ouelette was employed by or affiliated with Defendants Shield Financial and PanthRex as an investment advisor of the firms and acting within the course and scope of his actual or apparent agency with Shield Financial and PanthRex at all times material to this action.

243.    Defendant Wieniewitz was employed by or affiliated with Defendant Wieniewitz Wealth as an investment advisor of the firm and acting within the course and scope of his actual or apparent agency with Wieniewitz Wealth at all times material to this action.

244.    Defendants First Financial, FEK Enterprises, Knowles Systems, Atlantic, Florida Tax, Retirement Solutions, Paramount, Old Security, Kovak Securities, HD Vest, William Blair, Prudential Annuities, Lighthouse, Putnam Retail, Shield Financial, PanthRex, and Wieniewitz Wealth are vicariously liable for all damages or relief awarded as a result of the tortious conduct of their respective affiliated Sales Agent Defendants as alleged herein, each of whom were acting within the course and scope of their actual or apparent agency.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all similarly situated individuals, demands judgment against Defendants as follows:

(1)    a determination that this action be certified as a class action and that Plaintiffs be designated as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel be designated as class counsel;

(2)    awarding Plaintiffs and the Class compensatory damages in an amount to be determined at trial, including interest;

(3)    awarding Plaintiffs and the Class the reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees;

(4)    awarding such other relief that is just, proper, and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff and the Class request a jury trial for any and all claims for which a jury trial is permitted by law.

Dated:  January 26, 2018.

By: */s/ Jonathan B. Butler*
Matthew N. Thibaut (FBN 514918)
MThibaut@ciklinlubitz.com
Jonathan B. Butler (FBN 056197)
JButler@ciklinlubitz.com
Jason S. Haselkorn (FBN 052140)
JHaselkorn@ciklinlubitz.com
**CIKLIN LUBITZ & O'CONNELL**
515 North Flagler Drive, 20th Floor
West Palm Beach, FL 33401
T: (561) 832-5900
F: (561) 833-4209
*Co-Counsel for Plaintiffs*

-and-

Joseph G. Galardi (FBN 180572)
galardi@beasleylaw.net
James W. Beasley, Jr. (FBN 145750)
beasley@beasleylaw.net
Andrew S. Kwan (FBN 76539)
kwan@beasleylaw.net
**BEASLEY KRAMER & GALARDI, P.A.**
505 South Flagler Drive, Suite 1500
West Palm Beach, Florida 33401
T: (561) 835-0900
F: (561) 833-4209
*Co-Counsel for Plaintiffs*

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that the foregoing document was electronically filed with the Clerk of the Court and served on all parties via CM/ECF. and that a true and correct copy of the foregoing has been furnished via electronic email to Robert C. Harris, Esq., Hunter Taubman Fischer & Li LLC, 2 Alhambra Plaza, Suite 650, Coral Gables, Florida, 33134, attorneys for Defendants Barry M. Kornfeld, Ferne E. Kornfeld, First Financial Tax Group, Inc., FEK Enterprises, Inc., on this 26th day of January, 2018.

*/s/ Jonathan B. Butler*
Jonathan B. Butler