Sealed

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO.:

**17-24624**

FILED by _____ D.C.

DEC 20 2017

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
D. OF FLA. – MIAMI

SECURITIES AND EXCHANGE COMMISSION,                )
                                                                                                    )          CIV-COOKE
                                   Plaintiff,                                            )
                                                                                                    )
v.                                                                                                )
                                                                                                    )
ROBERT H. SHAPIRO,                                                          )          GOODMAN
WOODBRIDGE GROUP OF COMPANIES, LLC,        )
d/b/a WOODBRIDGE WEALTH,                                     )
RS PROTECTION TRUST,                                               )
WMF MANAGEMENT, LLC,                                          )
WOODBRIDGE STRUCTURED FUNDING, LLC,       )
WOODBRIDGE MORTGAGE INVESTMENT FUND 1, LLC,   ) UNDER SEAL
WOODBRIDGE MORTGAGE INVESTMENT FUND 2, LLC,   )
WOODBRIDGE MORTGAGE INVESTMENT FUND 3, LLC,   )
WOODBRIDGE MORTGAGE INVESTMENT FUND 3A, LLC,  )
WOODBRIDGE MORTGAGE INVESTMENT FUND 4, LLC,   )
WOODBRIDGE COMMERCIAL BRIDGE LOAN FUND 1, LLC, )
WOODBRIDGE COMMERCIAL BRIDGE LOAN FUND 2, LLC, )
144 WOODBRIDGE-AFFILIATED PROPERTY LIMITED        )
LIABILITY COMPANIES,[1]                                              )
131 WOODBRIDGE-AFFILIATED HOLDING LIMITED          )
LIABILITY COMPANIES,                                                )
                                                                                                    )
                                   Defendants, and                              )
                                                                                                    )
JERI SHAPIRO,                                                                  )
WOODBRIDGE REALTY OF COLORADO, LLC              )
d/b/a WOODBRIDGE REALTY UNLIMITED,                 )
WOODBRIDGE LUXURY HOMES OF CALIFORNIA, INC.,  )
d/b/a MERCER VINE, INC.,                                            )
RIVERDALE FUNDING, LLC,                                       )
SCHWARTZ MEDIA BUYING COMPANY, LLC,          )
WFS HOLDING CO., LLC                                              )
                                                                                                    )          Exhibit "A"
                                   Relief Defendants.                          )
_____          )

**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**

---

[1] Appendix A identifies each of the named 144 Woodbridge-Affiliated Property Limited Liability Companies and 131 Woodbridge-Affiliated Holding Limited Liability Companies.

Plaintiff Securities and Exchange Commission ("Commission") alleges:

## I.     **INTRODUCTION**

1.      Beginning in July 2012 through December 4, 2017, Defendant Robert H. Shapiro ("Shapiro") used his web of more than 275 Limited Liability Companies to conduct a massive Ponzi scheme raising more than $1.22 billion from over 8,400 unsuspecting investors nationwide through fraudulent unregistered securities offerings. Shapiro promised investors they would be repaid from the high rates of interest Shapiro's companies were earning on loans the companies were purportedly making to third-party borrowers. However, nearly all the purported third-party borrowers were actually limited liability companies owned and controlled by Shapiro, which had no revenue, no bank accounts, and never paid any interest under the loans.

2.      Despite receiving over one billion dollars in investor funds, Shapiro and his companies only generated approximately $13.7 million in interest income from truly unaffiliated third-party borrowers. Without real revenue to pay the monies due to investors, Shapiro resorted to fraud, using new investor money to pay the returns owed to existing investors. Meanwhile Shapiro and his family lived in the lap of luxury and spent exorbitant amounts of investor money in alarming fashion, on items such as luxury automobiles, jewelry, country club memberships, fine wine, and chartering private planes.

3.      By December 2017, the fraudulent scheme collapsed. Shapiro and his companies became unable to timely meet their obligation to pay investors their monthly dividends and interest payments. Fundraising from investors was halted, and on December 4, 2017, Shapiro caused most of his companies to file Chapter 11 bankruptcy. The effect of Shapiro and his companies' actions will leave investors with substantial losses, as they are owed at least $961

million in principal. At least 2,600 of these investors unknowingly placed their retirement savings into Shapiro's Ponzi scheme.

4.      Shapiro's entities, Defendants Woodbridge Group of Companies, LLC (d/b/a Woodbridge Wealth) ("Woodbridge"), RS Protection Trust ("RS Trust"), WMF Management, LLC ("WMF"), Woodbridge Structured Funding, LLC (a/k/a Woodbridge Structured Funding of Florida, LLC) ("WSF"), Woodbridge Mortgage Investment Fund 1, LLC ("Fund 1"), Woodbridge Mortgage Investment Fund 2, LLC ("Fund 2"), Woodbridge Mortgage Investment Fund 3, LLC ("Fund 3"), Woodbridge Mortgage Investment Fund 3A, LLC ("Fund 3A"), Woodbridge Mortgage Investment Fund 4, LLC ("Fund 4"), Woodbridge Commercial Bridge Loan Fund 1, LLC ("Bridge Loan Fund 1"), Woodbridge Commercial Bridge Loan Fund 2, LLC ("Bridge Loan Fund 2"), 144 Woodbridge-affiliated Property Limited Liability Companies ("Shapiro Property LLCs"), and 131 Woodbridge-affiliated Holding Limited Liability Companies ("Shapiro Holding LLCs") (collectively the Shapiro entities are referred to as "Corporate Defendants"), were each essential to Shapiro's fraudulent business operation.

5.      Shapiro, as the sole person in control of the Corporate Defendants, not only made material misrepresentations and omissions to investors, but also signed falsified documents, controlled the company's bank accounts, made Ponzi payments to investors, paid significant sales commissions to unregistered sales agents, and misappropriated investor funds for his own personal enjoyment and the enjoyment of his family.

6.      At Shapiro's direction, Woodbridge's network of hundreds of in-house and external sales agents raised in excess of $1.22 billion dollars, falsely selling Woodbridge's investments as "safe" and "secure". Shapiro and Woodbridge directed that investor funds be deposited into the accounts of WSF, Fund 1, Fund 2, Fund 3, Fund 3A, Fund 4, Bridge Loan

Fund 1, and Bridge Loan Fund 2 (with Shapiro as the sole authorized signer) and almost immediately commingled the funds into Woodbridge's operating account.

7.      Shapiro and Woodbridge used at least $328 million to repay principal and interest to investors and spent at least another $172 million on operating expenses, including $64.5 million on sales agent commissions and $44 million on payroll. Shapiro also spent at least $21 million of investor funds on extravagant personal expenditures.

8.      Shapiro selected which properties would be purchased with the investors' commingled funds. Shapiro would create a Shapiro Property LLC to hold title to the property, making RS Trust and Shapiro the ultimate beneficial owners of the properties. The Shapiro Property LLCs, which had no revenue source or bank accounts, then issued promissory notes to one of the Fund entities promising to pay monthly interest, with the principal usually due in one year. Despite the Shapiro Property LLCs having no ability to pay monthly interest, Shapiro and Woodbridge created investment products which sought to market these Shapiro Property LLC's promissory notes as "low risk" and "simpler" investments.

9.      Because the Fund entities were not receiving any interest payments on the Shapiro Property LLC promissory notes, Shapiro instead used new investor funds to pay the interest and dividends owed to previous investors. These interest payments created the illusion that Shapiro and Woodbridge were successfully loaning investor funds as promised to legitimate third-party borrowers who had an ability to pay monthly interest. This allowed Woodbridge and Shapiro to continually induce new investors to participate in their investment products and induce existing investors to rollover their investment into a new note upon maturity, thus delaying Shapiro's and Woodbridge's need to come up with cash to repay the principal balance.

10.    Shapiro caused Woodbridge and WSF to pay substantial commissions to an internal and external sales force in exchange for selling Woodbridge's securities to the public. However, neither Woodbridge, WSF, nor Shapiro were associated with Commission-registered broker dealers, and very few of the sales agents were so associated.

11.    Relief defendants Jeri Shapiro (Shapiro's wife), Woodbridge Realty of Colorado, LLC d/b/a Woodbridge Realty Unlimited ("Woodbridge Realty"), Woodbridge Luxury Homes of California, Inc. d/b/a Mercer Vine, Inc. ("Mercer Vine"), Riverdale Funding, LLC ("Riverdale"), Schwartz Media Buying Company, LLC ("Schwartz Media"), and WFS Holding Co. LLC ("WFS") all received proceeds of the fraud without any legitimate entitlement to the funds.

12.    As a result of the conduct alleged in this Complaint, Shapiro, Woodbridge, WMF, WSF, Fund 1, Fund 2, Fund 3, Fund 3A, Fund 4, Bridge Loan Fund 1 and Bridge Loan Fund 2 violated Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and 77e(c)]; Shapiro, Woodbridge, WSF, Fund 1, Fund 2, Fund 3, Fund 3A, Fund 4, Bridge Loan Fund 1 and Bridge Loan Fund 2 violated Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)]; Shapiro and the Corporate Defendants violated Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rules 10b-5(a) and (c) [17 C.F.R. §§ 240.10b-5(a) and (c)]; Shapiro and RS Trust violated Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)]; Woodbridge and WSF violated Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)]; and Shapiro aided and abetted Woodbridge's and WSF's violations of Section 15(a) of the Exchange Act.

13.     Unless restrained and enjoined, the Defendants are reasonably likely to continue to violate the federal securities laws. The Commission seeks several forms of relief, including asset freezes, appointment of a Receiver, sworn accountings, and an order prohibiting the destruction of documents.  The Commission also seeks permanent injunctions and civil money penalties against all the Defendants, and disgorgement of ill-gotten gains against the Defendants and Relief Defendants.

