# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| PAUL HONIG, et al.,<br><br>                                Plaintiffs,<br><br>    v.<br><br>BARRY M. KORNFELD, et al.<br><br>                                Defendants. | 18-cv-80019 (DMM) |

**BRIEF OF THE SECURITIES AND EXCHANGE COMMISSION AS *AMICUS CURIAE*
ADDRESSING WHETHER THE FIRST POSITION COMMERCIAL MORTGAGES
ARE SECURITIES**

SECURITIES AND EXCHANGE COMMISSION
801 Brickell Ave., Suite 1800
Miami, Florida 33131

By:    Russell Koonin
         Christine Nestor
         *Attorneys for Securities and*
         *Exchange Commission*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................................ ii

INTEREST OF THE SECURITIES AND EXCHANGE COMMISSION .................................... 1

STATEMENT OF THE ISSUE ADDRESSED.. ............................................................................. 3

ARGUMENT ...................................................................................................................................... 3

    I.    The Well Pleaded Facts Clearly Indicate that FPCMs Are Securities under *Reves*. .......... 3

    II.    In the Alternative, FPCMs Are Investment Contracts and Hence Are Securities. ............. 7

CONCLUSION ................................................................................................................................ 10

i

# TABLE OF AUTHORITIES

**CASES**

*Bamert v Pulte Home Corp.*, 2011 WL 5105925 (11th Cir., Oct. 26, 2011) ................................. 8

*Deal v. Asset Mgmt. Grp.* 1992 WL 212482 (N.D. Ill. Aug. 28, 1992) ........................................... 5

*Fin. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276 (11th Cir. 2007) ................................... 3, 5

*Great Western Bank and Trust v. Kotz*, 532 F.2d 1252 (9th Cir. 1976) ......................................... 7

*Hays v. Adam,* 512 F. Supp. 2d 1330 (N.D. Ga. 2007) .................................................................. 9

*Long v. Shultz Cattle Co.*, 881 F.2d 129 (5th Cir. 1989) ................................................................ 8

*McNabb v. SEC*, 298 F.3d 1126 (9th Cir. 2002) ........................................................................... 4

*Phillips v. Kaplus*, 764 F.2d 807 (11th Cir. 1985) ......................................................................... 2

*Pollack v. Laidlaw Holdings, Inc.*, 27 F.3d 808 (2d Cir. 1994) .................................................. 4, 6

*Reves v. Ernst & Young*, 494 U.S. 56 (1990) .............................................................. 3, 4, 5, 6, 7

*SEC v. Chemical Trust*, 2000 WL 33231600 (S.D. Fla. Dec. 19, 2000) ........................................ 9

*SEC v. ETS Payphones, Inc.,* 300 F.3d 1281 (11th Cir. 2004) ...................................................... 8

*SEC v. ETS Payphones, Inc.* 408 F.3d 727 (11th Cir. 2005) ..................................................... 8, 9

*SEC v. Levin,* 2014 WL 11878357 (S.D. Fla. Oct. 6, 2014) ....................................................... 3, 4

*SEC v. Mut. Benefits Corp.*, 408 F.3d 737 (11th Cir. 2005) .......................................................... 3

*SEC v. R.G. Reynolds Enterprises, Inc.,* 952 F.2d 1125 (9th Cir. 1991) ....................................... 3

*SEC v. Thompson*, 732 F.3d 1151 (10th Cir. 2013) ...................................................................... 5

*SEC v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195 (11th Cir. 1999) ............................................ 9

*SEC v. J.T. Wallenbrock & Assoc.*, 313 F.3d 532 (9th Cir. 2002) ................................................. 5

*SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) ........................................................................... 7, 8

*Stoiber v. SEC*, 161 F.3d 745 (D.C. Cir. 1998) ............................................................................. 6

*Teague v. Bakker*, 35 F.3d 978 (4th Cir. 1994) ............................................................................. 8

*Wright v. Downs*, 1992 WL 168104 (6th Cir. July 17, 1992) ........................................................ 5

**STATUTES AND RULES**

Securities Act of 1933, 15 U.S.C. § 77a, *et seq.*

    Section 2(a)(1), 15 U.S.C. § 77b(a)(1) ............................................................................. 3, 7

    Section 5, 15 U.S.C. § 77e ................................................................................................. 1

    Section 17(a), 15 U.S.C. § 77q(a) ..................................................................................... 1

    Regulation D, 17 C.F.R. 230.500, *et seq.* ......................................................................... 1

Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.*

    Section 3(a)(10), 15 U.S.C. § 78c(a)(10) ....................................................................... 3, 7

