## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 18-80019-CV-MIDDLEBROOKS/BRANNON

PAUL HONIG, CARLA HONIG,
DAVID LIPPMAN, CAROLYN
LIPPMAN, JOHN HERTVIK,
GERALD ROY, and HERMANT
NANAVATY, on behalf of themselves
and a class of all others similarly situated,

      Plaintiffs,

v.

BARRY M. KORNFELD, *et al.*,

      Defendants.

_____/

### <u>ORDER ON MOTIONS TO DISMISS</u>

THIS CAUSE comes before the Court on Motions to Dismiss filed by the following Defendants: Barry M. Kornfeld, Ferne E. Kornfeld, First Financial Tax Group, Inc., and FEK Enterprises (the "Kornfeld Defendants") (DE 41); Albert D. Klager, Michele Klager, and Atlantic Insurance & Financial Services, Inc. (the "Klager Defendants") (DE 53); H.D. Vest Investment Services, Inc. ("HD Vest") (DE 63); Kovack Securities, Inc. ("KSI") (DE 64); Henry Wieniewitz ("Mr. Wieniewitz") and Wieniewitz Wealth Management, LLC ("WWM") (collectively, the "Wieniewitz Defendants") (DE 65); Jerry Davis Raines ("Mr. Raines") (DE 66); Gordon C. Hannah ("Mr. Hannah") and Retirement Planning Solutions, LLC ("RPS") (collectively, the "Hannah Defendants") (DE 69); GBH CPAS, PC ("GBH") (DE 70); Old Security Financial Group, Inc. ("OSFG"), Tony MacKenzie ("Mr. Mackenzie"), and Robert S. Davis, Jr. ("Mr. Davis") (collectively, the "OSFG Defendants") (DE 74); Douglas R. Andrew ("Mr. Andrew") and Paramount Financial Services, Inc. ("Paramount") (collectively, the

"Paramount Defendants") (DE 75); Shield Financial Group, Inc. ("Shield") and David Ouellette ("Mr. Ouellette") (collectively, the "Shield Defendants") (DE 79); Lynette M. Robbins ("Ms. Robbins") and Theodore F. Leutz ("Mr. Leutz") (collectively, "Knowles Defendants") (DE 94); and James H. Gilchrist ("Mr. Gilchrist") (DE 111) [1] (collectively, with the exception of GBH, the "External Sales Agent Defendants").  All motions to dismiss have been fully briefed.

This cause also is before the Court upon Defendant HD Vest's Motion to Stay Discovery Pending a Determination of this Court's Subject-Matter Jurisdiction, filed on August 8, 2018. (DE 135).  This motion has not yet been briefed.

## I.   BACKGROUND

This action arises from an alleged Ponzi scheme orchestrated by non-parties Robert H. Shapiro ("Shapiro") and his company, Woodbridge Group of Companies, LLC d/b/a Woodbridge Wealth ("Woodbridge").  Plaintiff's allegations, many of which were taken from a related pending enforcement action brought in this District against Shapiro and Woodbridge by the SEC (*SEC v. Robert H. Shapiro, Woodbridge Group of Companies, LLC et al.*, 17-24624-CV-MGC (S.D. Fla.) (the "SEC Action")), describe a scheme by which Plaintiffs were marketed and sold promissory notes, fund equity units, and other offerings as low-risk, high-yield investments backed by high interest rate loans made to commercial borrowers.   (DE 6 (hereinafter "First Amended Complaint" or "FAC") ¶¶ 2, 11).

### A.   The Scheme

Shapiro and Woodbridge offered two primary types of investments: (1) a twelve-to-eighteen month term promissory note marketed as paying a 5-8% annual return on a monthly

---

[1] Mr. Gilchrist, proceeding *pro se*, filed a motion that does not raise substantive argument, but joins all motions to dismiss filed by the other defendants.   Accordingly, I interpret Mr. Gilchrist's motion as adopting all arguments relevant to him that were raised in the other motions.

basis known as a First Position Commercial Mortgage ("FPCM"), and (2) seven different private placement fund offerings with five-year terms ("Fund Offerings"), marketed as paying a 6-10% annual return on a monthly basis and, at the end of five years, a 2% accrued dividend and share of the profits (collectively, the "Woodbridge Investments" or the "Investments"). (FAC ¶ 74). Neither of the Investments were ever registered with the SEC or another government agency. (FAC ¶ 75).

Plaintiffs allege that the Shapiro and Woodbridge's purported revenue source was: (1) the development and sale of properties for a profit (FAC ¶ 77), and (2) the interest a Woodbridge affiliate would be receiving on loans to third-party owners of commercial real estate (FAC ¶ 76). Woodbridge purportedly told investors that it would pool money from its many investors and lend it to these third-party borrowers for a short term, and for only about two-thirds of the value of the real estate securing the transaction, which would ensure that the properties that secure the mortgages are worth considerably more than the loans themselves at closing. (*Id.*). These third-party borrowers were allegedly paying Woodbridge 11-15% annual interest for short-term financing. (*Id.*).

Plaintiffs allege that despite being told that they would be repaid from high interest rates that Shapiro's companies were earning on loans made to third-party borrowers, all of the third-party borrowers were actually companies affiliated with Shapiro and had no revenue or bank accounts, and did not actually pay interest on the loans. (FAC ¶¶ 3, 78). Instead, Shapiro relied on new investor funds from the Woodbridge Investments to pay the interest and dividends owed to its earlier investors, constituting a Ponzi scheme. (FAC ¶¶ 4, 78, 79). Shapiro employed the RS Trust, whose trustee is Shapiro, to conceal his fraudulent scheme and hide the fact that most of the third-party borrowers and owners of the underlying property were Shapiro and his family.

(FAC ¶ 97). "None of the publicly available documentation indicated the RS Trust was the ultimate owner of the underlying properties that had been purchased with funds from" the Investments, and the vast majority of loans were made to entities that Shapiro controlled and which had no revenue. (*Id.*).

## B. Sales of the Investments through Sales Agents

To sell the FPCMs and Fund Offerings, Shapiro purportedly had a team of thirty in-house employees and a network of hundreds of external sales agents to solicit investments from the public. (FAC ¶ 80). Many of the sales agents were not licensed or registered with any regulatory agency, which was purportedly not disclosed to investors. (FAC ¶ 82). Woodbridge paid external sales agents a 9% wholesale rate, and the sales agents in turn offered the FPCMs to their investor clients at 5% to 8% interest, and the external sales agent received the difference. (FAC ¶ 83). Woodbridge also offered incentives to the external sales agents for promoting the FPCMs, including cash bonuses and the opportunity to earn 25 basis points on each FPCM sale for each FPCM sale closed by a colleague of a sales agent through a program called "Pass It On." (FAC ¶¶ 84). Nina Pederson, the Comptroller of Woodbridge, mischaracterized transactions from Woodbridge's operating account that were often used to pay commissions to Woodbridge's external sales force, and to pay for mortgages on property secretly purchased through the RS Trust. (FAC ¶¶ 62, 102).

To sell the Investments, Woodbridge provided the sales agents with uniform, scripted information and sales materials which were in turn provided to investors (the "Woodbridge Script"). (FAC ¶ 85). Plaintiffs allege that all of the information in the Woodbridge Script was false, and that in addition to outlining Woodbridge and Shapiro's purported source of revenue, Woodbridge told investors that the borrowers were "bona fide commercial property owners who

could not obtain traditional loans and were willing to pay higher rates for short-term financing." (FAC ¶¶ 85-86). The Woodbridge Script purportedly told the investors that their investment, to be used to loan money to a third-party borrower, was "secured by a hard asset collateral – the property itself." (FAC ¶ 89). Woodbridge also told FPCM investors that they had a "pro rata first-position 'lien' interest in the underlying properties," which meant that the investor would have priority over any other liens or claims on a property if the property owner defaulted. (FAC ¶ 91). Plaintiffs allege that Woodbridge raised at least $1.22 billion from investors in the Investments, but issued only $675 million in "loans" for real estate securing those investments, which generated just $13.7 million in interest from third-party borrowers. (FAC ¶ 93).

The external sales agents were supervised by non-party Dayne Roseman ("Roseman"), the Managing Director of Woodbridge who was responsible for supervising the external sales agents and sales program of the Woodbridge Investments. (FAC ¶¶ 61, 95). Roseman was purportedly "responsible for ensuring that the sales force followed the Woodbridge [S]cript, knowing that representations relating to the Woodbridge [I]nvestments were false or misleading," and withholding such information from investors. (FAC ¶ 96).