## II.     DEFENDANTS AND RELIEF DEFENDANTS

### A. Defendants

14.     **SHAPIRO** is a resident of Sherman Oaks, California and also maintains a residence in Aspen, Colorado.  He is a Florida registered voter, and his voter information provides a Palm Beach County address.  He is Woodbridge's owner and President, and during all relevant times maintained sole operational control over the company.  Shapiro is not, and has never been, registered with the Commission, FINRA, or any state securities regulator.  Shapiro personally solicited investors, including several high net-worth individuals, to invest in Woodbridge.  At all relevant times, Shapiro controlled each of the Corporate Defendants and is the beneficial owner of RS Trust, which owns the entities that hold title to the properties.

15.     **WOODBRIDGE** is a Sherman Oaks, California-based financial company not registered with the Commission in any capacity with no publicly traded stock.  Formed in 2014, Woodbridge has served as the main operating company of Shapiro's businesses with approximately 140 employees in offices in six states, including in Boca Raton, Florida. Woodbridge formerly operated as Woodbridge Structured Funding, LLC and was headquartered in Boca Raton, Florida.

16.     **RS TRUST** is an irrevocable domestic asset protection trust settled under Nevada law under the control of Shapiro for the benefit of himself and his family.  RS Trust is an umbrella asset trust holding all of Shapiro's business entities and personal assets, including, but not limited to, WMF, Woodbridge, WSF, Shapiro Holding LLCs and Shapiro Property LLCs. RS Trust, as the beneficial owner of all of Shapiro's business entities, maintained operational control of each of the investment offerings through its ownership of Woodbridge, WSF, and WMF.

17.     **WMF** is a California Limited Liability Company formed on June 25, 2012. WMF, a privately owned entity, was controlled during all relevant times by Shapiro.  WMF is a holding company for various Shapiro business entities including, but not limited to, Woodbridge, Fund 1, Fund 2, Fund 3, Fund 3A, Fund 4, Bridge Loan Fund 1 and Bridge Loan Fund 2.

18.     **WSF** is a Delaware Limited Liability Company formed on July 20, 2009.  WSF was owned and controlled by Shapiro during all relevant times.  WSF is not, and has never been, registered with the Commission in any capacity and has no publicly traded stock.  From 2012 through approximately 2015, WSF served as the operating company of Shapiro's business entities, including but not limited to, the securities offerings at issue and maintained Shapiro's businesses' primary bank account.

19.     **FUND 1** is a Delaware Limited Liability Company formed on June 25, 2012.  At all relevant times, Shapiro was the President and CEO of Fund 1 which is wholly-owned by WMF.  On August 2, 2012, Fund 1 filed with the Commission a Form D notice of exempt offering of securities pursuant to Rule 506 of Regulation D of the Securities Act seeking to raise $10 million from investors.

20.     **FUND 2** is a Delaware Limited Liability Company formed on December 6, 2013. At all relevant times, Shapiro was the President and CEO of Fund 2 which is wholly-owned by WMF.  On January 8, 2014, Fund 2 filed with the Commission a Form D notice of exempt offering of securities pursuant to Rule 506(b) of Regulation D of the Securities Act seeking to raise $25 million from investors.

21.     **FUND 3** is a Delaware Limited Liability Company formed on September 9, 2014. At all relevant times, Shapiro was President and CEO of Fund 3 which is wholly-owned by WMF.  On September 19, 2014, Fund 3 filed with the Commission a Form D notice of exempt offering of securities pursuant to Rule 506(b) of Regulation D of the Securities Act seeking to raise $50 million from investors.

22.     **FUND 3A** is a Delaware Limited Liability Company formed on July 28, 2015.  At all relevant times, Shapiro was the President and CEO of Fund 3A which is wholly-owned by WMF.  On October 30, 2015, Fund 3A filed with the Commission a Form D notice of exempt offering of securities pursuant to Rule 506(b) of Regulation D of the Securities Act seeking to raise $100 million from investors.

23.     **FUND 4** is a Delaware Limited Liability Company formed on June 3, 2015.  At all relevant times, Shapiro was the President and CEO of Fund 4 which is wholly-owned by WMF.  On November 21, 2016, Fund 4 filed with the Commission a Form D notice of exempt offering of securities pursuant to Rule 506(b) of Regulation D of the Securities Act seeking to raise $100 million from investors.

24.     **BRIDGE LOAN FUND 1** is a Delaware Limited Liability Company formed on May 7, 2015.  At all relevant times, Shapiro was the President and CEO of Bridge Loan Fund 1 which is wholly-owned by WMF.  On June 17, 2015, Bridge Loan Fund 1 filed with the

Commission a Form D notice of exempt offering of securities pursuant to Rule 506(c) of Regulation D of the Securities Act seeking to raise $50 million from investors.

25.     **BRIDGE LOAN FUND 2** is a Delaware Limited Liability Company formed on July 28, 2015.  At all relevant times, Shapiro was the President and CEO of Bridge Loan Fund 2 which is wholly-owned by WMF.  On November 22, 2016, Bridge Loan Fund 2 filed with the Commission a Form D notice of exempt offering of securities pursuant to Rule 506(c) of Regulation D of the Securities Act seeking to raise $100 million from investors.

26.     **SHAPIRO PROPERTY LLCs** are 144 Delaware and Colorado Limited Liability Companies owned, and at all relevant times controlled by Shapiro and/or Jeri Shapiro (through RS Trust), which own real estate purchased with investor funds underlying the securities at issue.  A list of each Shapiro Property LLC is included in Appendix A.

27.     **SHAPIRO HOLDING LLCs** are 131 Delaware and Colorado Limited Liability Companies that own the Shapiro Property LLCs.  The Shapiro Holding LLC were at all relevant times owned and controlled by Shapiro through RS Trust.  A list of each Shapiro Holding LLC is included in Appendix A.

**B.  Relief Defendants**

28.     **JERI SHAPIRO** is Shapiro's wife, and a resident of Sherman Oaks, California who also maintains a residence in Aspen, Colorado.  Jeri Shapiro is not, nor has she ever been, registered with the SEC, FINRA or any state securities regulator.  She has been employed as a Vice President of Woodbridge since approximately 2012.  Jeri Shapiro also owns and/or controls certain Shapiro Property LLCs in possession of real property and other assets purchased with investor funds.   Without any legitimate basis, Jeri Shapiro received investors' proceeds emanating from the Defendants' securities fraud.

29.     **WOODBRIDGE REALTY** is a Carbondale, Colorado based Limited Liability Company formed on August 20, 2014, owned by Woodbridge, and at all relevant times controlled by Shapiro.   Woodbridge Realty is a real estate brokerage firm responsible for purchasing and selling Colorado real property owned by several of the Shapiro Property LLCs. Without any legitimate basis, Woodbridge Realty received investors' proceeds emanating from the Defendants' securities fraud.

30.     **MERCER VINE** is a Los Angeles based, California corporation formed on August 6, 2014, majority-owned by Woodbridge, and at all relevant times managed and controlled by Shapiro.  Mercer Vine is a real estate brokerage firm responsible for purchasing, developing and selling California real property owned by several of the Shapiro Property LLCs. Without any legitimate basis, Mercer Vine received investors' proceeds emanating from the Defendants' securities fraud.

31.     **RIVERDALE** is a Delaware Limited Liability Company formed in 2012, owned by Woodbridge, and at all relevant times controlled by Shapiro.  Riverdale is engaged in the business of providing hard-money loans to third-party clients and servicing those loans.  Without any legitimate basis, Riverdale received investors' proceeds emanating from the Defendants' securities fraud.

32.     **SCHWARTZ MEDIA** is a Delaware Limited Liability Company formed on June 11, 2012 and owned and managed by Jeri Shapiro.  Without any legitimate basis, Schwartz Media received investors' proceeds emanating from the Defendants' securities fraud.

33.     **WFS** is a Delaware Limited Liability Company formed in September 2017 and owned and managed by Shapiro.  Pursuant to Woodbridge's bankruptcy filing and a Transition Services Agreement ("Transition Agreement") dated December 1, 2017, Shapiro has been

retained as a consultant to Woodbridge at the monthly rate of $175,000 paid to WFS for the benefit of Shapiro. Should the purported independent manager terminate this consulting agreement without cause, 50% of the total yearly amount of $2.1 million will be immediately due under the Transition Agreement. Shapiro was paid the first $175,000 in advance upon executing the Transition Agreement. Without any legitimate basis, WFS received investors' proceeds emanating from the Defendants' securities fraud.

### III.  OTHER REGULATORY ACTIONS

34.    On July 17, 2017, the Commission brought a subpoena enforcement action in this District (Case No. 17-mc-22665-Altonaga/Goodman) against Woodbridge after Woodbridge failed to produce documents required under the Commission's January 31, 2017 subpoena, including key documents relevant to the Commission's investigation into Woodbridge's investments and business operations such as company emails of Robert Shapiro and Woodbridge's Controller. After obtaining an order requiring production, the Commission was forced to move for contempt as Woodbridge continued to fail to produce the emails.

35.    On October 31, 2017, the Commission brought a second subpoena enforcement action in this District (Case No. 17-mc-23986-Huck/McAliley) against 235 Limited Liability Companies ("235 LLCs") affiliated with Woodbridge and Shapiro after the 235 LLCs failed to produce documents required under the Commission's August 16 and 17, 2017 subpoenas, which sought information related to their ownership structure and payments purportedly made by them to Woodbridge. Many of the 235 LLCs subject to the Commission's subpoena enforcement action are named as Defendants here.

36.    Since 2015, regulators in eight states have filed civil or administrative actions against one or more of the Corporate Defendants and certain of their sales agents alleging they

11

have engaged in the unregistered offering of securities in their respective jurisdictions and have unlawfully acted as unregistered investment advisors or broker-dealers. Five states, Massachusetts, Texas, Arizona, Pennsylvania, and Michigan, have entered temporary or permanent cease and desist orders against one or more of the Corporate Defendants related to their unregistered sale of securities.