    Section 10(b), 15 U.S.C. § 78j(b) ...................................................................................... 1

    Section 15, 15 U.S.C. § 78o ............................................................................................... 1

    Section 20(a), 15 U.S.C. § 78t(a) ...................................................................................... 1

    Rule 10b-5, 17 C.F.R. 240. § 10b-5 ................................................................................... 1

**INTEREST OF THE SECURITIES AND EXCHANGE COMMISSION**

Two lawsuits pending in the United States District Court for the Southern District of Florida— the Securities and Exchange Commission's civil enforcement action (*SEC v. Shapiro*, 17-cv-24624 (S.D. Fla., Miami Division), Hon. Marcia G. Cooke) and this private action (*Honig v. Kornfeld*, 18-cv-80019 (S.D. Fla., W. Palm Beach Division)—arise out of alleged misconduct involving the same underlying investment instruments, the First Position Commercial Mortgages ("FPCMs") offered and sold by affiliates of the Woodbridge Group of Companies, LLC.[1] In its enforcement action, the Commission alleges multiple federal securities law violations by Woodbridge, Robert Shapiro (its owner and President), and hundreds of affiliates, arising out of Woodbridge's offer and sale of the FPCMs as part of a massive Ponzi scheme that raised more than $1.2 billion from over 8,000 investors nationwide. *See SEC v. Shapiro*, at Dkt. 22.[2]

Woodbridge represented that the FPCMs were promissory notes with 12 to 18 month terms and an annual interest rate of 5% to 8% payable monthly, secured by an assignment of Woodbridge's interests in mortgage loans it had purportedly made using investors' pooled funds. *See id.* at Dkt. 22, ¶¶ 42-141. In this private action, plaintiffs have pleaded multiple state-law

---

[1] The Commission and the private plaintiffs allege that Woodbridge offered and sold an additional type of instrument—"Fund Offerings"—but the Fund Offerings are not addressed in this brief because there is no dispute that they are securities. *See SEC v. Shapiro*, at Dkt. 120, p. 2 n.2. The Fund Offerings are private placement offerings pursuant to Regulation D of the Securities Act, 17 C.F.R. 230.500, *et seq.*, with returns based on interest from Woodbridge's purported mortgage loans and based on promised real estate development. *See SEC v. Shapiro*, at Dkt. 22, ¶¶ 19-25, 42; *Honig v. Kornfeld*, at Dkt. 6, ¶¶ 74, 93.

[2] Specifically, the Commission alleges violations of the antifraud provisions of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), Rule 10b-5, 17 C.F.R. 240.10b-5, Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), and control person liability for those violations under Exchange Act Section 20(a), 15 U.S.C. § 78t(a); the securities registration provisions of Securities Act Section 5, 15 U.S.C. § 77e; the broker registration provisions of Exchange Act Section 15, 15 U.S.C. § 78o, and aiding and abetting those violations. *See SEC v. Shapiro*, at Dkt. 22.

claims against persons affiliated with Woodbridge based on their offer and sale of the same FPCMs.  *See Honig v. Kornfeld*, at Dkt. 6, ¶¶ 1-11, 72-93.  *See also id.* at Dkt. 41, p. 2 (Defendants contending that the private plaintiffs are "piggybacking allegations in the SEC action.").

In both actions, defendants have moved to dismiss on several grounds, including that the FPCMs are not securities.  *Compare SEC v. Shapiro*, at Dkt. 104, *with Honig v. Kornfeld,* at Dkt. 41, pp. 10-11 & Dkt. 53, pp. 15-17.[3]  The private claims are made under Florida's state securities laws against Woodbridge-affiliated persons that are not named as defendants in the Commission's enforcement action.  *Honig v. Kornfeld,* at Dkt. 41.  But those state-law claims depend on whether the FPCMs are securities as defined by federal law because "the definition of 'security' under the Florida [Securities Act] is the same as that under federal law."  *Phillips v. Kaplus*, 764 F.2d 807, 815 n.8 (11th Cir. 1985); *see also Honig v. Kornfeld,* at Dkt. 41, ¶ 11(complaint referring to *SEC v. Shapiro* as a "related action"); *id.* at ¶ 141(b)(vii) (contending that there is a "question of law and fact" whether the FPCMs are "securities as defined by state or federal law").  Indeed, in moving to dismiss this private action, the defendants cite only federal law.  *See Honig v. Kornfeld,* at Dkt. 41, pp. 10-11 & Dkt. 53, pp. 15-17.

Accordingly, the issue of whether the FPCMs are securities is common to both cases— and its resolution calls for the application of the same legal principles to factual allegations that are presumed to be true on the motions to dismiss.  The Commission files this brief to address only this issue and expresses no view on any other aspect of the private plaintiffs' claims or their merit.