## 1. Kornfeld Defendants

Defendants Barry and Ferne Kornfeld, principals of First Financial Tax Group, were employed as external sales agents for Woodbridge. (FAC ¶¶ 104-05). The Kornfeld Defendants are Florida residents. (FAC ¶¶ 19-22). Mr. Kornfeld purportedly held himself out to be a "financial advisor with an 'unsurpassed level of expertise' and promises 'trusting relationships with his clients' and 'the best possible results.'" (FAC ¶ 106). He "claims a specialized focus on providing retirees and senior citizens with guaranteed income financial products to 'ensure lives of prosperity and security in retirement' based on his purported understanding of 'the complex

psychology of aging and retirement planning.'" (*Id.*).  Mr. Kornfeld allegedly promoted the Woodbridge Investments and held himself out as having a specialized knowledge of FPCMs, which he stated are safe and secure with a fixed high return. (FAC ¶ 107).  Ms. Kornfeld is allegedly a former registered securities broker "who promotes herself as an experienced investment advisor specializing in providing investment advice and 'guaranteed' returns to retirees."  (FAC ¶ 109).  Plaintiffs allege that Ms. Kornfeld taught a course on retirement planning and income optimization that she used to solicit investments in the Woodbridge Investments, and that the Honig Plaintiffs were specifically targeted, solicited, and induced into buying such securities after attending Ms. Kornfeld's course.  (FAC ¶¶ 110-111).  In doing so, Plaintiffs allege that the Kornfeld Defendants used the Woodbridge Script to induce the Honig Plaintiffs, along with Plaintiffs David and Carolyn Lippman, and John Hertvik, all Florida residents, to purchase Woodbridge Investments.  (FAC ¶ 112).  The Kornfeld Defendants purportedly sold Woodbridge Investments to at least 300 clients who invested over $50 million with Woodbridge.  (FAC ¶ 113).

### 2. Klager Defendants

Defendants Albert and Michelle Klager are allegedly a married couple who conducted an investment advisory business through Defendant Atlantic Insurance and Financial Services, Inc. (FAC ¶ 115).  The Klager Defendants are Florida residents.  (FAC ¶¶ 26-28).  The Klager Defendants purportedly held themselves out to be investment advisors, and utilized the Woodbridge Script to recommend and sell Woodbridge Investments to Plaintiff Gerald Roy, a Florida resident, and hundreds of additional  investors in Florida and throughout the United States.  (FAC ¶ 116).  The Klager Defendants allegedly raised approximately $20 million

through the sale of Woodbridge Investments and were paid in excess of $1.2 million in commissions by Woodbridge.  (FAC ¶ 117).

### 3. Knowles Defendants

Defendants Lynette Robbins and Theodore Leutz are allegedly a married couple who conducted an investment advisory business through Defendant Knowles Systems.  (FAC ¶ 118). The Knowles Defendants are citizens of Florida.  (FAC ¶¶ 23-25).  The Knowles Defendants purportedly held themselves out to be investment advisors, and utilized the Woodbridge Script to recommend and sell Woodbridge Investments to Plaintiff Hermant Nanavaty, an Illinois resident, and hundreds of additional investors in Florida, Chicago, and throughout the United States. (FAC ¶ 119).  The Knowles Defendants allegedly raised approximately $100 million through the sale of Woodbridge Investments and were paid in excess of $8 million in commissions by Woodbridge.  (FAC ¶ 117).

### 4. Other External Sales Agent Defendants

Plaintiffs also make factual allegations against other External Sales Agents, including: HD Vest; Kovack Securities, Inc.; the Wieniewitz Defendants, comprised of Henry Wieniewitz, a Tennessee resident, and Wieniewitz Wealth Management, LLC, a Tennessee limited liability company; Jerry Davis Raines, a Texas resident; the Hannah Defendants, comprised of Gordon C. Hannah, a Florida resident, and Retirement Planning Solutions, LLC, a Florida business; the OSFG Defendants, consisting of Old Security Financial Group, Inc., a Texas corporation, and Tony MacKenzie and Robert S. Davis, Jr., Texas residents; the Paramount Defendants, consisting of Douglas R. Andrew, a Utah resident, and Paramount Financial Services, Inc., a Utah corporation; the Shield Defendants, comprised of Shield Financial Group, Inc., a Texas corporation, and David Ouellette, a Texas resident; and James H. Gilchrist, a Florida resident.

(*See* FAC ¶¶ 31-57).   Plaintiffs allege that, as with the Kornfeld, Klager, and Knowles Defendants, these other External Sales Agent Defendants "similarly utilized the false and misleading Woodbridge sales script to recommend and sell Woodbridge Investments to thousands of additional investors in Florida and throughout the United States." (FAC ¶ 121).

On January 26, 2018, Plaintiffs filed their First Amended Class Action Complaint ("FAC") alleging seven causes of action against forty Defendants who, with one exception,[2] were all purportedly sales agents who sold promissory notes and other investments on behalf of non-parties Robert H. Shapiro ("Shapiro") and Woodbridge Group of Companies, LLC ("Woodbridge") in an alleged Ponzi scheme. (DE 6 ("FAC")).  The seven named Plaintiffs, on behalf of a putative class, assert claims for (1) negligence (Counts I-III), (2) negligent misrepresentation (Counts IV-VI), (3) breach of fiduciary duty (Counts VII-IX), (4) aiding and abetting breach of fiduciary duty (Count X), (5) sale of unregistered securities, in violation of Chapter 517, Florida Statutes (Counts XI-XII), (6) civil conspiracy (Count XIII), and (7) vicarious liability against all corporate defendants (Count XIV). (*Id.*).

## II.   **LEGAL STANDARD**

In assessing the legal sufficiency of a complaint's allegations, the Court is bound to apply the pleading standard articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  That is, the complaint "must . . . contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 570).  When reviewing a motion to dismiss, a court must construe plaintiff's complaint in the

---

[2] The only non-sales-agent defendant is an alleged auditor for Woodbridge, GBH CPAS, PC. While there are several factual allegations against GBH CPAS, PC (FAC, ¶¶ 122-129), there are no claims alleged against it in the FAC.

light most favorable to plaintiff and take the factual allegations stated therein as true. *See Erickson v. Pardus*, 551 U.S. 89, 93 (2007); *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997). However, pleadings that "are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 678; *see also Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1260 (11th Cir. 2009) (stating that an unwarranted deduction of fact is not considered true for purpose of determining whether a claim is legally sufficient). Further, "when the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern." *Crenshaw v. Lister*, 556 F.3d 1283, 1292 (11th Cir. 2009) (citation omitted).

Generally, a plaintiff is not required to detail all the facts upon which he bases his claim. Fed. R. Civ. P. 8(a)(2). Rather, Rule 8(a)(2) requires a short and plain statement of the claim that fairly notifies the defendant of both the claim and the supporting grounds. *Twombly*, 550 U.S. at 555-56. However, "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Id.* at 556 n.3. Plaintiff's "obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (citation omitted). "Factual allegations must be enough to raise [plaintiff's] right to relief above the speculative level, on the assumption that all of the allegations in the complaint are true." *Id.*

## III. CLAIMS ONLY AGAINST KORNFELD, KLAGER, AND KNOWLES DEFENDANTS

### A. <u>Sale of Unregistered Securities (Counts XI and XII)</u>

Plaintiffs allege claims against the Kornfeld and Klager Defendants under the Florida Securities and Investor Protection Act ("FSIPA"), Fla. Stat. § 517.211 for the sale of

unregistered securities, the FPCMs and Fund Offerings.  In their Motions to Dismiss, Defendants argue that the FPCMs are not securities, and therefore Plaintiffs cannot state a claim for sale of unregistered securities under Florida law.  (DE 41 at 10-11; DE 53 at 15-17).  Because the issue of whether the Woodbridge Investments were securities bears on the viability of several other claims brought by Plaintiffs, I will address this question first.[3]

### 1. Legal Standard

Florida Statute § 517.211 creates a private right of action against individuals who sell securities that are not registered under Florida law.  Fla. Stat. § 517.211 (referencing Fla. Stat. § 517.07).  Section 517.211(1) provides that:

> Each person making the sale and every director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale, is jointly and severally liable to the purchaser in an action for rescission, if the purchaser still owns the security, or for damages, if the purchaser has sold the security.