## IV. CHAPTER 11 RESTRUCTURING BANKRUPTCY FILING

37.     On December 4, 2017, the Proposed Corporate Defendants (except RS Trust and the non-bankruptcy filing Shapiro Holding Companies and Shapiro Property LLCs as identified in Appendix A) voluntarily filed for Chapter 11 bankruptcy, *In re Woodbridge Group of Companies LLC, et al.,* Case No. 17-12560 (jointly administered) (Bankr. D. Del. Dec. 4, 2017). The bankruptcy debtors have not acknowledged their fraudulent activities, but rather continue to operate as before the filing and disingenuously seek to reorganize their operations with a plan to emerge from the bankruptcy as a viable company with Shapiro at the helm.

## V.  JURISDICTION AND VENUE

38.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d) and 77v(a)]; and Sections 21(d), 21(e) and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa(a)].

39.     This Court has personal jurisdiction over the Defendants and venue is proper in the Southern District of Florida for several reasons. Woodbridge maintains an office in Boca Raton. In addition, Woodbridge raised at least $114 million from approximately 700 investors residing in this district. Woodbridge also paid over $12 million in transaction-based commissions to 20 sales agents located in this district. Prior to 2016, Woodbridge operated as WSF, and was headquartered in Boca Raton, Florida.

40.     In connection with the conduct alleged in the Complaint, Defendants, directly and indirectly, singly or in concert with others, made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in the interstate commerce, and of the mails.

## VI.  OVERVIEW OF WOODBRIDGE'S FRAUDULENT BUSINESS

41.     Beginning in July 2012 through at least December 4, 2017, Shapiro and the Corporate Defendants orchestrated a massive Ponzi scheme raising in excess of $1.22 billion from over 8,400 nationwide investors.  At least 2,600 of these investors used their Individual Retirement Account funds to invest nearly $400 million.

42.     Woodbridge sold investors two primary types of securities:  (1) a twelve-to-eighteen month term promissory note bearing 5%-8% interest that Woodbridge described as First Position Commercial Mortgages ("FPCM Investment" and "FPCM Investors"), and (2) seven different private placement fund offerings with five-year terms ("Fund Offerings" and "Fund Investors").

43.     The purported revenue source enabling Woodbridge to make the payments to FPCM Investors was the interest a Woodbridge affiliate would be receiving from mainly one-year loans to supposed third-party commercial property owners ("Third-Party Borrowers").

44.     Woodbridge told investors that these Third-Party Borrowers were paying the company 11-15% annual interest for "hard money," short-term financing.  As an additional source of revenue, Woodbridge told Fund Investors that it would purchase properties to develop and sell for a profit.

45.     Woodbridge employed a sales team of approximately 30 in-house employees that operated within Woodbridge's offices.  Woodbridge also utilized a network of hundreds of

external sales agents to solicit investments from the general public by way of television, radio, and newspaper advertisements, cold calling campaigns, social media, websites, seminars, and in-person presentations.

46.     Although virtually none of these sales agents were registered with any regulatory agency, Woodbridge paid them more than $64.5 million in transaction-based compensation in the form of commissions for selling investments in Woodbridge securities.

47.     In reality, Woodbridge's business model was a sham—the vast majority of the purported Third-Party Borrowers were hundreds of Shapiro owned and controlled LLCs, which had no source of income, no bank accounts, and never made any loan payments to Woodbridge, all facts Woodbridge and Shapiro concealed from investors.  Rather, Shapiro and Woodbridge continued its ruse for the past several years by supporting its business operations nearly entirely by raising and using new investor funds, in classic Ponzi scheme fashion.

48.     For example, although Woodbridge raised at least $1.22 billion dollars from FPCM and Fund Investors, it issued only approximately $675 million in "loans".  Rather than generating the 11-15% interest as promised, the loans generated only $13.7 million from Third-Party Borrowers, significantly less than required to operate Woodbridge's business and pay returns to investors.  Despite this significant shortfall, Woodbridge paid investors more than $368 million in interest, dividends, and principal repayments.  Woodbridge spent another $172 million on operating expenses, and $21.2 million to support Shapiro's extravagant lifestyle.

49.     To keep the fraudulent operation afloat, and because Shapiro's Property LLC's were not making any of the promised interest payments and Woodbridge's other revenue was minimal, Woodbridge and Shapiro required a continuous infusion of new investor funds and

needed existing FPCM Investors to rollover their investment into a new note at the end of the term, so as to avoid having to come up with the cash to repay the principal.

50.     Finally, on December 1, 2017, after amassing more than $1.22 billion dollars of investor money, with more than $961 million in principal still due to investors, Woodbridge and Shapiro missed their first interest payments to investors after purportedly ceasing their fundraising activities.  Without the infusion of new investor funds, just days later, on December 4, 2017, Shapiro caused most of his companies to be placed in Chapter 11 Bankruptcy.

### A.  Woodbridge's Flawed Business Model

51.     Woodbridge was the principal operating company of Shapiro's businesses and employed approximately 140 people in offices in six states.  This is a chart of the basic corporate structure of Shapiro's entities:



52.     Since its inception, Woodbridge was wholly-owned by Shapiro, who maintained sole operational control over Woodbridge and each of its affiliates.

53.     Woodbridge's seven private placement Fund Offerings were managed by its affiliate WMF, another Shapiro owned and controlled company.

54.     Woodbridge solicited the general public to invest in its securities offerings through its website, telemarketing, point-and-click internet ads, social media, direct mail, seminars, and in-person group sales presentations.

55.     None of the securities sold by Shapiro were registered with the Commission, nor was Woodbridge, WSF, WMF, or any of the Woodbridge affiliates.

   **i.     Woodbridge's Fundraising Activities - FPCM Securities and Fund Offerings**

56.     Woodbridge's FPCM investment business model was to borrow money from investors and in exchange issue the FPCM Investor a promissory note ("FPCM Note") maturing in twelve (or sometimes up to eighteen) months, bearing an annual interest rate of 5-8%, payable monthly.  The FPCM Note was issued by either Fund 1, Fund 2, Fund 3, Fund 3A, Fund 4, Bridge Loan Fund 1, or Bridge Loan Fund 2 ("Fund Entity" or collectively referenced as "Fund Entities").

57.     Woodbridge represented that the FPCM Investment was a "simple, safer and more secured opportunity for individuals to achieve their financial objectives."  Woodbridge told investors that it was making short-term, high interest rate loans to Third-Party Borrowers, which would be secured by real estate.

58.     These Third-Party Borrowers, Woodbridge claimed, were bona-fide commercial property owners that could not obtain traditional loans and were willing to pay Woodbridge higher interest rates for short-term financing.

59.     Woodbridge provided FPCM Investors three primary documents: (1) a promissory note, (2) collateral assignment of note and mortgage, and (3) an inter-creditor agreement. Each of these documents created the illusion of a legitimate business.

60.     Woodbridge promised FPCM Investors a pro-rata first position lien interest in the underlying property and told them that their returns would be generated by interest payments made by the Third-Party Borrowers.

61.     Woodbridge represented that the Fund Entity would in turn pool money received from many FPCM Investors and lend those funds to a Third-Party Borrower for one-two years and for up to only 60-70% of the value of the real estate securing the transaction ensuring that the "properties that secure the mortgages are worth considerably more than the loans themselves at closing."

62.     At the same time it was soliciting FPCM Investors, Woodbridge offered a second type of security offering, the Fund Offering, to investors through Funds 1, 2, 3, 3A, and 4, and Bridge Loan Funds 1 and 2, pursuant to purported exemptions from registration under Rules 506(b) and (c) of Regulation D of the Securities Act, collectively seeking to raise at least $435 million from investors.

63.     Woodbridge, in an attempt to avoid registration of its securities with the Commission, purportedly limited each of the Fund Offerings to accredited investors with a $50,000 minimum subscription and provided for a five-year term with a 6% to 10% aggregate annual return paid monthly to Fund Investors and a 2% "accrued preferred dividend" to be paid at the end of the five-year term and a share of "profits".

64.     In the offering memoranda for the Fund Offerings, Woodbridge represented to Fund Investors that their funds would be used for real estate acquisitions and investments,

notably including Woodbridge's FPCMs. The Fund Offerings, in effect, were investments into pooled FPCMs. Many of these pools contained 40 or more investors.

65.    The loans to Third-Party Borrowers typically ranged in amounts between $1 million and $90 million, depending on the value of the Third-Party Borrowers' property.

66.    Woodbridge told investors that it conducted all due diligence including title search and appraisal on the commercial property and borrower. The investors did not have any role in selecting or analyzing the underlying properties.

67.    Shapiro identified the properties underlying the investments, approved every real estate purchase, and selected the amount and type of investments sold.

68.    In addition, the expected profitability of the investments, as well as the promise to pay returns, were derived solely from the efforts of Shapiro and Woodbridge. Once investors provided their funds to Woodbridge, they had no control over how Shapiro and Woodbridge used their money.

69.    At the end of the one-year term, the Third-Party Borrower was obligated to repay Woodbridge the principal amount of the loan and if it defaulted, Woodbridge could foreclose on the property to recover the amount owed.

70.    The transaction between the Fund Entity and the Third-Party Borrower was documented with a promissory note ("Fund Note") between the Fund Entity and the Third-Party Borrower, as well a mortgage in favor of the Fund Entity. The Fund Note carried an interest rate equal to usually 11% but sometimes as high as 15% per annum.

71.    Therefore, if the Fund Entity loaned money to a Third-Party Borrower at 11% interest, but borrowed money from the FPCM Investor at 5% interest, then the spread or

difference in rate of 6% was income available to the Fund Entity and Woodbridge that they could use to pay expenses including operating expenses and sales commissions.