---

[3] The motion to dismiss the enforcement action (*SEC v. Shapiro*, at Dkt. 104) and the Commission's response (*id.* at Dkt. 120, excerpted *infra*) were filed in March 2018, and the Court has not decided the motion or set a date for argument.  The Commission will keep this Court informed about any decision on the motion.

**STATEMENT OF THE ISSUE ADDRESSED**

The Securities and Exchange Commission, the agency principally responsible for the enforcement of the federal securities laws, submits this brief as *amicus curiae* to address whether the FPCMs are securities because they are "notes" or "investment contracts" under Securities Act Section 2(a)(1), 15 U.S.C. § 77b(a)(1), and Exchange Act Section 3(a)(10), 15 U.S.C. § 78c(a)(10).

**ARGUMENT**

The argument below demonstrating that the FPCMs are securities is excerpted from the Commission's response to the defendants' motion to dismiss its enforcement action filed on March 6, 2018 in *SEC v. Shapiro*, at Dkt. 120, pp. 9-15.

\*           \*           \*

**I.    The Well Pleaded Facts Clearly Indicate that FPCMs Are Securities Under *Reves*.**

A "note" is presumed to be a security under *Reves v. Ernst & Young*, 494 U.S. 56 (1990); *Fin. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007).[4]  This presumption can be rebutted if the note is an instrument the Court specifically said was not a security. *Reves,* 494 U.S. at 65; *SEC v. R.G. Reynolds Enterprises, Inc.,* 952 F.2d 1125 (9th Cir. 1991); *SEC v. Levin,* 2014 WL 11878357, *9 (S.D. Fla. Oct. 6, 2014).  According to the Court, Congress' purpose "was to regulate *investments*, in whatever form they are made and by whatever name they are called."  *Reves*, 494 U.S. at 61 (emphasis in original); *SEC v. Mut. Benefits Corp.*, 408 F.3d 737, 742 (11th Cir. 2005).   A note that is not among the list identified in *Reves* is a security

---

[4]  Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1), and Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10), define "security" to include "any note."

3

unless it bears a "strong family resemblance" to the non-security notes identified in the opinion. *Reves*, 494 U.S. at 64-65; *Levin,* 2014 WL 11878357 at *9.

*Reves* established a four-factor family resemblance test to determine whether a note is a security: (1) the motivations of the buyer and seller; (2) the plan of distribution; (3) the reasonable expectations of the investing public; and (4) the existence of an alternate regulatory regime. *See id*. at 66-67. Failure to satisfy one of the *Reves* factors is not dispositive, as the test is considered as a whole. *See, e.g., McNabb v. SEC*, 298 F.3d 1126, 1132-33 (9th Cir. 2002). If a note fails the family resemblance test, it is deemed a security and subject to federal securities regulation.

The first *Reves* factor examines the transaction "to assess the motivations that would prompt a reasonable seller and buyer to enter into it." *Reves*, 494 U.S. at 66. The inquiry is whether the motivations are investment (suggesting a security) or commercial or consumer (suggesting a non-security). *See Pollack v. Laidlaw Holdings, Inc.*, 27 F.3d 808, 812 (2d Cir. 1994) (holding that mortgage participations were securities under *Reves*). The FPCM investors were unquestionably motivated by the high rate of return—5% to 8% annual interest—which Woodbridge offered. (*SEC v. Shapiro*, at Dkt. 22, hereinafter "Compl." ¶108). Woodbridge represented that the FPCM Investment was a "simple, safer and more secured opportunity for individuals to achieve their financial objectives." (Compl. ¶57). The *Reves* Court recognized that if the buyer is primarily interested in the profit the note is expected to generate, it is likely to be a security. *See Reves*, 494 U.S. at 66.

In addition, the raising of money "for the general use of a business enterprise or to finance substantial investments" is indicative of an investment motivation. *See Reves*, 494 U.S. at 66; *Pollack*, 27 F.3d at 812-13. Woodbridge used the funds raised to pay operating expenses

4

and sales commissions (Compl. ¶¶71, 98), and also used the funds raised to provide loans to the Third-Party Borrowers (the majority of which were Shapiro's LLC entities), ranging from $1 million to $90 million (Compl. ¶65), which, in reality, were used to purchase almost 200 residential and commercial properties primarily in Los Angeles, California and Aspen, Colorado. (Compl. ¶84). Thus, the first factor is again satisfied.