*Id.*  "With some exceptions, Fla. Stat. § 517.07 requires every security sold in Florida to be registered with the . . . Office of Financial Regulation."  *Musolino v. Yeshiva Machzikei Hadas Beiz*, 137 F. App'x 321, 323 (11th Cir. 2005) (citing Fla. Stat. § 517.07 ("It is unlawful and a violation of this chapter for any person to sell or offer to sell a security within this state unless . . . .")).  "Failure to register [a security] results in strict liability for the recision of the transactions."  *Musolino v. Yeshiva Machzikei Hadas Beiz*, 137 F. App'x at 323 (citing Fla. Stat. § 517.211(1)).

Under Florida law, a security is defined as a "note," among other things.  Fla. Stat. 517.021(22)(a).  "[T]he definition of 'security' under the Florida statute is the same as that under federal law, . . . [so] we look to federal law" in determining whether an instrument is a security.

---

[3] With the Court's permission, the SEC submitted an *amicus curiae* brief on the issue of whether the FPCMs are securities that was considered in the following analysis.  (DE 110).

*Phillips v. Kaplus*, 764 F.2d 807, 814-15 n.8 (11th Cir. 1985) (citing *Wiener v. Brown*, 356 So. 2d 1302 (Fla. 3d DCA 1978)).

The Securities Act and the Exchange Act define security to mean "any note." *SEC v. Levin*, No. 12-CV-21917, 2014 WL 11878357, at *9 (S.D. Fla. Oct. 6, 2014) (citing 15 U.S.C. § 78c(a)(10) and 15 U.S.C. § 77b(a)(1)). In *Reves v. Ernst & Young*, the Supreme Court held that "[a] note is presumed to be a 'security,' and that presumption may be rebutted only by a showing that the note bears a strong resemblance (in terms of the four factors we have identified) to one of the enumerated categories of instrument." 494 U.S. 56, 67 (1990). This four-factor test is called the "family resemblance" test. *Id.* No one factor in this test is dispositive, and the test is considered as a whole. *Id.* (citing *McNabb v. SEC*, 298 F.3d 1126, 1132-33 (9th Cir. 2002)).

For the first factor, the court examines "the motivation that would prompt a reasonable seller and buyer to enter into the transaction." *Levin*, 2014 WL 11878357, at *9 (citing *Reves*, 494 U.S. at 66). "If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a 'security.'" *Reves*, 494 U.S. at 66. Conversely, "the note is less sensibly described as a security" "[i]f the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose." *Id.*

In assessing the second factor, the distribution plan of the instrument is examined "to determine whether it is an instrument in which there is 'common trading for speculation or investment.'" *Id.* "All . . . [that is] necessary to establish the requisite 'common trading' in an instrument" is that the instrument is "offered and sold to a broad segment of the public." *Id.* at 68.

Third, the court "will consider instruments to be 'securities'" on the basis of "the reasonable expectations of the investing public," "even where an economic analysis of the circumstances of the particular transaction might suggest that the instruments are not 'securities' as used in that transaction." *Id.* at 66.

Fourth and finally, the court must "examine whether some factor such as the existence of another regulatory scheme reduces the risk of the instrument thereby rendering application of the Securities Acts unnecessary." *Id.* at 67.

### 2. Analysis

Here, I have no trouble in concluding that the FPCMs are securities. Defendants' argument that the FPCMs are not securities only relates to the first factor. Defendants argue that FPCMs are not securities under this test because they were based on short-term loans advanced for a commercial and consumer purpose – to make loans to third-party owners of commercial real estate and to purchase property to develop and sell for a profit – and therefore are not securities. (DE 41 at 10-11; DE 53 at 15-17). Although Defendants are correct that the profits were used for such a purpose, the expenditures are more geared towards use of the money for the seller's "general use of a business enterprise or to finance substantial investments" than any commercial or consumer purpose. The reality of the transaction, as alleged in the FAC, was that new investor funds derived from FPCM sales were used to almost wholly support Woodbridge's business operations and to pay commissions to the external sales agents. (FAC ¶¶ 76-78, 83). Moreover, the FPCM buyer's primary motivation was likely the 5-8% annual return, paid on a monthly basis, and representations that the offerings were "low-risk, high-yield investments backed by high interest rate loans made to commercial borrowers." (FAC ¶¶ 2, 6, 74). Thus, the first factor cuts in favor of the FPCMs being securities. *See, e.g.*, *Reves*, 494 U.S. at 67-68

(finding first factor weighed in favor of calling note a security when notes were "sold to raise capital for its general business operations, and purchasers bought them in order to earn a profit in the form of interest").

The second factor also weighs in favor of classifying the FPCM as a security. Plaintiffs allege that the FPCMs were sold to "over 8,400 . . . investors nationwide" (FAC ¶¶ 9, 72), and that "a network of several hundred external sales agents . . . solicit[ed] investments from the public . . . through television, radio, newspaper advertising, cold calling, social media, websites, seminars, and in-person presentations" (FAC ¶¶ 80-81). The FPCMs were clearly "offered and sold to a broad segment of the public," and therefore the second factor weighs in favor of declaring the FPCMs to be securities. *See, e.g., SEC v. Wallenbrock*, 313 F.3d 532, 539 (9th Cir. 2002) (finding second factor weighed in favor of classifying note as security when notes held by over 1,000 investors in at least twenty-five states); *Levin*, 2014 WL 11878357, at *9 (finding second prong weighed in favor of security when notes were sold to 83 different investors in at least six different states).

Similarly, the third factor supports the idea that the FPCMs were securities because the investing public was likely motivated to purchase FPCMs based on (1) the advertised 5-8% annual return, paid on a monthly basis, and (2) representations that the offerings were "low-risk, high-yield investments backed by high interest rate loans made to commercial borrowers." (FAC ¶¶ 2, 6, 74); *see, e.g., SEC v. Stoiber*, 161 F.3d 745, 751 (D.C. Cir. 1998) ("Whether notes are reasonably perceived as securities generally turns on whether they are reasonably viewed by purchasers as investments."); *Levin*, 2014 WL 11878357, at *10 (finding public would reasonably view notes as securities when "notes were described in PowerPoint presentations as a

'low risk investment strategy," and investors were promised a high interest rate on their investment").

Finally, Plaintiffs have not identified, and the Court cannot discern, any risk-reducing factors or existing non-securities regulations that would reduce risks associated with the FPCMs such that they should not be considered securities. There is no comprehensive regulatory scheme sufficient to regulate the FPCMs, and if the Acts did not apply to these notes, they "would escape federal regulation entirely." *Reves*, 494 U.S. at 69.

In light of the presumption that any note is a security, and given the fact that all four factors of the family resemblance test weigh in favor of classifying the FCPMs as a security, I conclude that the FPCM is a security under Florida law. Accordingly, Plaintiffs state a claim against the Klager and Kornfeld Defendants for a violation of Fla. Stat. § 517.211.[4]

### B. Breach of Fiduciary Duty (Counts VII, VIII, IX)

Three groups of Plaintiffs allege breach of fiduciary duty claims against three different groups of Defendants: Plaintiffs Honig, Lippman, and Hertvik against the Kornfeld Defendants (Count VII) (FAC ¶¶ 171-75); Plaintiff Roy against the Klager Defendants (Count VIII) (FAC ¶¶ 176-180); and Plaintiff Nanavaty against the Knowles Defendants (Count IX) (FAC ¶¶ 181-85). The Defendants argue that Plaintiffs fail to state a claim against them because (1) Plaintiffs did not plead the existence of a fiduciary relationship with particularity, and, in any case, failed to establish such a relationship (DE 53 at 13-14; DE 94 at 5-6), and (2) Plaintiffs have failed to allege how any alleged breaches of fiduciary duties resulted in damages (DE 41 at 8-9).

---

[4] To the extent that the Kornfeld and Klager Defendants argue that they cannot be held liable under § 517.211 because Woodbridge, not the instant Defendants, recommended and sold FPCMs and other Woodbridge Fund Offerings, that argument is without merit. Based on the well-pled allegations in the FAC, Plaintiffs plausibly allege that the Defendants, using the Woodbridge Script, recommended and sold securities, including the FPCMs, to Plaintiffs and other investors. (FAC ¶¶ 104-14; 115-117; 194-213).