72.     Each Fund Offering memoranda provided that the company was reserving between 5% and 8% of the total amount raised for commissions to "licensed broker/dealers." Shapiro determined sales agents' commissions.

73.     Woodbridge's in-house sales team of approximately 30 sales agents, led by Head of Sales "DR," was responsible for soliciting Fund Investors.  These sales agents received transaction-based compensation for sales of Fund Offerings.

74.     Shapiro hand-signed thousands of checks to investors and sales agents.  In fact, Shapiro controlled Woodbridge's bank accounts and was the sole signer on all of Woodbridge and its affiliates' bank accounts.

     **ii.**     **Marketing Materials Claimed Safety of Investment**

75.     In numerous marketing materials sent to FPCM Investors, Woodbridge described this investment as "low risk," "simpler," "safe" and "conservative" and that investor returns were generated by the Third-Party Borrowers' interest payments.

76.     For example, Woodbridge wrote in marketing materials that "Woodbridge receives the mortgage payments directly from the borrower, and Woodbridge in turn delivers the loan payments to you under your first position documents."  As discussed below, this was a lie.

77.     Woodbridge went on to represent to investors that having a "first-position" means "you have priority over any other liens or claims on a property if the property owner defaults. *It puts you in control.*"

78.     Woodbridge further reassured investors, telling them not to worry about the borrower not making their loans payments because Woodbridge would continue to pay the

investor their interest payments. For example, in a Frequently Asked Question brochure for the FPCM product, Woodbridge stated the following:

> Q:  If the borrower does not make their payments to Woodbridge will I be informed?

> A:  This question is actually irrelevant, because Woodbridge would continue to make monthly payments to you . . . and may or may not inform you of the underlying non-payment. *As long as Woodbridge continues to make regular payments to you, there would be no reason to be concerned.*

These statements were materially misleading. In fact, virtually no Third-Party Borrowers would be making payments to Woodbridge, which made payments to investors not through earnings, but by continuous new investor funds and rollovers. The scheme's collapse was only a matter of time, and investors had every "reason to be concerned." Woodbridge and Shapiro disclosed none of this to investors.

## B.  **Fraudulent Conduct**

### i.  **Woodbridge Was a Ponzi Scheme Orchestrated by Shapiro and His Entities**

79.  Overall, between July 2012 and December 2017, Woodbridge and Shapiro raised over $1.22 billion from more than 8,400 FPCM Investors and Fund Investors.

80.  During this time, Woodbridge collected only about $13.7 million in interest from Third-Party Borrowers. Yet during this time frame, Woodbridge, using investor funds, paid more than $103 million in monthly interest to FPCM Investors and dividends to Fund Investors, and another $265 million to repay principal to investors. The amount of principal remaining due to FPCM Investors and Fund Investors exceeds $961 million.

81.  Woodbridge also spent another $172 million of investor funds on operating expenses, including $64.5 million on sales agent commissions and $44 million on payroll.

82.     Moreover, Woodbridge and Shapiro pooled FPCM Investors' and Fund Investors' investment funds into Fund Entity bank accounts and then further commingled them into a single Woodbridge or WSF operating account under Shapiro's control.   The commingling was extensive and resulted in transfers totaling approximately $1.66 billion and exceeded 10,700 transactions.

83.     WMF also participated in the scheme by managing the various Fund offerings, including commingling all investor proceeds into one operating account and paying returns to investors using investor proceeds.

84.     Instead of issuing loans to unaffiliated Third-Party Borrowers in arms-length transactions, Woodbridge and Shapiro used FPCM Investors' and Fund Investors' funds to purchase almost 200 residential and commercial properties located primarily in Los Angeles, California and Aspen, Colorado, and placed title to those property in the name of one of the Shapiro Property LLCs, which were ultimately owned by Shapiro through RS Trust.

85.     In order to document the fraudulent transaction, the Fund Entity issued promissory notes, that on their face, indicated a purported loan was being made from one of the Fund Offerings to a Third-Party Borrower.  These notes promised that the particular Shapiro Property LLC as the Third-Party Borrower would pay interest to the Fund Entity loaning it money.  However, as Shapiro knew at the time he signed the note, the Shapiro Property LLC could not and would not make the promised loan payments because it lacked any source of revenue, a fact not disclosed to investors.

86.     Beginning in December 2013, when Fund 2 was formed, and subsequently with Funds 3, 3A, and 4, the amount of funds loaned to entities affiliated with Shapiro was in excess of 70%--and as high as 98%--of Woodbridge's overall loan portfolio.

21

87.     The purported Third-Party Borrowers made minimal interest payments, and thus payments to the FPCM Investors and Fund Investors were almost exclusively from funds Woodbridge received from other investors, in classic Ponzi scheme fashion.  Shapiro and Woodbridge concealed these facts from investors.

**ii.  Woodbridge's Sales Team Perpetuated the Fraud at Shapiro's Behest**

88.     As a result of the Shapiro Borrowers' lack of revenue and failure to make any interest payments, Woodbridge and Shapiro required the continuous infusion of new funds from investors in order to keep the scheme afloat.

89.     Woodbridge did not evaluate whether the FPCM investors were "sophisticated," "accredited" or otherwise had any particular financial acumen.  Indeed, instructions from a company providing Woodbridge with leads on potential investors remarked that leads followed up within 20 minutes of generation are "where your sales team will find the majority of low hanging, easiest to harvest fruit."

90.     Woodbridge could not afford to return investors their principal investments, so when FPCM Notes came due, Woodbridge and Shapiro sought extensions and re-enrollment of FPCM investors at the end of their terms, and sought to move FPCM Investors into the longer five-year term Fund Offerings.  Woodbridge aggressively sought to avoid investors cashing out at the end of their terms and in fact touted achieving a 90% re-enrollment rate.  In marketing materials Woodbridge boasted "clients keep coming back to [Woodbridge] because time and experience have proven results.  Over 90% national renewal rate!"

91.     In oral sales presentations, marketing materials provided to prospective investors, advertisements and on its website, Woodbridge and Shapiro made materially false and

misleading statements to induce prospective investors to invest in the FPCMs and Fund Offerings.

92.     In one recorded phone call, a Woodbridge internal salesman falsely represented to a prospective investor that Woodbridge is "lending and not purchasing the properties." The salesman further told the investor that the equity in the property "protects us from a property owner defaulting" while omitting the material fact that the property owner was a Woodbridge affiliate which would not be making any interest payments on the "loan".

93.     The Fund Offering and FPCM Offering sales materials included a host of misstatements meant to entice investors to "safe" and "secured" offerings with returns generated by Third-Party Borrowers' interest payments. These misrepresentations had the effect of concealing the true nature of Woodbridge's business—a large-scale Ponzi scheme using only new investor funds as the source of existing investors' returns.

94.     DR, the Head of Sales, reported directly to Shapiro, who called for daily sales updates from DR. Shapiro demanded that DR and the Woodbridge sales team continuously seek to "move your loan from the First Position Mortgage . . . even if your term hasn't expired yet— to our higher-return Mortgage Investment Fund." Woodbridge threatened to terminate its relationship with external sales agents who would not permit Woodbridge to contact the sales agents' clients about moving from the FPCM to the longer term Fund Offerings.

95.     Shapiro provided frequent, often daily, requirements to DR of the number ("we need to raise 45 million in the next 39 days.") and type ("I need $5 million in [Fund Investors] in the next 2 weeks") of securities that needed to be sold.

96.     To ensure compliance with these demands, Shapiro would either threaten his employees with termination or promise bonuses.

97.     DR raised FPCM funds even when Woodbridge had no inventory of available real estate properties.  For example, March 4, 2016, DR celebrated with Woodbridge's sales team that "even without being able to fund due to lack of inventory we funded over 37 million in [FPCMs] and 6 million in [Fund Offerings]!!!!!!!  By far our biggest month to date!!!!!" and congratulated Woodbridge's sales team, stating "WE ARE WINNERS!!!!"

98.     Woodbridge retained sales commissions for the sale of their investment products (5% - 8% of the total amount raised) and paid their largely unregistered sales agent employees transaction-based commissions.

99.     Shapiro was also notified whenever an investor chose to withdraw their funds from Woodbridge.  He also personally solicited bridge loans from wealthy individuals to cover gaps in the company's funding as needed.  These loans represented tens of millions of dollars and were repaid in short time frames once investor funds were available.

100.     Woodbridge also recruited a network of several hundred external, mostly unregistered, sales agents.  Woodbridge provided the sales agents with the information and sales materials that the external sales agents gave to FPCM Investors.  Every piece of sales material required Woodbridge's approval.

101.     The external sales agents solicited the general public through marketing materials created, and in many cases, paid for by Woodbridge, which the external sales agents disseminated via television commercials, radio ads and talk shows, newspaper ads, social media, newsletters and internet websites.

102.     Woodbridge supplied the external sales agents a sales packet to provide each prospective FPCM Investor that contained a one-page description of the key terms of the FPCM, a list of FAQs, and perfunctory examples of the collateral properties.  Woodbridge also posted

these documents online and instructed external sales agents to direct their clients to the company's website to view them.

103.   Woodbridge's marketing materials included a graphic that summarized the FPCM Investment as follows:



104.   In reality, the claimed interest payments from the purported third-party "property owner" (Circle 3) to Woodbridge (Circle 2) did not exist.  Payments to the FPCM Investors and Fund Investors derived almost exclusively from funds Woodbridge received from other investors.

105.   Woodbridge further lied to investors in marketing materials when it claimed it "receives the mortgage payments directly from the borrower, and Woodbridge in turn delivers the loan payments to you."