The second factor is whether there is "common trading for speculation or investment" which is satisfied when the notes are "offered and sold to a broad segment of the public." *Reves*, 494 U.S. at 68; *Fin. Sec. Assur.*, 500 F.3d at 1287. The FPCM notes here were sold to thousands of investors nationwide who invested hundreds of millions of dollars. (Compl. ¶41). Woodbridge had a nationwide network of sales agents, and provided them information that the sales agents gave to FPCM investors. (Compl. ¶100). The external sales agents solicited the general public through marketing materials created, and in many cases, paid for by Woodbridge, which the external sales agents disseminated via television commercials, radio ads and talk shows, newspaper ads, social media, newsletters and internet websites. (Compl. ¶101). Such a widespread distribution to an extremely large number of holders is more typical of a securities offering than of a borrower/lender relationship. *See SEC v. J.T. Wallenbrock & Assoc.*, 313 F.3d 532, 539 (9th Cir. 2002) (notes sold to over 1,000 investors in at least 25 states constituted broad segment of public); *Wright v. Downs*, 1992 WL 168104, *3 (6th Cir. July 17, 1992) (notes sold to 200 investors constituted broad segment); *see also Deal v. Asset Mgmt. Grp.* 1992 WL 212482, *4 (N.D. Ill. Aug. 28, 1992) (holding that just six unrelated investors constituted broad segment). Woodbridge also placed no limitations on who could purchase the notes, offering them to any member of the public with the money to buy them. (Compl. ¶¶1, 41, 89). *See SEC v. Thompson*, 732 F.3d 1151, 1165 (10th Cir. 2013) (noting that seller "sought to expand its

5

distribution to anyone interested who had $100,000 to invest . . . and it made its instruments available to anyone willing to pay.").

The next factor to analyze is the "reasonable expectations of the investing public" and whether there is a valuable return on an investment, as well as the length and characteristics of the note. *See*, *e.g., Stoiber v. SEC*, 161 F.3d 745, 751 (D.C. Cir. 1998) ("Whether notes are reasonably perceived as securities generally turns on whether they are reasonably viewed by purchasers as investments."). This analysis is quite similar to that required by the first *Reves* factor—the FPCMs were held by thousands of individual investors and carried a promised high rate of return. (Compl. ¶¶60-61, 70-71). Woodbridge repeatedly advertised them as "safe," "secure," and "conservative." (Compl. ¶¶57, 75). These facts would lead a reasonable investor to believe that the FPCMs were investments and, in fact, investors viewed these as passive investments generating safe returns.

The final factor is whether there are any risk-reducing factors indicating that the notes are not in fact securities. *Reves*, 494 U.S. at 69. An alternative regulatory regime would need to be quite comprehensive, such as FDIC or ERISA regulations, to keep the notes from "escap[ing] federal regulation entirely." *Id*. Here, Shapiro cannot possibly allege there are risk-reducing factors. Shapiro did not use investors' funds as promised. (Compl. ¶¶41, 47, 80, 84, 85, 87). Instead of funding loans to Third-Party Borrowers, Shapiro and his web of LLCs used newer investor funds to make interest payments to other investors, in classic Ponzi scheme fashion. (Compl. ¶¶41, 47, 80, 84, 85, 87). It is quite clear that there are wholly inadequate risk-reducing factors and any recuperation of investor assets will be based on the ability of the Commission to seek redress of investor harm in this action and/or in the parallel bankruptcy action. *See Pollack*, 27 F.3d at 814-15 (holding state mortgage regulations inadequate).

Importantly, the FPCMs do not involve one-on-one transactions, but, as demonstrated, are comprised of large pools of unrelated, private investors who do not know one another. (Compl. ¶¶60-61). They differ substantially from sophisticated institutions, such as banks, engaged in the business of providing mortgages or consumer lending. While the FPCM investors must rely on limited or no information about their investment, a commercial bank deals "face-to-face with the promissor," putting the bank in a position to make an informed decision and protect itself against loss. *Great Western Bank and Trust v. Kotz*, 532 F.2d 1252, 1262 (9th Cir. 1976).

No matter whether the FPCM promissory notes are weighed against the four *Reves* factors individually or collectively, Shapiro cannot satisfy his burden of establishing that the notes are not securities and subject to federal securities regulation. The FPCM promissory notes do not fall into any category of non-security notes recognized in *Reves*, and application of the family resemblance test confirms that they are securities. As such, the FPCMs offered by Woodbridge are securities within the meaning of Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act.

**II.     In the Alternative, FPCMs Are Investment Contracts and Hence Are Securities.**

Even under an analysis of the FPCMs as investment contracts, they would still meet the definition of a security. Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act define "security" to include, among other things, "investment contracts." In *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946), the Supreme Court defined an investment contract as (1) an investment of money, (2) in a common enterprise, (3) with the expectation of profits produced solely by the efforts of others. *SEC v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1199 (11th Cir. 1999).