1.  Legal Standards

"The elements of a claim for breach of fiduciary duty are: the existence of a fiduciary duty, and the breach of that duty such that it is the proximate cause of the plaintiff's damages." *Gracey v. Eaker*, 837 So. 2d 348, 353 (Fla. 2002). "A cause of action for breach of a fiduciary duty is founded on a fiduciary relationship. A fiduciary relationship is based on trust and confidence between the parties where 'confidence is reposed by one party and a trust accepted by the other.'" *Taylor Woodrow Homes Fla., Inc. v. 4/46-A Corp.*, 850 So. 2d 536, 540 (Fla. 5th DCA 2003) (quoting *Doe v. Evans*, 814 So. 2d 370, 374 (Fla. 2002)). "Unless the relationship is formed through the terms of an express agreement, the issue whether a fiduciary relationship exists will generally depend upon the specific facts and circumstances surrounding the relationship of the parties and the transaction in which they are involved." *Id.* "To establish a fiduciary relationship, a party must allege some degree of dependency on one side and some degree of undertaking on the other side to advise, counsel, and protect the weaker party." *Id.* (citing *Watkins v. NCNB Nat'l Bank of Fla., N.A.*, 622 So.2d 1063, 1065 (Fla. 3d DCA 1993). "When the parties are dealing at arm's length, a fiduciary relationship does not exist because there is no duty imposed on either party to protect or benefit the other." *Id.* at 541.

"The law is clear that a broker owes a fiduciary duty of care and loyalty to a securities investor." *Gochnauer v. A.G. Edwards & Sons, Inc.*, 810 F.2d 1042, 1049 (11th Cir. 1987) (applying Florida law); *Abramowitz v. Westport Nat'l Bank*, 2009 WL 10667468, at *8 (S.D. Fla. Nov. 5, 2009) (finding plaintiffs stated breach of fiduciary duty claims under Florida law against investment advisors who managed money that was invested in Ponzi scheme); *In re Old Naples Secs., Inc.*, 343 B.R. 310, 321-24 (Bankr. M.D. Fla. 2006) (finding broker breached fiduciary duty in selling securities for which he failed to adequately investigate investments he

recommended and fully explain risk of investments that were part of Ponzi scheme).  Even when the seller of the security only advises the investor on a single transaction and has no continuing management duty over the account once the transaction is complete, certain fiduciary duties arise, including but not limited to (1) "the duty to recommend investments only after studying it sufficiently to become informed as to its nature, price, and financial prognosis," and (2) "the duty to inform the customer of the risks involved in purchasing or selling a particular security." *Gochnauer*, 810 F.2d at 1049 (referring to a broker's one-time non-discretionary account for engaging in a securities transaction).

## 2. Analysis

Here, Plaintiffs plausibly allege that Defendants had a fiduciary duty to the Plaintiffs because Plaintiffs have pled that Defendants held themselves out as experienced investment advisors and sold Plaintiffs securities.  Although Plaintiffs pled that Defendants were not registered brokers (FAC ¶¶ 174, 179, 184), those facts do not preclude Defendants from being charged with the same fiduciary duties that apply to all individuals who sell securities, as Defendants did here.  Where, as here, Defendants are alleged to have (1) engaged in the business of effecting transactions in securities for the account of others, (2) received transaction-based commissions, (3) provide advice and recommendations as to investment in securities, (4) actively solicited investment in securities, and (5) held themselves out as investment advisors, their mere failure to register as a "broker" or "investment advisor" does not excuse them from the duties which attach to such activities.  *See* Fla. Stat. 517.021(14(a)) (defining "investment advisor" as "any person who receives compensation, . . . and engages for all or part of her or his time, . . . in the business of advising others as to the value of securities or as to the advisability of investments in, purchasing of, or selling of securities"); 15 U.S.C. § 78c(a)(4) (defining "broker"

in the Securities and Exchange Act to be "any person who engaged in the business of effecting transactions in securities for the account of others"); *Neogenix Oncology, Inc. v. Gordon*, 133 F. Supp. 3d 539, 559 (E.D.N.Y. Sept. 30, 2015) (noting that "the receipt of transaction based compensation – usually, in the form of commissions – is significant" in determining whether an individual selling securities acted as a broker); *SEC v. Kramer*, 778 F. Supp. 2d 1320, 1333-34 (M.D. Fla. 2011) (noting that "[t]he broker-dealer registration requirement is of the utmost importance in effecting the purpose of the [SEC] Act" and that court must consider whether individual actively finds investors, provides advice or valuation as to the merit of an investment, and receives a commission rather than a salary in determining whether seller of securities is broker).

Moreover, unlike in *Wilson v. Everbank*, cited by the Klager Defendants, the relationship between Plaintiffs and Defendants was not an arms-length deal such as a borrower-lender or mortgagor-mortgagee transaction, but was a sale of a security by an allegedly experienced investment advisor to an investor. *See Wilson v. Everbank*, 77 F. Supp. 3d 1202, 1223-24 (S.D. Fla. 2015).

Assuming the Kornfeld, Klager, and Knowles Defendants had fiduciary duties to Plaintiffs arising out of the sale of the Woodbridge securities, Plaintiffs plausibly stated claims for breach of fiduciary duty.  Plaintiffs allege that: (1) Defendants advised and instructed the Plaintiffs on their investment needs, (2) the Plaintiffs trusted Defendants and the representations they made, (3) Defendants did not conduct due diligence on the Woodbridge securities before recommending and selling them to Plaintiffs, and (4) Defendants sold Plaintiffs securities for which they received commissions.  Plaintiffs allege that the Defendants relied on the Woodbridge Script instead of doing their own due diligence on the Woodbridge securities before

selling them to Plaintiffs, and did not disclose to Plaintiffs that neither the securities nor Defendants themselves were registered.

The Kornfeld Defendants also argue that Plaintiffs failed to plead how the alleged breaches resulted in damages.   Although the allegations in the breach of fiduciary duty counts merely state that the "breaches of fiduciary duty directly and proximately caused [Plaintiffs] to sustain significant damages," taking the allegations of the FAC as a whole that are reincorporated into each account, it is apparent that the alleged damages referred to are the now-lost securities in which they invested.[5]

## C. __Negligence (Counts I, II, III)__

Plaintiffs allege negligence claims against the same three groups of Defendants: Plaintiffs Honig, Lippman, and Hertvik against the Kornfeld Defendants (Count I) (FAC ¶¶ 144-47); Plaintiff Roy against the Klager Defendants (Count II) (FAC ¶¶ 148-51); and Plaintiff Nanavaty against the Knowles Defendants (Count III) (FAC ¶¶ 152-55).   The Kornfeld, Klager, and Knowles Defendants all argue that Plaintiffs fail to state a claim against them because Plaintiffs have failed to plead sufficient factual allegations to establish that Defendants owed Plaintiffs a duty of care when selling the Woodbridge FPCMs and Fund Offerings.   (DE 41 at 6-7; DE 53 at 10-11; DE 94 at 4-5).   In addition, the Kornfeld and Klager Defendants argue that Plaintiffs have failed to plead facts demonstrating how they allegedly breached any duties to Plaintiffs.   (DE 41 at 7; DE 53 at 11).

---

[5] The Knowles Defendants also argue that Plaintiffs' breach of fiduciary claims must be pled with particularity under Florida law.  (DE 94 at 7-8 (citing *Sussman v. Weintraub*, No. 06-20408, 2007 WL 908280, at *4 (S.D. Fla. Mar. 22, 2007)).  However, there is a dearth of other Florida law supporting that proposition, and the Court found no evidence that the Rule 9(b) heightened pleading standard is required for such claims.  Accordingly, the Court declines to require any heightened pleading requirement to these claims.

1. Legal Standards

To state a negligence claim under Florida law, a plaintiff must plead facts to plausibly show: "(1) a legal duty owed by defendant to plaintiff, (2) breach of that duty by defendant, (3) injury to plaintiff legally caused by defendant's breach, and (4) damages as a result of that injury." *Estate of Rotell ex rel. Rotell v. Kuehnle*, 38 So. 3d 783, 788 (Fla. 2d DCA 2010) (citation omitted).  Whether or not a duty exists is a question of law for the Court to determine. *McCain v. Fla. Power Corp.*, 593 So. 2d 500, 502 (Fla. 1992).

"Florida . . . recognizes that a legal duty will arise whenever a human endeavor creates a generalized and foreseeable risk of harming others." *Tank Tech, Inc. v. Valley Tank Testing, L.L.C.*, 244 So. 3d 383, 393 (Fla. 2d DCA 2018) (quoting *McCain v. Fla. Power Corp.*, 593 So. 2d 500, 502 (Fla. 1992)).  "The duty element of negligence focuses on whether the defendant's conduct foreseeably created a broader "zone of risk" that poses a general threat of harm to others." *McCain v. Fla. Power Corp.*, 593 So. 2d 500, 502 (Fla. 1992).  "The principle of 'duty' is linked to the concept of foreseeability and may arise from four general sources: (1) legislative enactments or administration regulations; (2) judicial interpretations of such enactments or regulations; (3) other judicial precedent; and (4) a duty arising from the general facts of the case." *Clay Elec. Co-op., Inc. v. Johnson*, 873 So. 2d 1182, 1185 (Fla. 2003) (citing *McCain*, 593 So. 2d at 503 n.2).