106.    Woodbridge's training manual included a sales script for its internal sales agents to follow when offering the FPCM program to external sales agents.  The script reiterated the information contained in the sales packet and on the website.  Hence, to entice investors, these external sales agents, used a variety of sales techniques and represented the investment as being "low risk," "safe," "simpler," and "conservative."  When they pitched the investments, sales agents repeated Woodbridge's lies that investor returns were generated by Third-Party Borrowers' interest payments.  However, given the absence of revenue and Woodbridge's and Shapiro's misappropriation of investor money, the investments were anything but safe.

107.    To ensure its sales agents followed this script, Woodbridge maintained an internal telephone recording system monitored by quality assurance personnel who reported any inconsistencies to DR.

108.    Woodbridge offered its FPCM product to its external sales agents at a 9% wholesale rate, and the agents in turn offered the FPCM to their investor clients at 5% to 8% annual interest—the external sales agent received a commission equivalent to the difference.

109.    Overall, Woodbridge paid external sales agents at least $64.5 million in commissions through this arrangement.

110.    Many of their sales agents were not associated with registered broker-dealers or investment advisory firms.  Several of these sales agents, including some of the highest producers, had been censured or barred by the Commission, FINRA or state securities regulators. Woodbridge did not disclose this to investors.

### iii.   **Misuse and Misappropriation of Investor Funds**

111.   Instead of investing their funds as promised, Woodbridge and Shapiro misused and misappropriated hundreds of millions of dollars that Fund Investors and FPCM Investors entrusted to them.

112.   Although Woodbridge, through the Shapiro Property LLCs, purchased almost 200 properties in and around Aspen and Los Angeles for approximately $675 million, the company has generated nominal net proceeds.  Many of the properties Woodbridge purchased remain as vacant lots that have sat undeveloped for several years.

113.   In the meantime, Shapiro treated himself to an exorbitant lifestyle, at the investors' expense.

114.   Shapiro misappropriated at least $21.2 million for his own personal benefit and to benefit his related entities or family members.  For example, Shapiro charged at least $9 million dollars on credit cards which were paid for nearly entirely by one or more Woodbridge entity.  In fact, about 99% of the payments made toward those credit cards were derived from Woodbridge.

115.   Shapiro charged personal items, including extravagant travel expenses, luxury brand items, and furnishings.  For example, Shapiro used investor funds on the following:

- $200,000 at Four Seasons Hotels and Ritz Carlton Hotels.

- $34,000 on limousine services.

- $1.6 million on home furnishings.

- $1.4 million on luxury retail purchases like Louis Vuitton and Chanel.

- $700,000 on meals and entertainment

- $600,000 on political contributions.

- $400,000 on jewelry

- $308,000 on wine.

116.    In addition to the credit card charges, Shapiro spent additional investor funds as follows:

- $3.1 million to charter private planes.

- $1.2 million in alimony to his ex-wife.

- $340,000 in luxury automobiles.

- $130,000 on country club fees.

117.    Woodbridge and Shapiro also paid nearly $1 million to a rare coin and precious metal firm, purportedly for client gifts.

118.    Shapiro's wife, Jeri Shapiro, and her company Schwartz Media, also received substantial benefits from the use of investor funds.  Jeri Shapiro owns and/or controls certain Shapiro Property LLCs in possession of real property and other assets purchased with investor funds.  Jeri Shapiro is a beneficiary of RS Trust, which holds title to over 140 properties purchased with investor funds.  In addition, Jeri Shapiro and her company Schwartz Media, without a legitimate basis, received investors' proceeds emanating from the Defendants' securities fraud.

119.    Another of Shapiro's companies, Woodbridge Realty, acted as the real estate brokerage firm responsible for purchasing and selling the Colorado real property owned by several of the Shapiro Property LLCs.   When Woodbridge bought or sold properties, Woodbridge Realty received a sales commission.  Similarly, Mercer Vine, a company majority owned by Shapiro and managed by him, is a real estate brokerage firm responsible for purchasing, developing and selling the California real property owned by several of the Shapiro Property LLCs.  Mercer Vine similarly received sales commissions as a result of the real estate

transactions.  Therefore, Shapiro lined his pockets with investor funds by receiving portions of these sales commissions.

120.    Riverdale is another Woodbridge company controlled by Shapiro which engaged in the business of providing hard-money loans to third-party clients and servicing those loans.  It too received millions of dollars from Woodbridge during the relevant time frame of the Ponzi scheme, without any legitimate basis.

121.    WFS was formed just a few months ago in September 2017 and is owned and managed by Shapiro.  On the eve of its bankruptcy filing, Woodbridge retained Shapiro as a consultant to the company at the monthly rate of $175,000 paid to WFS.  Shapiro, through WFS, has been paid at least $175,000 thus far. Without any legitimate basis, WFS received investors' proceeds emanating from the Defendants' securities fraud.

### iv.    Internal Bookkeeping System Indicative of Ponzi Scheme

122.    Woodbridge used a bookkeeping system wholly inconsistent with its massive fundraising activities and which was indicative of its Ponzi operation.

123.    Woodbridge did not retain external auditors and used an internal bookkeeping system managed by NP, its Controller, who is not a CPA.  NP operated from a satellite office in Daytona Beach, Florida, where she maintained the company's financial records with daily instructions from Shapiro.

124.    NP provided Shapiro daily notifications of the company's income and expenses and provided him a monthly report showing the company's revenue and interest payments to investors.

125.    The various Woodbridge entities maintained their accounting general ledgers in the accounting software QuickBooks. Woodbridge's and the Fund Entities' QuickBooks records did not accurately reflect Woodbridge's business operations.

126.    For example, the QuickBooks reflect interest payments to Fund Entities totaling approximately $93 million. However, of that figure, only about $13 million represents actual cash payments of interest by third parties. The balance of $80 million represents intercompany receivables created when the Shapiro Property LLCs failed (inevitably) to make interest payments when due.

127.    In addition, the Fund Entities recorded assets duplicative of Woodbridge's assets, potentially overstating assets by at least $790 million. For example, as of April 2017, Woodridge recorded mortgages and real estate investments in QuickBooks as being almost $1.4 billion, when in reality Woodbridge's mortgages and real estate investments totaled about $592 million through April 2017.

128.    In email conversations, Shapiro and DR discuss how to manipulate Woodbridge's records to show Woodbridge's supposed "profits" from certain property development.

129.    Despite creating the illusion of a profitable real estate development business, Woodbridge's revenue from development activity was nominal and woefully inadequate to satisfy its ever-increasing obligations to its investors.

### v.   <u>Shapiro's Web of Limited Liability Entities Engaged in a Scheme to Defraud</u>

130.    The Shapiro Property LLCs and RS Trust also engaged in a scheme to defraud investors. Shapiro created a web of more than 100 Shapiro Property LLCs and more than 100 corresponding like-titled Shapiro Holding LLCs in order to purchase, and hold title to, properties he controlled, financed 100% by investor funds from the FPCM and Fund Offerings. The end

beneficiary of the fraud being Shapiro and RS Trust, the vehicle used to ultimately hide Shapiro's beneficial title ownership of the properties.

131.    WMF also participated in the scheme by managing the various Fund offerings, including commingling all investor proceeds into one operating account and paying returns to investors using investor proceeds.

### vi. Shapiro and RS Trust Concealed Their Ownership of Properties

132.    Shapiro and RS Trust made every effort to hide the fact that most of the Third-Party Borrowers and owners of the underlying properties were Shapiro and his family.

133.    Shapiro owns the real estate properties through the Shapiro Property LLCs, which are managed by Shapiro Holding LLCs, whose member is RS Trust, and whose trustee is Shapiro.  None of the publicly available documentation indicated that RS Trust was the ultimate owner of the underlying properties that had been purchased with FPCM Investors' and Fund Investors' funds.  These investors were not told that the vast majority of loans were made to Shapiro Property LLCs (who had no revenue), entities Shapiro controlled through RS Trust.

134.    As early as 2014, Shapiro was presented the opportunity to disclose his membership interest in Limited Liability formation documents.  Instead, Shapiro refused and had a high ranking Woodbridge employee instruct Woodbridge's Registered Agent to not include any member/manager information, allowing Shapiro's ownership interest to remain hidden.

135.    Given that the corporate filings were predominantly in Delaware, with extremely limited public information, the Commission was forced to subpoena over two-hundred individual LLCs controlled by Shapiro seeking underlying formation documents, and then was forced to file a subpoena enforcement action in district court to obtain these documents when neither Shapiro nor the LLCs responded to those subpoenas.

**vii.** **Violations of State Cease and Desist Orders and Attempts to Manipulate  Public Perception**

136.    Five states, Texas, Massachusetts, Arizona, Pennsylvania, and Michigan, have issued cease and desist orders against one or more of the Corporate Defendants based on their unregistered sale of securities.   Woodbridge nonetheless continued to sell their investment products to residents of those states.   For example Woodbridge accepted the following FPCM investments subsequent to the dates of the cease and desist orders:

- $3.2 million from at least 11 Massachusetts investors.

- $2.3 million from at least 25 Texas investors.

- $900,000 from at least 13 Arizona investors.

- $2.6 million from at least 31 Pennsylvania investors.

137.    Woodbridge and Shapiro engaged in deceptive conduct with respect to the many other pending state regulatory actions against Woodbridge for its sale of unregistered securities. Shapiro instructed DR to affirmatively withhold this information from investors and to "only tell investors if they ask."

138.    Woodbridge's sales agents falsely mischaracterized the dispositions of these regulatory actions to external sales agents claiming that the company "was exonerated of any wrongdoing or fraudulent activity" when no such determination was actually made.

139.    Shapiro also hired a public relations firm to manipulate search engine results so that investors that looked up Woodbridge would not see the state regulatory orders filed against the company.

140.    Additionally, at Shapiro's specific instruction, Woodbridge made a series of negligible charitable donations with the sole purpose of generating a stream of positive press

releases to push these regulatory actions off the front page of internet search results relating to the company.