The Eleventh Circuit employs a "broad vertical commonality test," which only requires a showing that the investors are dependent upon the expertise or efforts of the investment promotor for their returns. *SEC v. ETS Payphones, Inc.,* 300 F.3d 1281, 1284 (11th Cir. 2004), *re-aff'd by SEC v. ETS Payphones, Inc.* 408 F.3d 727, 732 (11th Cir. 2005). The investment contract analysis is "flexible" and "capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey*, 328 U.S. at 299. Indeed, Courts have classified as investment contracts a kaleidoscope of investment opportunities that satisfy *Howey*'s three criteria. *See, e.g., id*. (holding that sale of citrus groves, in conjunction with a service contract, is an investment contract); *Bamert v Pulte Home Corp.*, 2011 WL 5105925 (11th Cir., Oct. 26, 2011) (real estate purchases with two-year management agreements for rentals); *Teague v. Bakker*, 35 F.3d 978, 981, 990 (4th Cir. 1994) (same regarding purchase of life partnership in evangelical community); *Long v. Shultz Cattle Co.*, 881 F.2d 129, 132 (5th Cir. 1989) (same regarding cattle-feeding and consulting agreement).

Here, in analyzing the *Howey* test, FPCM investors clearly made an "investment of money." (Compl. ¶¶ 41, 56). Thousands of people invested hundreds of millions of dollars in promissory notes based on the supposed payment of interest from hundreds of commercial property Borrowers. (Compl. ¶¶1-3, 56-58). The FPCM investors had no role in selecting or analyzing the underlying commercial properties. (Compl. ¶¶66-68). Here, the expected profitability of the investments, as well as the promise to pay returns, were derived solely from the efforts of Woodbridge. (*Id.*). Woodbridge further reassured investors, telling them not to worry about the borrower not making their loans payments because Woodbridge would continue to pay the investor their interest payments. (Compl. ¶78). Once investors purchased the FPCM

8

notes, they had no control over how Woodbridge used their money. (*Id.*). Moreover, investors' funds were combined in a pool with funds of other investors, (Compl. ¶61), as Woodbridge and Shapiro pooled FPCM Investors' and Fund Investors' investment funds into Fund Entity bank accounts and then further commingled them into a single Woodbridge or WSF operating account under Shapiro's control. (Compl. ¶82). The commingling was extensive and resulted in transfers totaling approximately $1.66 billion and exceeded 10,700 transactions. (*Id.*). WMF also participated in the scheme by managing the various Fund offerings, including commingling all investor proceeds into one operating account and paying returns to investors using investor proceeds. (Compl. ¶83). These characteristics clearly demonstrate the vertical commonality of the FPCM investment. *See e.g. SEC v. Chemical Trust,* 2000 WL 33231600 (S.D. Fla. Dec. 19, 2000) (pooled investment indicates vertical commonality). And of course, Woodbridge was a Ponzi scheme, where the interest payments to old investors were contingent on the influx of new investor money. (Compl. ¶¶1, 4, 5, 47, 79-94, 111-112). *See e.g. ETS Payphones, Inc.,* 408 F.3d at 732 (finding common enterprise where 99% of investors leased back phones to company operated by promoter and were reliant on promoter to attract new investors to pay earlier ones); *Hays v. Adam,* 512 F. Supp. 2d 1330, 1337 (N.D. Ga. 2007) (By virtue of Ponzi scheme nature of the investment, the fortunes of investors were interwoven with and dependent upon the efforts and success of the defendants).

*   *   *

End of excerpt.

## CONCLUSION

In reviewing the motion to dismiss here, the Court should apply the legal interpretations set forth in this brief.

Dated: May 8, 2018                                       Respectfully submitted,

                                            By:   */s/ Russell Koonin & Christine Nestor*
                                                  Russell Koonin & Christine Nestor
                                                  Senior Trial Counsel
                                                  kooninR@sec.gov; nestorc@sec.gov
                                                  FL Bar No.: 474479; FL Bar No. 597211
                                                  Telephone: (305) 982-6385; (305) 982-6367

                                                  Attorneys for Plaintiff
                                                  **SECURITIES AND EXCHANGE COMMISSION**
                                                  801 Brickell Ave., Suite 1800
                                                  Miami, Florida 33131
                                                  Telephone: (305) 982-6300
                                                  Facsimile:  (305) 536-4154

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on May 8, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

                                                   */s/Russell Koonin*
                                                  Russell Koonin, Esq.