"From its early origins, the interest protected by a cause of action in negligence was the interest in one's person and physical property." *Lucarelli Pizza & Deli v. Posen Constr., Inc.*, 173 So. 3d 1092, 1094 (Fla. 2d DCA 2015).  "Where the plaintiff seeks only the recovery of an economic loss, the duty element of negligence law serves as an important barrier to over-extension of liability." *Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1339 (11th Cir. 2012)

(interpreting Florida law).  Therefore, "in order to proceed on a common law negligence claim based solely on economic loss, there must be some sort of link between the parties or some other extraordinary circumstance that justifies recognition of such a claim." *Tank Tech, Inc.*, 244 So. 3d at 393.  For example, if the defendant is an "economic professional" like an insurance broker, the defendant "fits into a special professional category where the standard of care includes a duty to protect the economic interests of clients or affected parties." *Lucarelli Pizza & Deli v. Posen Constr., Inc.*, 173 So. 3d 1092, 1095 (Fla. 2d DCA 2015); *Abramowtiz*, 2009 WL 10667468, at *8 (finding plaintiffs stated negligence claim under Florida law against investment advisors who managed money and actively promoted investment in Ponzi scheme); *Old Naples*, 343 B.R. at 321-24 (finding that investor stated negligence claims against broker selling securities when broker failed to question validity of or investigate investments in Ponzi scheme); *Anwar v. Fairfield Greenwich Ltd.*, 118 F. Supp. 3d 591, 616 (S.D.N.Y. 2015) (applying Florida negligence law and finding that securities broker-dealers had a duty of care to conduct a proper investigation of recommended investments).

## 2. Analysis

Here, Plaintiffs allege that Defendants breached their duties of care "as investment advisors," which "included the obligation to perform reasonable due diligence on these Plaintiffs' behalf prior to selling them Woodbridge FPCMs and Fund Offerings." (FAC ¶¶ 145, 149, 153).  In their response to Defendant's Motions to Dismiss, Plaintiffs argue that Defendants "owed common law duties of care towards the respective Plaintiffs who purchased securities from them" because "[e]ach Defendant is alleged to have been conducting business and holding themselves out to be investment advisors in connection with their solicitation and recommendation of Woodbridge investments." (DE 102 at 12).

Taking all well-pled allegations as true and construing them in the light most favorable to Plaintiffs, Plaintiffs have established that the Kornfeld, Klager, and Knowles Defendants owed them a duty, and that the Defendants breached that duty when they ignored certain red flags regarding the investments they sold to Plaintiffs.  The Knowles Defendants argue that Plaintiffs' allegations regarding Defendants' status as "investment advisors" is conclusory, is not supported by any representations, claims, or statements made to them in their alleged capacity as investment advisors, and therefore cannot form the basis of a duty.  (DE 117 at 2).  Defendants do not provide any convincing support for the notion that such information must be pled in order to state a claim in this case.  Plaintiffs adequately allege that the Defendants conducted business as, and held themselves out to be, investment advisors, advising and instructing Plaintiffs on the suitability of the Woodbridge securities, and eventually recommending and selling the Woodbridge securities to the relevant named Plaintiffs.

The Knowles Defendants also argue that since Plaintiffs only allege that they suffered an economic loss here, Plaintiffs have failed to establish "some sort of link between the parties or some other extraordinary circumstance that justifies recognition of such a claim." *Tank Tech, Inc.*, 244 So. 3d at 393; (DE 94 at 5; DE 117 at 3-4).  However, by allegedly holding themselves out to be investment advisors and by recommending and selling securities, Defendants fall into the category of "economic professionals" under Florida law who have a duty of care to protect the economic interests of clients. *See, e.g.*, *Lucarelli*, 173 So. 3d at 1095.  Plaintiffs did not have some attenuated relationship or suffer some unforeseeable harm; as Defendants' clients in the sale of the Woodbridge securities, Plaintiffs are individuals to whom the Defendants owed a duty of care to exercise reasonable due diligence on their behalf, and the injury purportedly suffered by Plaintiffs was one that could potentially be traced directly to Defendants' alleged failure to

exercise their duties of care.  Irrespective of the fact that the Defendants may have been using a "uniform, scripted information and sales materials" provided by Shapiro and Woodbridge "to recommend and sell Woodbridge investments" (FAC ¶¶ 6, 82, 85, 112, 116, 119), Defendants, as the individuals who recommended and sold those securities, had an independent duty of care to their clients.

Moving on from the duty determination, the Kornfeld and Klager Defendants argue that Plaintiffs have failed to plead facts demonstrating how they allegedly breached any duties to Plaintiffs.  (DE 41 at 7; DE 53 at 11).  Defendants provide no legal support for their argument. Turning to the FAC, it is apparent that construing all reasonable inferences in favor of the Plaintiffs, the Plaintiffs allege that Defendants breached their duty of care when they ignored specific "red flags concerning the Woodbridge FPCMs and Fund Offerings," specifically including (1) that the Woodbridge securities were unregistered, (2) Defendants were also not registered with any regulatory agency but received commissions from selling the securities, and (3) the examples of real property used in the sales materials to sell Woodbridge securities were not actually owned by third-party borrowers, as the Woodbridge Script contended, and (4) that Woodbridge threatened to terminate the Defendants if they did not permit Woodbridge to contact investors directly to roll over short-term FPCMs into longer-term Fund Offerings.  (FAC ¶¶ 146, 150, 154).  Given these allegations, Plaintiffs adequately pled that Defendants breached their duty of care by failing to conduct any due diligence into the securities before recommending and selling them.

Though not challenged by Defendants, Plaintiffs also allege that Defendants' breach of the duty of care caused damages.  (FAC ¶¶ 151, 155, 160).  Accordingly, Defendants' Motions to Dismiss Plaintiffs' negligence claims are denied.

### D. **Negligent Misrepresentation (Counts IV, V, VI)**

The same three groups of named Plaintiffs assert negligent misrepresentation claims against the same three different groups of Defendants: Plaintiffs Honig, Lippman, and Hertvik against the Kornfeld Defendants (Count IV) (FAC ¶¶ 156-60); Plaintiff Roy against the Klager Defendants (Count V) (FAC ¶¶ 161-65); and Plaintiff Nanavaty against the Knowles Defendants (Count VI) (FAC ¶¶ 166-70).  The Kornfeld, Klager, and Knowles Defendants all argue that Plaintiffs fail to state a claim against them because Plaintiffs have failed to plead the facts supporting their negligent misrepresentation claims with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure.  (DE 41 at 7-8; DE 53 at 11-13; DE 94 at 5-6).

### 1. Legal Standard

"To state a cause of action for negligent misrepresentation in Florida, a plaintiff must allege: '(1) the defendant made a misrepresentation of material fact that he believed to be true but which was in fact false; (2) the defendant was negligent in making the statement because he should have known the representation was false; (3) the defendant intended to induce the plaintiff to rely . . . on the misrepresentation; and (4) injury resulted to the plaintiff acting in justifiable reliance upon the misrepresentation.'" *McGee v. JP Morgan Chase Bank, NA*, 520 F. App'x 829, 831 (11th Cir. 2013) (quoting *Simon v. Celebration Co.*, 833 So. 2d 826, 832 (Fla. 5th DCA 2004)).

In Florida, since "negligent misrepresentation sounds in fraud," the facts supporting any claim must be pled with particularity.  *Id.* (citing Fed. R. Civ. P. 9(b) and *Ostreyko v. B.C. Morton Org., Inc.,* 310 So.2d 316, 318 (Fla. 3d DCA 1975)).  Thus, to state a claim, Plaintiff must allege "(1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for

making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendant obtained as a consequence of the fraud." *FindWhat Investor Group v. FindWhat.com,* 658 F.3d 1282, 1296 (11th Cir. 2011). "These factors are not exclusive, however, and a plaintiff may satisfy Rule 9(b)'s particularity requirements through alternative means." *SIG, Inc. v. AT&T Digital Life, Inc.*, 971 F. Supp. 2d 1178, 1187 (S.D. Fla. 2013) (Rosenbaum, J.) (citing *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1371 (11th Cir. 1997)).