141.    More recently, Woodbridge had begun transitioning investors into a new product called a Co-Lending Opportunity ("CLO"). The CLO mirrors the FPCM in every material respect save one—the CLO's term is for 9 months. In email communications, Shapiro and DR contended that this small change ensured that the CLO was not a security and that Woodbridge could circumvent the states' regulatory agencies. Instead of seeking state regulators' opinion about the CLO, Shapiro and DR planned to "switch first then settle quietly [with Colorado and California]."

## VII. CLAIMS FOR RELIEF

### COUNT I

### Violations of Sections 5(a) and 5(c) of the Securities Act

### (Against Shapiro, Woodbridge, WMF, WSF, Fund 1, Fund 2, Fund 3, Fund 3A, Fund 4, Bridge Loan Fund 1, and Bridge Loan Fund 2)

142.    The Commission repeats and realleges paragraphs 1 through 141 of its Complaint.

143.    No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the securities issued by the Defendants subject to this count as described in this Complaint and no exemption from registration existed with respect to these securities.

144.    From July 2012 through at least December 4, 2017, the Defendants subject to this count directly and indirectly:

> (a)    made use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, through the use or medium of a prospectus or otherwise;

(b)    carried or caused to be carried securities through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; or

(c)    made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security,

without a registration statement having been filed or being in effect with the Commission as to such securities.

145.    By reason of the foregoing the Defendants subject to this count violated and, unless enjoined, are reasonably likely to continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## COUNT II

## VIOLATIONS OF SECTION 17(a)(1) OF THE SECURITIES ACT

### (Against Shapiro, Woodbridge, RS Trust, WMF, WSF, Fund 1, Fund 2, Fund 3, Fund 3A, Fund 4, Bridge Loan Fund 1, Bridge Loan Fund 2, Shapiro Property LLCs, and Shapiro Holding LLCs)

146.    The Commission repeats and realleges Paragraphs 1 through 141 of this Complaint as if fully set forth herein.

147.    From July 2012 through at least December 4, 2017, the Defendants subject to this count, in the offer or sale of securities by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, knowingly or recklessly employed devices, schemes or artifices to defraud.

148.    By reason of the foregoing, the Defendants subject to this count, directly and indirectly have violated, and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT III

### VIOLATIONS OF SECTION 17(a)(2) OF THE SECURITIES ACT

#### (Against Shapiro, Woodbridge, WSF, Fund 1, Fund 2, Fund 3, Fund 3A, Fund 4, Bridge Loan Fund 1, and Bridge Loan Fund 2)

149.    The Commission repeats and realleges Paragraphs 1 through 141 of this Complaint as if fully set forth herein.

150.    From July 2012 through at least December 4, 2017, the Defendants subject to this count, in the offer or sale of securities by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly negligently obtained money or property by means of untrue statements of material facts or omissions to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading.

151.    By reason of the foregoing, the Defendants subject to this count directly and indirectly have violated, and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

### COUNT IV

### VIOLATIONS OF SECTION 17(a)(3) OF THE SECURITIES ACT

#### (Against Shapiro, Woodbridge, RS Trust, WMF, WSF, Fund 1, Fund 2, Fund 3, Fund 3A, Fund 4, Bridge Loan Fund 1, Bridge Loan Fund 2, Shapiro Property LLCs, and Shapiro Holding LLCs)

152.    The Commission repeats and realleges Paragraphs 1 through 141 of this Complaint as if fully set forth herein.

153.    From July 2012 through at least December 4, 2017, the Defendants subject to this count, in the offer or sale of securities by use of the means or instruments of transportation or

communication in interstate commerce and by the use of the mails, directly or indirectly negligently engaged in transactions, practices and courses of business which have operated, are now operating or will operate as a fraud or deceit upon the purchasers.

154.     By reason of the foregoing, the Defendants subject to this count, directly and indirectly, have violated, and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

## COUNT V
### VIOLATIONS OF SECTION 10(b) AND RULE 10b-5(a) OF THE EXCHANGE ACT

### (Against Shapiro, Woodbridge, RS Trust, WMF, WSF, Fund 1, Fund 2, Fund 3, Fund 3A, Fund 4, Bridge Loan Fund 1, Bridge Loan Fund 2, Shapiro Property LLCs, and Shapiro Holding LLCs)

155.     The Commission repeats and realleges Paragraphs 1 through 141 of this Complaint as if fully set forth herein.

156.     From July 2012 through at least December 4, 2017, the Defendants subject to this count, directly and indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails in connection with the purchase or sale of securities, knowingly or recklessly employed devices, schemes or artifices to defraud.

157.     By reason of the foregoing, the Defendants subject to this count directly and indirectly, and have violated, and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a), 17 C.F.R. § 240.10b-5(a), thereunder.

## COUNT VI

### VIOLATIONS OF SECTION 10(b) AND RULE 10b-5(b) OF THE EXCHANGE ACT

#### (Against Shapiro, Woodbridge, WSF, Fund 1, Fund 2, Fund 3, Fund 3A, Fund 4, Bridge Loan Fund 1, and Bridge Loan Fund 2)

158.    The Commission repeats and realleges Paragraphs 1 through 141 of this Complaint as if fully set forth herein.

159.    From July 2012 through at least December 4, 2017, the Defendants subject to this count, directly and indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails in connection with the purchase or sale of securities, knowingly or recklessly made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

160.    By reason of the foregoing, the Defendants subject to this count directly and indirectly violated, and unless enjoined, is reasonably likely to continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b), thereunder.

## COUNT VII

### VIOLATIONS OF SECTION 10(b) AND RULE 10b-5(c) OF THE EXCHANGE ACT

#### (Against Shapiro, Woodbridge, RS Trust, WMF, WSF, Fund 1, Fund 2, Fund 3, Fund 3A, Fund 4, Bridge Loan Fund 1, Bridge Loan Fund 2, Shapiro Property LLCs, and Shapiro Holding LLCs)

161.    The Commission repeats and realleges Paragraphs 1 through 141 of this Complaint as if fully set forth herein.

162.    From July 2012 through at least December 4, 2017, the Defendants subject to this count, directly and indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails in connection with the purchase or sale of securities, knowingly or recklessly engaged in acts, practices and courses of business which operated as a fraud upon the purchasers of such securities.

163.    By reason of the foregoing, the Defendants subject to this count, directly and indirectly have violated, and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(c), 17 C.F.R. § 240.10b-5(c), thereunder.

## COUNT VIII

## SECTION 20(a) OF THE EXCHANGE ACT – CONTROL PERSON LIABILITY

### For Woodbridge, RS Trust, WMF, WSF, Fund 1, Fund 2, Fund 3, Fund 3A, Fund 4, Bridge Loan Fund 1, Bridge Loan Fund 2, Shapiro Property LLCs, and Shapiro Holding LLCs' Violations Of The Exchange Act (Against Shapiro and RS Protection Trust)

164.    The Commission repeats and realleges Paragraphs 1 through 141 of this Complaint as if fully set forth herein.

165.    From July 2012 through at least December 4, 2017, Shapiro and RS Trust have been, directly or indirectly, control persons of Woodbridge, RS Trust, WMF, WSF, Fund 1, Fund 2, Fund 3, Fund 3A, Fund 4, Bridge Loan Fund 1, Bridge Loan Fund 2, Shapiro Property LLCs, and Shapiro Holding LLCs for purposes of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

166.    From July 2012 through at least December 4, 2017, Woodbridge, RS Trust, WMF, WSF, Fund 1, Fund 2, Fund 3, Fund 3A, Fund 4, Bridge Loan Fund 1, Bridge Loan Fund 2, Shapiro Property LLCs, and Shapiro Holding LLCs violated Section 10(b) and Rule 10b-5 of

the Exchange Act.

167.    As control persons of Woodbridge, WMF, WSF, Fund 1, Fund 2, Fund 3, Fund 3A, Fund 4, Bridge Loan Fund 1, Bridge Loan Fund 2, Shapiro Property LLCs, and Shapiro Holding LLCs, Shapiro and RS Trust are jointly and severally liable with and to the same extent as Woodbridge, WMF, WSF, Fund 1, Fund 2, Fund 3, Fund 3A, Fund 4, Bridge Loan Fund 1, Bridge Loan Fund 2, Shapiro Property LLCs, and Shapiro Holding LLCs for each of their violations of Section 10(b) and Rule 10b-5 of the Exchange Act.

168.    By reason of the foregoing, Shapiro and RS Protection Trust directly and indirectly have violated, and unless enjoined, are reasonably likely to continue to violate, Sections 10(b) and 20(a) and Rule 10b-5 of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and 17 C.F.R. § 240.10b-5.

## COUNT IX

### VIOLATIONS OF SECTION 15(a) OF THE EXCHANGE ACT

### (Against Woodbridge and WSF)

169.    The Commission repeats and realleges Paragraphs 1 through 141 of this Complaint as if fully set forth herein.

170.    The Defendants subject to this count made use of the mails and other means or instrumentalities of interstate commerce, to effect transactions in, or to induce or attempt to induce the purchase or sale of securities, without being associated with a broker or dealer that was registered with the Commission in accordance with Section 15(b) of the Exchange Act [15 U.S.C. § 78o(b)].