2. Analysis

Here, Plaintiffs fail to state claims for negligent misrepresentation against the Kornfeld, Klager, and Knowles Defendants because they failed to plead meet the heightened pleading standard required by Rule 9(b). Plaintiffs allege the relevant Defendants all made the following misrepresentations of material fact: (1) "the FPCMs used were bona fide third-party borrowers who were in need of hard-money loans from Woodbridge;" (FAC ¶¶ 157(a), 162(a), 167(a))  (2) "the FPCM investors would be paid using the interest from the funds of new investors;" (FAC ¶¶ 157(b), 162(b), 167(b)) and (3) "the Fund Offerings would be funded in part by properties that Woodbridge would purchase to develop and sell for profit" (FAC ¶¶ 157(c), 162(c), 167(c)).

With regard to the Knowles and Klager Defendants, the only specific allegations are that they "utilized the false and misleading Woodbridge sales script to recommend and sell Woodbridge investments" to Plaintiffs. (FAC ¶¶ 112, 116, 119). These bare allegations, alone, are insufficient to meet the heightened pleading standard of Rule 9(b).

Although Plaintiffs allege slightly more specific facts against the Kornfeld Defendants, those allegations are still insufficient to meet the particularity standards required by Rule 9(b) and Florida law. The Honig Plaintiffs allege that they "were specifically targeted, solicited and

induced to invest in Woodbridge investments by the Kornfelds after attending the Ferne Kornfeld Course." (FAC ¶ 111).  However, the Plaintiffs do not specify when they attended the course, what was said at the course they attended, and how what was said during the course induced them to purchase any FPCMs or Fund Offerings.

In reviewing the allegations against the Kornfeld, Klager, and Knowles Defendants, it is apparent that "Plaintiffs have simply 'lumped together' all of the Defendants in their allegations of fraud." *Brooks*, 116 F.3d at 1381 (finding plaintiffs did not plead with particularity under Rule (b) when analyzing analogous RICO claim).  To the extent that Plaintiffs' negligent misrepresentation claims center around the uniform Woodbridge Script, Plaintiffs may be able to plead such a claim with particularity; to do so, however, Plaintiffs must put forth (1) specific factual allegations as to when and where Defendants made such misrepresentations and (2) the precise statements that Defendants made which induced Plaintiffs to purchase the Woodbridge Investments.

Plaintiffs' citations to Third Circuit opinions and tests are unavailing, as is Plaintiffs' urging the Court to "be 'sensitive' to situations in which 'sophisticated defrauders' may 'successfully conceal the details of their fraud.'" (DE 102 at 15).  The essence of Plaintiffs' claims is that Defendants used a uniform sales script provided to them by Woodbridge and Shapiro.  Plaintiffs also allege that this Woodbridge Script was "provided to investors." (FAC ¶ 85).  Nevertheless, Plaintiffs did not plead any alleged misrepresentations that were part of this uniform sales script, allegedly provided to Plaintiffs and used to induce the named Plaintiffs along with potentially "8,400 unsuspecting investors nationwide." (FAC ¶ 9).  "Nor, given the lack specificity, do Plaintiffs sufficiently link their reliance and damages to any particular falsehood." *SIG, Inc.*, 971 F. Supp. 2d at 1198; (FAC ¶¶ 160, 165, 170).  Accordingly,

Plaintiffs' negligent misrepresentation claims must be dismissed as to the Kornfeld, Klager, and Knowles Defendants.

## IV.   CLAIMS AGAINST ALL EXTERNAL SALES AGENT DEFENDANTS

### A.   Aiding and Abetting Breach of Fiduciary Duty (Count X)

Plaintiffs allege claims against all of the External Sales Agent Defendants for aiding and abetting breach of fiduciary duty.  (Count X) (FAC ¶¶ 186-93).  Plaintiffs allege that the External Sales Agent Defendants aided and abetted Shapiro's breach of fiduciary duty when they "substantially assisted in Shapiro's breaches of fiduciary duty with knowledge, general awareness, or recklessness by inducing investors to purchase FPCMs and Fund Offerings." (FAC ¶ 191).  The External Sales Agent Defendants argue that Plaintiffs have failed to plead facts suggesting they had any knowledge of Shapiro's breach of fiduciary duty.

#### 1. Legal Standard

A cause of action for aiding and abetting the breach of a fiduciary duty requires a plaintiff to establish: 1) a fiduciary duty on the part of a primary wrongdoer; 2) a breach of that fiduciary duty; 3) knowledge of the breach by the alleged aider and abettor; and 4) the aider and abettor's substantial assistance or encouragement of the wrongdoing.  *Fonseca v. Taverna Imports, Inc.*, 212 So. 3d 431, 442 (Fla. 3d DCA 2017).  Florida law requires that a defendant have actual "knowledge of the underlying fraud or breach of fiduciary duty," not merely that certain "red flags" indicate a defendant "should have known" of the breach.  *Lamm v. State Street Bank & Trust*, 749 F.3d 398, 950 (11th Cir. 2014) (applying in case where defendant was bank); *Wiand v. Wells Fargo Bank, N.A.*, 938 F. Supp. 2d 1238, 1244 (M.D. Fla. 2013) ("While actual knowledge may be shown by circumstantial evidence, courts "stress that the requirement is *actual* knowledge" and the circumstantial evidence must demonstrate that the aider-and-abettor

*actually knew* of the underlying wrongs committed."); *Groom v. Bank of Am.*, 2012 WL 50250, at *3 (M.D. Fla. Jan. 9, 2012) (in case against bank, finding that "[s]uch 'red flags' do not constitute the conscious awareness of wrongdoing necessary to maintain an aiding and abetting cause of action"); *see also Lawrence v. Bank of Am., N.A.*, 455 F. App'x 904, 907 (11th Cir. 2012). Moreover, "only conclusory allegations that [a defendant] substantially assisted or encouraged the wrongdoing . . . [are] insufficient to withstand a motion to dismiss. *Turnberry Vill. N. Tower Condo. Ass'n, Inc. v. Turnberry Vill. S. Tower Condo. Ass'n, Inc.*, 224 So. 3d 266, 267 (Fla. 3d DCA 2017).

2. <u>Analysis</u>

Here, there appears to be no dispute that Shapiro, as the primary issuer of the Woodbridge securities who controlled the whole scheme, owed a fiduciary duty to investors, and that Shapiro breached that fiduciary duty through his orchestration of the Ponzi scheme. With regard to the third element of this claim, the only factual allegation asserted against the majority of the External Sales Agent Defendants was that they "similarly utilized the false and misleading Woodbridge sales script to recommend and sell Woodbridge investments to thousands of additional investors in Florida and throughout the United States," which "provided Woodbridge with a constant and significant source of investor funds necessary to keep the Ponzi scheme afloat." (FAC ¶ 121). There are no other factual allegations in the FAC supporting the notion that the Non-Resident Sales Agent Defendants had actual knowledge of the Woodbridge scheme or Shapiro's breach of fiduciary duty.

Contrary to Plaintiffs' argument, mere allegations that the External Sales Agent Defendants "utilized the false and misleading Woodbridge sales script," and that the Defendants "knew or should have known" that the Woodbridge investments were fraudulent are insufficient

to establish that the Defendants *knew* that Shapiro was breaching his fiduciary duties and provided substantial assistance to him to do so.  (*See* FAC ¶¶ 6, 111-12; 116; 119; 146; 150; 154).  Although Plaintiffs identify several "red flags" that should have indicated to the Kornfeld, Klager, and Knowles Defendants that something was amiss with the Woodbridge securities, these red flags fail to establish actual knowledge on the part of the External Sales Agent Defendants.  Moreover, Plaintiffs' attempt to lower this knowledge standard to "recklessness" is contrary to Florida law.