171.   By reason of the foregoing, the Defendants subject to this count directly and indirectly have violated, and unless enjoined, are reasonably likely to continue to violate, Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

## COUNT X
## AIDING AND ABETTING VIOLATIONS OF
## SECTION 15(a) OF THE EXCHANGE ACT

### (Against Shapiro)

172.   The Commission repeats and realleges paragraphs 1 through 141 of this complaint as if fully restated herein.

173.   Defendants Woodbridge and WSF acted as brokers or dealer and have made use of the mails or any means or instrumentality of interstate commerce to effect transactions in securities, or to induce or attempt to induce the purchase or sale of securities, without being associated with a broker or dealer that was registered with the Commission in accordance with Section 15(b) of the Exchange Act [15 U.S.C. § 78o(b)] in violation of Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

174.   Defendant Shapiro, knowingly or recklessly, substantially assisted Defendants Woodbridge and WSF's violations of Section 15(a) of the Exchange Act.  Unless enjoined, Defendant Shapiro is reasonably likely to continue to provide substantial assistance to Woodbridge's and WSF's violations.

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests the Court find the Defendants committed the violations alleged, and:

### A. Permanent Injunctive Relief

Issue a Permanent Injunction restraining and enjoining (1) Shapiro, Woodbridge, WMF, WSF, Fund 1, Fund 2, Fund 3, Fund 3A, Fund 4, Bridge Loan Fund 1 and Bridge Loan Fund 2 from violating Sections 5(a) and 5(c) of the Securities Act; (2) Shapiro, Woodbridge, WSF, Fund 1, Fund 2, Fund 3, Fund 3A, Fund 4, Bridge Loan Fund 1 and Bridge Loan Fund 2 from violating Section 17(a)(2) of the Securities Act and Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5(b); (3) Shapiro and the Corporate Defendants from violating Sections 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Exchange Act Rules 10b-5(a) and (c); (4) Shapiro and RS Trust from violating Section 20(a) of the Exchange Act; (5) Woodbridge and WSF from violating Section 15(a) of the Exchange Act; and (6) Shapiro from aiding and abetting Woodbridge and WSF's violations of Section 15(a) of the Exchange Act.

### B. Asset Freeze

Issue an Order freezing the assets of Shapiro, RS Trust, and the non-bankruptcy filing Shapiro Property LLCs and Shapiro Holding LLCs (as identified in Appendix A), until further Order of the Court.

### C. Appointment of a Receiver

Appoint a receiver over Woodbridge, RS Trust, WMF, WSF, Fund 1, Fund 2, Fund 3, Fund 3A, Fund 4, Bridge Loan Fund 1, Bridge Loan Fund 2, Shapiro Property LLCs, and Shapiro Holding LLCs.

### D. <u>Records Preservation</u>

Issue an Order restraining and enjoining Shapiro and RS Trust, their directors, officers, agents, servants, employees, attorneys, depositories, banks, and those persons in active concert or participation with any one or more of them, and each of them, from, directly or indirectly, destroying, mutilating, concealing, altering, disposing of, or otherwise rendering illegible in any manner, and of the books, records, documents, correspondence, brochures, manuals, papers, ledgers, accounts, statements, obligations, files and other property of or pertaining to Defendants and Relief Defendants, wherever located and in whatever form, electronic or otherwise, that refer or relate to the acts or courses of conduct alleged in this Complaint, until further Order of this Court.

### E. <u>Sworn Accounting</u>

Issue an Order directing Shapiro and RS Trust to provide a sworn accounting of all assets and liabilities, including all monies and real properties directly or indirectly received from investors and all uses of investor funds.

### F. <u>Disgorgement and Prejudgment Interest</u>

Issue an Order directing the Defendants and Relief Defendants to disgorge all ill-gotten gains or proceeds received from investors as a result of the acts and/or courses of conduct complained of herein, with prejudgment interest thereon.

### G. <u>Civil Money Penalties</u>

Issue an Order directing the Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act, and Section 21(d) of the Exchange Act.

### H. <u>Further Relief</u>

Grant such other and further relief as may be necessary and appropriate.

## I. **Retention of Jurisdiction**

Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

## J. **Demand For Jury Trial**

The Commission hereby demands a trial by jury on any and all issues in this action so triable.

Dated: December 20, 2017

Respectfully submitted,

By:

Russell Koonin & Christine Nestor
Senior Trial Counsel
kooninr@sec.gov; nestorc@sec.gov
FL Bar No.: 474479; FL Bar No. 597211
Telephone: (305) 982-6385; (305) 982-6367

Scott Lowry
Senior Counsel
lowrys@sec.gov
Special Bar ID # A5502400
Telephone: (305) 982-6387

Attorneys for Plaintiff
Securities and Exchange Commission
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone: (305) 982-6300
Facsimile: (305) 536-4154

# APPENDIX A

| # | Shapiro Property LLCs Bankruptcy Filers | # | Shapiro Holding LLCs Bankruptcy Filers |
|---|---|---|---|
| 1 | 215 North 12th Street, LLC | | |
| 2 | Addison Park Investments, LLC | 1 | H31 Addison Park Holding Company, LLC |
| 3 | Anchorpoint Investments, LLC | 2 | M11 Anchorpoint Holding Company, LLC |
| 4 | Arborvitae Investments, LLC | 3 | H32 Arborvitae Holding Company, LLC |
| 5 | Archivolt Investments, LLC | 4 | M26 Archivolt Holding Company, LLC |
| 6 | Arlington Ridge Investments, LLC | 5 | H2 Arlington Ridge Holding Company, LLC |
| 7 | Arrowpoint Investments, LLC | 6 | M19 Arrowpoint Holding Company, LLC |
| 8 | Baleroy Investments, LLC | 7 | H58 Baleroy Holding Company, LLC |
| 9 | Bay Village Investments, LLC | 8 | H13 Bay Village Holding Company, LLC |
| 10 | Bear Brook Investments, LLC | 9 | H15 Bear Brook Holding Company, LLC |
| 11 | Beech Creek Investments, LLC | 10 | H46 Beech Creek Holding Company, LLC |
| 12 | Black Bass Investments, LLC | 11 | H53 Black Bass Holding Company, LLC |
| 13 | Black Locust Investments, LLC | 12 | H28 Black Locust Holding Company, LLC |
| 14 | Bluff Point Investments, LLC | 13 | H20 Bluff Point Holding Company, LLC |
| 15 | Bowman Investments, LLC | 14 | H49 Bowman Holding Company, LLC |
| 16 | Bramley Investments, LLC | 15 | H40 Bramley Holding Company, LLC |
| 17 | Brise Soleil Investments, LLC | 16 | M27 Brise Soleil Holding Company, LLC |
| 18 | Broadsands Investments, LLC | 17 | M28 Broadsands Holding Company, LLC |
| 19 | Brynderwen Investments, LLC | 18 | M29 Brynderwen Holding Company, LLC |
| 20 | Cablestay Investments, LLC | 19 | M13 Cablestay Holding Company, LLC |
| 21 | Cannington Investments, LLC | 20 | M31 Cannington Holding Company, LLC |
| 22 | Carbondale Glen Lot A-5, LLC | | |
| 23 | Carbondale Glen Lot E-24, LLC | | |
| 24 | Carbondale Glen Lot GV-13, LLC | | |
| 25 | Carbondale Glen Lot SD-14, LLC | | |
| 26 | Carbondale Glen Lot SD-23, LLC | | |
| 27 | Carbondale Glen Mesa Lot 19, LLC | | |
| 28 | Carbondale Glen River Mesa, LLC | 21 | Crystal Valley Holdings, LLC* |
| 29 | Carbondale Glen Sundance Ponds, LLC | | |
| 30 | Carbondale Glen Sweetgrass Vista, LLC | | |
| 31 | Carbondale Spruce 101, LLC | | |
| 32 | Castle Pines Investments, LLC | 22 | M53 Castle Pines Holding Company, LLC |
| 33 | Centershot Investments, LLC | 23 | M25 Centershot Holding Company, LLC |
| 34 | Chaplin Investments, LLC | 24 | M76 Chaplin Holding Company, LLC |
| 35 | Chestnut Investments, LLC | 25 | M79 Chestnut Company, LLC |
| 36 | Chestnut Ridge Investments, LLC | 26 | H5 Chestnut Ridge Holding Company, LLC |