In fact, numerous factual allegations that Woodbridge and Shapiro intentionally concealed the scheme lend support to the proposition that the Defendants did not have actual knowledge of Shapiro's breach of fiduciary duty.  For example, Plaintiffs allege that (1) Shapiro "maintained exclusive operational control over Woodbridge" and "orchestrated and operated the fraud" (FAC ¶¶ 73, 94), (2) Roseman, Woodbridge's Head of Sales who reported directly to Shapiro, "directed internal and external sales agents to continue to raise funds from investors knowing that Woodbridge had no inventory of available real property and lacked revenue . . . necessary  to make interest payments to investors" (FAC ¶ 95), (3) Roseman was responsible for ensuring the sales force followed the Woodbridge Script, "knowing that the representations relating to the Woodbridge investments were false or misleading" (FAC ¶¶ 85, 96), (4) Shapiro used various tactics to conceal the fraudulent scheme, including using his RS Trust and concealing or mischaracterizing transactions from the Woodbridge operating account, including those to pay commissions to the External Sales Agents (FAC ¶¶ 94-102), and (5) "Woodbridge's sales agents falsely mischaracterized the dispositions of regulatory actions to external sales agents claiming that the company was exonerated of wrongdoing or fraudulent activity" (FAC ¶

132).   Accordingly, Plaintiffs' allegations fail to establish that Defendants had any actual knowledge of Shapiro's breach of fiduciary duty and fail to state a claim for aiding and abetting.

Moreover, the dearth of factual allegations on Defendants' purported knowledge regarding the Woodbridge scheme and Shapiro's breach of fiduciary duty fail to give rise to the reasonable inference that the Defendants "substantially assisted or encouraged the wrongdoing." A mere recitation of the elements is insufficient to state a claim, and Plaintiffs' allegations regarding Defendants' alleged substantial assistance or encouragement fail to rise above that level.

Plaintiffs are permitted to re-plead to attempt to state a claim here by adding specific factual allegations that could plausibly give rise to the reasonable inference that Defendants had actual knowledge of Shapiro's breach of fiduciary duty, and that they substantially assisted or encouraged the wrongdoing.

### B. **Civil Conspiracy (Count XIII)**

Plaintiffs allege a civil conspiracy claim against all External Sales Agent Defendants in Count XIII.  (FAC ¶¶ 214-227).  Defendants' primary argument in their Motions to Dismiss is that the civil conspiracy claim consists of conclusory allegations that fail to establish that there was an agreement between the External Sales Agent Defendants and their co-conspirators to do an unlawful act.

#### 1. Legal Standard

"A civil conspiracy claim requires: (1) an agreement between two or more parties; (2) to do an unlawful act or to do a lawful act by unlawful means; (3) the doing of some overt act in pursuance of the conspiracy; and (4) damage to plaintiff as a result of the acts done under the conspiracy." *Philip Morris USA, Inc. v. Russo*, 175 So. 3d 681, 686 n.9 (Fla. 2015). "The gist of

a civil action for conspiracy is not the conspiracy itself but the civil wrong which is alleged to have been done pursuant to the conspiracy." *Id.* (citations omitted). Although Rule 9(b) does not list conspiracy as a cause of action which must be pled with particularity, a complaint will be dismissed where the allegations are conclusory and vague. *Primerica Fin. Servs., Inc. v. Mitchell*, 48 F. Supp. 2d 1363, 1369 (S.D. Fla. 1999)

"An actionable conspiracy requires an actionable underlying tort or wrong." *Hercules Capital, Inc. v. Gittleman*, No. 16-81663, 2018 WL 395489, at *24 (S.D. Fla. Jan. 12, 2018) (Middlebrooks, J.) (citing *Wright v. Yurko*, 446 So. 2d 1162, 1165 (Fla. 5th DCA 1984)). "An act which does not constitute a basis for a cause of action against one person cannot be made the basis for a civil action for conspiracy." *Wright*, 446 So. 2d at 1165.

"A conspirator need not take part in the planning, inception, or successful conclusion of a conspiracy. The conspirator need only know of the scheme and assist in it in some way to be held responsible for all of the acts of his coconspirators." *Donofrio v. Matassini*, 503 So. 2d 1278, 1281 (Fla. 2d DCA 1987). ). However, allegations that the co-conspirators were "engaged in the same 'scheme,'" alone, are insufficient to state a claim for civil conspiracy. *Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302, 1319 (S.D. Fla. 2014). Indeed, "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007)).

"[Although] a conspiracy may be proven by circumstantial evidence, this may be done 'only when the inference sought to be created by such circumstantial evidence outweighs all

reasonable inferences to the contrary.'" *Raimi v. Furlong*, 702 So. 2d 1273, 1284 (Fla. 3d DCA 1997).

### 2. Analysis

To support their civil conspiracy claim, Plaintiffs allege that "Woodbridge, Shapiro, and the other Woodbridge insiders embarked on a scheme and civil conspiracy relating to the sale of Woodbridge Investments" (FAC ¶ 215), and that "Shapiro, Roseman and the other Woodbridge insiders thus launched a conspiracy to recruit and compensate a network of several hundred sales agents to solicit the purchase and sale of Woodbridge Investments" (FAC ¶ 217). Plaintiffs also allege that "[t]he common purpose and design of the conspiracy was to generate substantial wealth and profits through the sale of Woodbridge Investments by engaging in uniform, widespread misrepresentations, omissions, and breaches of fiduciary duty," (FAC ¶ 218) and that "the Sales Agent Defendants each reached and entered into an express or tacit agreement with at least one or more of the co-conspirators, including specifically but not limited to Shapiro and Roseman, to pursue . . . [a] course of concerted, unlawful conduct in exchange for substantial compensation" (FAC ¶ 219). With regard to the existence of agreement to do an unlawful act, Plaintiffs allege Defendants "reached and entered into an express or tacit agreement with at least one or more of the other co-conspirators," "agreed to join in and participate in the Woodbridge civil conspiracy," and "knew or should have known that the solicitation, recommendation, and sale of the Woodbridge securities . . . was improper and unlawful" are conclusory. (FAC ¶¶ 219, 221-23). Additionally, although more specific allegations are pled with regard to the Kornfeld, Klager, and Knowles Defendants, Plaintiffs allege that the other External Sales Agent Defendants in this action "utilized the false and misleading Woodbridge sales script to recommend and sell Woodbridge investments to thousands of additional investors in Florida and

throughout the United States . . . provid[ing] Woodbridge with a constant and significant source of investor funds necessary to keep the Ponzi scheme afloat." (FAC ¶ 121).

Construing all well-pled facts in the light most favorable to Plaintiffs, Plaintiffs' allegations are insufficient to state a claim for civil conspiracy because they do not plead facts showing that Defendants agreed to do any unlawful purpose or act.

As an initial matter, there must be some underlying tort or wrong to state a claim for conspiracy under Florida law. Individuals cannot agree to be negligent, and therefore Plaintiffs' negligence claims cannot serve as the basis for the civil conspiracy claim. *See Sonnenreich v. Philip Morris Inc.*, 929 F. Supp. 416, 419-20 (S.D. Fla. 1996) (applying Florida law in finding that "[l]ogic and case law dictate that a conspiracy to commit negligence is a non sequitur"). Thus, the underlying legal wrongs that could form the basis for Plaintiffs' civil conspiracy claim include sale of unregistered securities and breach of fiduciary duty.

Applying these underlying wrongs to Plaintiffs' civil conspiracy claim, Plaintiffs have not pled sufficient facts demonstrating that any of the Defendants agreed to breach their fiduciary duties, sell unregistered securities, or do any other unlawful act. There are no factual allegations from which this Court could plausibly infer that any defendant knew of the unlawful scheme, and Plaintiffs' allegations that the Defendants "reached and entered into an express or tacit agreement with at least one or more of the other co-conspirators," "agreed to join in and participate in the Woodbridge civil conspiracy," and "knew or should have known that the solicitation, recommendation, and sale of the Woodbridge securities . . . was improper and unlawful" are conclusory. (FAC ¶¶ 219, 221-23). Plaintiffs correctly point out that they need not show that the External Sales Agent Defendants knowingly agreed to join and participate in Woodbridge's alleged Ponzi scheme, or that the proceeds from their sales of Woodbridge

securities were used to operate the scheme.  Even so, Plaintiffs' allegations fail to plausibly plead the existence of a separate civil conspiracy whereby the External Sales Agent Defendants knowingly entered into an agreement with Shapiro and other Woodbridge insiders to recommend and sell unregistered Woodbridge securities using the Woodbridge Script.  These conclusory allegations of agreement do not establish a civil conspiracy.

Indeed, the only "example" alleged by Plaintiffs in the civil conspiracy count that purportedly demonstrates the External Sales Agent Defendants' agreement to join in the scheme is an email between non-parties Shapiro and Roseman, two individuals alleged in the FAC to have concealed the nature of the scheme, discussing how the Knowles, Paramount, and Kornfeld Defendants were "all slow at the moment." (FAC ¶ 224).  I fail to see how this email, which did not include any of the aforementioned Defendants, provides any support for the notion that the External Sales Agent Defendants agreed to engage in any unlawful conduct.  It may provide support for the fact that the Defendants were unwittingly helping the Woodbridge insiders perpetrate the scheme, but that falls far short of the agreement necessary to plead a civil conspiracy.