| 37 | Clover Basin Investments, LLC | 27 | M45 Clover Basin Holding Company, LLC |
|---|---|---|---|
| 38 | Coffee Creek Investments, LLC | 28 | M51 Coffee Creek Holding Company, LLC |
| 39 | Crossbeam Investments, LLC | 29 | M14 Crossbeam Holding Company, LLC |
| 40 | Crowfield Investments, LLC | 30 | M63 Crowfield Holding Company, LLC |
| 41 | Crystal Woods Investments, LLC | 31 | M92 Crystal Woods Holding Company, LLC |
| 42 | Daleville Investments, LLC | 32 | M72 Daleville Holding Company, LLC |
| 43 | Derbyshire Investments, LLC | 33 | M39 Derbyshire Holding Company, LLC |
| 44 | Diamond Cove Investments, LLC | 34 | H76 Diamond Cove Holding Company, LLC |
| 45 | Dixville Notch Investments, LLC | 35 | H14 Dixville Notch Holding Company, LLC |
| 46 | Dogwood Valley Investments, LLC | 36 | H7 Dogwood Valley Holding Company, LLC |
| 47 | Dollis Brook Investments, LLC | 37 | M32 Dollis Brook Holding Company, LLC |
| 48 | Donnington Investments, LLC | 38 | M9 Donnington Holding Company, LLC |
| 49 | Doubleleaf Investments, LLC | 39 | M15 Doubleleaf Holding Company, LLC |
| 50 | Drawspan Investments, LLC | 40 | M22 Drawspan Holding Company, LLC |
| 51 | Eldredge Investments, LLC | 41 | M71 Eldredge Holding Company, LLC |
| 52 | Elstar Investments, LLC | 42 | H25 Elstar Holding Company, LLC |
| 53 | Emerald Lake Investments, LLC | 43 | H19 Emerald Lake Holding Company, LLC |
| 54 | Fieldpoint Investments, LLC | 44 | M24 Fieldpoint Holding Company, LLC |
| 55 | Franconia Notch Investments, LLC | 45 | M88 Franconia Notch Holding Company, LLC |
| 56 | Gateshead Investments, LLC | 46 | M10 Gateshead Holding Company, LLC |
| 57 | Glenn Rich Investments, LLC | 47 | M85 Glenn Rich Holding Company, LLC |
| 58 | Goose Rocks Investments, LLC | 48 | M93 Goose Rocks Holding Company, LLC |
| 59 | Goosebrook Investments, LLC | 49 | M68 Goosebrook Holding Company, LLC |
| 60 | Graeme Park Investments, LLC | 50 | H68 Graeme Park Holding Company, LLC |
| 61 | Gravenstein Investments, LLC | 51 | H26 Gravenstein Holding Company, LLC |
| 62 | Green Gables Investments, LLC | 52 | H44 Green Gables Holding Company, LLC |
| 63 | Grenadier Investments, LLC | 53 | H27 Grenadier Holding Company, LLC |
| 64 | Grumblethorpe Investments, LLC | 54 | H41 Grumblethorpe Holding Company, LLC |
| 65 | Hackmatack Investments, LLC | 55 | M87 Hackmatack Hills Holding Company, LLC |
| 66 | Haffenburg Investments, LLC | 56 | M56 Haffenburg Holding Company, LLC |
| 67 | Haralson Investments, LLC | 57 | H39 Haralson Holding Company, LLC |
| 68 | Harringworth Investments, LLC | 58 | M33 Harringworth Holding Company, LLC |
| 69 | Hazelpoint Investments, LLC | 59 | M80 Hazelpoint Holding Company, LLC |
| 70 | Heilbron Manor Investments, LLC | 60 | H66 Heilbron Manor Holding Company, LLC |
| 71 | Hollyline Owners, LLC | 61 | Hollyline Holdings, LLC |
| 72 | Hornbeam Investments, LLC | 62 | H35 Hornbeam Holding Company, LLC |
| 73 | Idared Investments, LLC | 63 | H37 Idared Holding Company, LLC |
| 74 | Imperial Aly Investments, LLC | 64 | H74 Imperial Aly Holding Company, LLC |
| 75 | Ironsides Investments, LLC | 65 | M99 Ironsides Holding Company, LLC |

| 76 | Lenni Heights Investments, LLC | 66 | H43 Lenni Heights Holding Company, LLC |
|---|---|---|---|
| 77 | Lilac Meadow Investments, LLC | 67 | H6 Lilac Meadow Holding Company, LLC |
| 78 | Lincolnshire Investments, LLC | 68 | M17 Lincolnshire Holding Company, LLC |
| 79 | Lonetree Investments, LLC | 69 | M54 Lonetree Holding Company, LLC |
| 80 | Longbourn Investments, LLC | 70 | M40 Longbourn Holding Company, LLC |
| 81 | Mason Run Investments, LLC | 71 | M73 Mason Run Holding Company, LLC |
| 82 | Melody Lane Investments, LLC | 72 | H8 Melody Lane Holding Company, LLC |
| 83 | Merrimack Valley Investments, LLC | 73 | M90 Merrimack Valley Holding Company, LLC |
| 84 | Mineola Investments, LLC | 74 | M61 Mineola Holding Company, LLC |
| 85 | Monadnock Investments, LLC | 75 | H16 Monadnock Holding Company, LLC |
| 86 | Moravian Investments, LLC | 76 | H60 Moravian Holding Company, LLC |
| 87 | Mountain Spring Investments, LLC | 77 | M67 Mountain Spring Holding Company, LLC |
| 88 | Mt. Holly Investments, LLC | 78 | M83 Mt. Holly Holding Company, LLC |
| 89 | Mutsu Investments, LLC | 79 | H38 Mutsu Holding Company, LLC |
| 90 | Newville Investments, LLC | 80 | M91 Newville Holding Company, LLC |
| 91 | Old Carbon Investments, LLC | 81 | H51 Old Carbon Holding Company, LLC |
| 92 | Old Maitland Investments, LLC | 82 | H55 Old Maitland Holding Company, LLC |
| 93 | Owl Ridge Investments, LLC | 83 | M46 Owl Ridge Holding Company, LLC |
| 94 | Papirovka Investments, LLC | 84 | H22 Papirovka Holding Company, LLC |
| 95 | Pawtuckaway Investments, LLC | 85 | H4 Pawtuckaway Holding Company, LLC |
| 96 | Pemberley Investments, LLC | 86 | M38 Pemberley Holding Company, LLC |
| 97 | Pemigewasset Investments, LLC | 87 | H17 Pemigewasset Holding Company, LLC |
| 98 | Pepperwood Investments, LLC | 88 | M95 Pepperwood Holding Company, LLC |
| 99 | Pinney Investments, LLC | 89 | M70 Pinney Holding Company, LLC |
| 100 | Pinova Investments, LLC | 90 | H23 Pinova Holding Company, LLC |
| 101 | Quarterpost Investments, LLC | 91 | M34 Quarterpost Holding Company, LLC |
| 102 | Red Woods Investments, LLC | 92 | M97 Red Woods Holding Company, LLC |
| 103 | Ridgecrest Investments, LLC | 93 | M57 Ridgecrest Holding Company, LLC |
| 104 | Riley Creek Investments, LLC | 94 | M75 Riley Creek Holding Company, LLC |
| 105 | Rising Sun Investments, LLC | 95 | H59 Rising Sun Holding Company, LLC |
| 106 | Sagebrook Investments, LLC | 96 | M62 Sagebrook Holding Company, LLC |
| 107 | Seven Stars Investments, LLC | 97 | H54 Seven Stars Holding Company, LLC |
| 108 | Silk City Investments, LLC | 98 | H11 Silk City Holding Company, LLC |
| 109 | Silver Maple Investments, LLC | 99 | H30 Silver Maple Holding Company, LLC |
| 110 | Silverthorne Investments, LLC | 100 | M41 Silverthorne Holding Company, LLC |
| 111 | Springline Investments, LLC | 101 | M36 Springline Holding Company, LLC |
| 112 | Squaretop Investments, LLC | 102 | M49 Squaretop Holding Company, LLC |
| 113 | Stayman Investments, LLC | 103 | H24 Stayman Holding Company, LLC |
| 114 | Steele Hill Investments, LLC | 104 | M86 Steele Hill Holding Company, LLC |
| 115 | Stepstone Investments, LLC | 105 | M5 Stepstone Holding Company, LLC |

| 116 | Strawberry Fields Investments, LLC | 106 | H9 Strawberry Fields Holding Company, LLC |
|---|---|---|---|
| 117 | Sturmer Pippin Investments, LLC | 107 | H36 Sturmer Pippin Holding Company, LLC |
| 118 | Summerfree Investments, LLC | 108 | H21 Summerfree Holding Company, LLC |
| 119 | Summit Cut Investments, LLC | 109 | H47 Summit Cut Holding Company, LLC |
| 120 | Thornbury Farm Investments, LLC | 110 | H65 Thornbury Farm Holding Company, LLC |
| 121 | Thunder Basin Investments, LLC | 111 | M60 Thunder Basin Holding Company, LLC |
| 122 | Topchord Investments, LLC | 112 | M37 Topchord Holding Company, LLC |
| 123 | Vallecito Investments, LLC | 113 | M48 Vallecito Holding Company, LLC |
| 124 | Varga Investments, LLC | 114 | M74 Varga Holding Company, LLC |
| 125 | Wetterhorn Investments, LLC | 115 | M50 Wetterhorn Holding Company, LLC |
| 126 | White Birch Investments, LLC | 116 | H12 White Birch Holding Company, LLC |
| 127 | White Dome Investments, LLC | 117 | M43 White Dome Holding Company, LLC |
| 128 | Wildernest Investments, LLC | 118 | M44 Wildernest Holding Company, LLC |
| 129 | Willow Grove Investments, LLC | 119 | H52 Willow Grove Holding Company, LLC |
| 130 | Winding Road Investments, LLC | 120 | M94 Winding Road Holding Company, LLC |
| 131 | Zestar Investments, LLC | 121 | H29 Zestar Holding Company, LLC |
| **Non-Bankruptcy Filing Shapiro Property LLCs** | | **Non-Bankruptcy Filing Shapiro Holding LLCs** | |
| 132 | 695 Buggy Circle, LLC | 122 | Buggy Circle Holdings, LLC |
| 133 | Carbondale Glen Lot 18, LLC | | |
| 134 | Carbondale Glen Lot L-2, LLC | 21 | Crystal Valley Holdings, LLC* |
| 135 | Carbondale Glen Owners, LLC | 123 | Carbondale Basalt Owners, LLC |
| 136 | Carbondale Peaks Lot L-1, LLC | 21 | Crystal Valley Holdings, LLC* |
| 137 | Deerfield Park Investments, LLC | 124 | H10 Deerfield Park Holding Company, LLC |
| 138 | Frog Rock Investments, LLC | 125 | M77 Frog Rock Holding Company, LLC |
| 139 | Hawthorn Investments, LLC | 126 | H33 Hawthorn Holding Company, LLC |
| 140 | Lilac Valley Investments, LLC | 127 | M96 Lilac Valley Holding Company, LLC |
| 141 | Massabesic Investments, LLC | 128 | H18 Massabesic Holding Company, LLC |
| 142 | Mount Washington Investments, LLC | 129 | M89 Mount Washington Holding Company, LLC |
| 143 | Sachs Bridge Investments, LLC | 130 | H50 Sachs Bridge Holding Company, LLC |
| 144 | Springvale Investments, LLC | 131 | M58 Springvale Holding Company, LLC |

*Crystal Valley Holdings, LLC is a Bankruptcy filer, but two of its associated Shapiro Property LLCs (Carbondale Glen Lot L-2, LLC and Carbondale Peaks Lot L-1, LLC) are not bankruptcy filers.