### 3. Personal Jurisdiction over Non-Resident Defendants

The Shield, OSFG, Wieniewitz, and Paramount Defendants  all argue that even if Plaintiffs had stated a claim for civil conspiracy and for aiding and abetting breach of fiduciary duty, this Court has no personal jurisdiction over them.  However, "[i]n Florida, before a court addresses the question of whether specific jurisdiction exists under the long-arm statute, the court must determine "whether the allegations of the complaint state a cause of action." *PVC Windoors, Inc. v. Babbitbay Beach Constr., N.V.*, 598 F.3d 802, 808 (11th Cir. 2010) (citing *Wendt v. Horowitz*, 822 So.2d 1252, 1260 (Fla. 2002)).  As Plaintiffs have failed to state a claim

against all Defendants for civil conspiracy or for aiding and abetting Shapiro's breach of fiduciary duty, and as the Court believes it is unlikely Plaintiffs can plead facts sufficient to establish that Defendants had actual knowledge of Shapiro's breach of fiduciary duty, or that the Defendants agreed to engage in an unlawful act, I decline to address whether there is personal jurisdiction over the Non-Resident Defendants at this time.

### C. Vicarious Liability (Count XIV)

In Count XIV, Plaintiffs assert a claim for vicarious liability against all corporate defendants in this matter. "Florida law is clear that in order to pursue a vicarious liability claim, the claimant must specifically plead it as a separate cause of action." *Gen. Asphalt Co. v. Bob's Barricades, Inc.*, 22 So. 3d 697, 699 (Fla. 3d DCA 2009) (citing *Goldschmidt v. Holman*, 571 So. 2d 422, 423 (Fla. 1990)). To state a claim based on vicarious liability, a plaintiff must "set forth any ultimate facts that establish either actual or apparent agency." *Holman*, 571 So. 2d at 423. "Essential to the existence of an actual agency relationship is (1) acknowledgment by the principal that the agent will act for him, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent." *Id.* at 424 n.5. Conversely, "apparent agency liability requires finding three essential elements: first, a representation by the principal to the plaintiff, which, second, causes the plaintiff reasonably to believe that the alleged agent is authorized to act for the principal's benefit, and which, third, induces the plaintiff's detrimental, justifiable reliance upon the appearance of agency." *Franza v. Royal Caribbean Cruises, Ltd.*, 772 F.3d 1225, 1252 (11th Cir. 2014). To hold a principal liable for the [tort] of either an actual or apparent agent, a plaintiff must "sufficiently allege the elements of agency in addition to the elements of the underlying negligent act of the agent for which the plaintiff seeks to hold the

principal liable." *Flaherty v. Royal Caribbean Cruises, Ltd.*, No. 15-22295, 2015 WL 8227674, at *6 (S.D. Fla. Dec. 7, 2015).

Here, Plaintiffs' allegations as to vicarious liability are insufficient. Plaintiffs' allegations that each natural person defendant "was employed by, an officer of, or affiliated with" each defendant's respective alleged corporate entity such that the natural person was "acting within the course and scope of his actual or apparent agency . . . at all times material to this action" are conclusory. (FAC ¶¶ 228-242). Plaintiffs fail to specify whether they are proceeding under a theory of actual or apparent agency as to each natural person defendant, and do not even attempt to plead facts to meet the legal tests for actual or apparent agency. Importantly, "since actual and apparent agency are not independent causes of action, but instead theories of liability," Plaintiffs fail to specify which underlying torts allegedly committed by the agents serve as the basis for their vicarious liability claims. *Flaherty*, 2015 WL 8227674, at *6. Accordingly, Plaintiffs have failed to state a claim for vicarious liability. If Plaintiffs choose to amend, they must specify which underlying torts, committed by whom, serve as the basis for each vicarious liability claim against each corporate defendant. Additionally, if Plaintiffs attempt to re-plead this claim, it may make sense for Plaintiffs to separate the apparent and actual agency theories into two separate counts for vicarious liability to promote clarity for the parties and the Court.

D. **GBH CPAS, PC**

Although Plaintiffs name GBH as a defendant in this action and make allegations against it in their FAC, Plaintiffs do not assert any claims against GBH, purportedly due to "drafting/scrivener's error." (DE 102 at 44). Accordingly, GBH's Motion to Dismiss is granted, and Plaintiffs may assert any claims they have against GBH in an amended complaint.

## V.   MOTION TO STAY DISCOVERY

Separately, Defendant HD Vest moves the Court to stay potentially burdensome discovery in this matter because of the Court's expressed concerns on whether it can exercise subject-matter jurisdiction over this case in light of certain CAFA exceptions.   (DE 135). Although the Court still shares those concerns, it is apparent from the Parties' previous briefing on the issue that the Parties do not have sufficient information yet on certain issues, including the composition of the putative class, to determine whether a CAFA exception would apply.  In any case, the Plaintiffs and two Defendants believe that no CAFA exception applies.  In light of the fact that this Court facially has subject-matter jurisdiction over this suit, and only may be prevented from exercising it should the CAFA exception apply, I decline to stay discovery. *See Hunter v. City of Montgomery, Ala.*, 859 F.3d 1329, 1334 (11th Cir. 2017); 28 U.S.C. § 1332(d). However, should certain facts come to light during discovery that would suggest a CAFA exception may apply in this matter, any party is invited to seek leave of Court to brief the issue provided the party sets forth its specific basis for the potential applicability of the statute in its motion.

## VI.   CONCLUSION

The Kornfeld and Klager Defendants' motions to dismiss the sale of unregistered securities claims under Florida law are denied.  The Kornfeld, Klager, and Knowles Defendants' motions to dismiss the negligent misrepresentation claim are granted, and their motions to dismiss the negligence and breach of fiduciary duty claim are denied.  All External Sales Agent Defendants' motions to dismiss the civil conspiracy and aiding and abetting breach of fiduciary claim are granted.  All corporate Defendants' motions to dismiss the vicarious liability claim are granted.

36

Plaintiffs may attempt to re-plead the negligent misrepresentation, aiding and abetting breach of fiduciary, civil conspiracy, and vicarious liability claims in an amended complaint.  In filing any amended complaint, Plaintiffs should make all efforts to clarify exactly which factual allegations support which claims against which Defendants.[6]  Accordingly, it is hereby

**ORDERED AND ADJUDGED** that

1. Defendant HD Vest's Motion to Stay Discovery Pending a Determination of this Court's Subject Matter Jurisdiction (DE 135) is **DENIED**.

2. Defendant James H. Gilchrist's Motion to Join the Motions to Dismiss (DE 111) is **GRANTED**.

3. Motions to Dismiss filed by the following Defendants are **GRANTED**:

   a. HD Vest (DE 63);

   b. Kovack Securities, Inc. (DE 64);

   c. The Wieniewitz Defendants (DE 65);

   d. Jerry Davis Raines  (DE 66);

   e. The Hannah Defendants (DE 69);

   f. GBH (DE 70);

   g. The OSFG Defendants (DE 74);

   h. The Paramount Defendants (DE 75);

   i. The Shield Defendants (DE 79).

4. Motions to Dismiss filed by the following Defendants are **GRANTED IN PART**:

   a. The Kornfeld Defendants (DE 41);

   b. The Klager Defendants (DE 53);

---

[6] Although virtually all Defendants moved to dismiss this action based on the fact that the FAC was a shotgun pleading, I decline to dismiss Plaintiffs' pleading on that basis.

    c.  The Knowles Defendants (DE 94).

5.  Plaintiffs' claims for negligent misrepresentation (Counts IV, V, VI), aiding and abetting breach of fiduciary duty (Count X), civil conspiracy (Count XIII), and vicarious liability (Count XIV) are dismissed without prejudice.  By **August 29, 2018**, Plaintiffs must file any amended complaint consistent with this Order.  In doing so, Plaintiffs may also add any claims they intend to assert against GBH as an auditor, and Plaintiff Hermant Nanavaty may attempt to plead a claim for sale of unregistered securities against the Knowles Defendants (DE 102 at 21 n.3).

**DONE AND ORDERED** in Chambers, West Palm Beach, Florida, on this _17_ day of August, 2018.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

CC: Counsel of record;
    James H. Gilchrist, *pro se*